**JEFFREY K. STARNES**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**P.O. Box 3447**
**Great Falls, MT  59403**
**119 First Ave N., Suite 300**
**Great Falls, MT  59401**
**Phone:   (406) 761-7715**
**FAX:      (406) 453-9973**
**E-mail:  Jeff.Starnes@usdoj.gov**

**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**GREAT FALLS DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>vs.<br><br>**STANLEY PATRICK WEBER**<br><br>Defendant. | **CR-18-14-GF-BMM**<br><br>**UNITED STATES' RESPONSE TO MOTION TO SUPPRESS STATEMENTS (Doc. 21)** |

## BACKGROUND

On February 7, 2018, a grand jury charged Weber by indictment with five counts of sexual misconduct with two male child victims on the Blackfeet Indian Reservation.  (Doc. 1).  It is alleged that Weber sexually abused the victims between 1992 and 1995, when Weber was a pediatrician for the Indian Health

1

Service ("IHS") assigned to Browning, Montana. In approximately June 1995, Weber transferred to the Pine Ridge Indian Reservation in South Dakota where he continued to work as a physician and pediatrician for over 20 years. During his tenure at Pine Ride, new allegations surfaced that Weber sexually abused young boys. An investigation ensued.

## RELEVANT FACTS

On May 19, 2016, at approximately 3:40 pm, Special Agent Fred Bennett, criminal investigator for the Bureau of Indian Affairs, encountered Weber in his truck on the Pine Ridge Reservation while Weber was stopped in traffic due to road construction. SA Bennett contacted Special Agent Curt Muller, criminal investigator for the Department of Health and Human Services Office of Inspector General ("HHS/OIG"), and notified Muller that he was going to approach Weber to see if Weber would agree to be interviewed by law enforcement. Bennett made contact with Weber and asked Weber to wait with him in a parking lot for Muller to arrive.

At approximately 3:45 pm, Muller arrived at the parking lot, showed Weber his credentials, and notified Weber that he and Bennett wanted to speak with Weber about a matter pertaining to the IHS. The agents informed Weber that he did not need to participate in an interview and he could refuse the agents' request if he wished. Weber agreed to participate in an interview at his government quarters

in Pine Ridge. Weber, Muller and Bennett left the parking lot and drove to Weber's home.

At the home, the agents and Weber proceeded to a living room/kitchen area where they remained for the duration of the interview. Prior to the interview, the agents again advised Weber that the interview was voluntary, that he was not under arrest, that he could refuse to answer any or all questions, that he could terminate the interview at any time, and that he could ask the agents to leave at any time. Weber stated that he understood and agreed to continue with the interview. The interview was documented by audio recording which was subsequently transcribed. A copy of both the recording and transcription has been previously disclosed to the defense.

During the interview, Weber discussed his knowledge of and relationship with several juvenile males during his time on the Pine Ridge Reservation, including three males who are the subject of the United States' notice of intent to offer evidence under 414. (Doc. 33 Weber). Weber admitted to knowing those three individuals but denied having a sexual relationship them.

Weber also discussed his tenure as a pediatrician on the Blackfeet Indian Reservation in the early to mid-1990s. He stated that he worked at the IHS Hospital in Browning, Montana from 1992 to 1995. He admitted that, while there, he sometimes allowed minors to stay at his government quarters. Although he

could not recall any of their names, this happened several times per year. He also admitted that he was investigated while he working in Browning after he was found drinking alcoholic beverages in his government quarters.

Weber filed a motion to suppress the statements he made to Special Agents Muller on Bennett at his home on May 19, 2016. (Doc. 21). He argues that his statements were not voluntarily made because "they were the result of entrapment or overreaching deportment by federal officers." (*Id*. at 1). The United States disagrees. As discussed more fully below, Weber's motion should be denied because it was not the product of physical or psychological coercion or improper inducement.

## ARGUMENT

1. **Weber's statements to Special Agents Muller and Bennett were voluntary.**

"Any criminal trial use against a defendant of his involuntary statement is a denial of due process of law, 'even though there is ample evidence aside from the confession to support the conviction'". *Mincey v. Arizona*, 437 U.S. 385 (1978) (citing *Jackson v. Denno*, 378 U.S. 368, 376 (1964)). To determine if a statement is voluntary, the court must decide, under a totality of the circumstances, whether the statement was obtained by physical or psychological coercion or by improper inducement so that the suspect's will was overborne. *United States v. Fisher*, 137 F.3d 1158, 1165 (9th Cir. 1998).

4

The defendant's state of mind is not enough to render a statement involuntary. *Colorado v. Connelly*, 479 U.S. 157, 165–66 (1986). Instead, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.' " *Id.* at 167. The focus is on whether the confession was obtained in a manner "so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). Factors that bear on voluntariness include: (1) the defendant's youth; (2) the defendant's intelligence; (3) lack of advice of constitutional rights; (4) the length of detention; (5) the repeated and prolonged nature of the questioning; and (6) the use of physical punishment such as deprivation of food or sleep. *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003).

Here, there is no evidence that law enforcement used deception, coercive means, or improper inducement to obtain Weber's statements. To the contrary, the interview proceeded in a typical, professional manner. Moreover, each of the factors identified in *Haswood* show that Weber's statements were voluntary.

To begin with, at the time of the interview, Weber was 67 years old. Thus, he was not particularly youthful. Weber was a medical doctor with more than 20 years of experience as a practicing pediatrician. Thus, he possessed at least average intelligence and likely, well-above average intelligence, at the time of the interview. Though not it custody, SA Muller nevertheless advised Weber that his

5

participation was completely voluntary and that he could stop questioning at any time:

> SPECIAL AGENT CURT MULLER: Okay, great. Now I want you to know upfront you don't need to talk to us, you don't have to talk to us. If you decide to talk to us and we ask question you don't want to answer obviously you don't have to answer them. If you say I'm done talking, you're done talking. If you want us to leave, we leave. We're not here to arrest anybody. We don't have any warrants. We don't have any indictments. We don't have any charges, anything like that. So when we're done today, you go wherever you go and we go wherever we go. You're not going with us. Okay? You're not in custody. Alright? I want you to know that up front. And if you get questions along the way I just want to be honest with you, that's the situation we're in. This is a voluntary contact and when you're done with it, you're done with it. Okay? And that's up to you. And I appreciate you inviting us into your house.

Thus, although not required, Weber did receive a substantial warning about his Constitutional rights.

Additionally, Weber was not detained, the interview took place in his home, questioning lasted from approximately 3:53 pm until approximately 6 pm – a total of just over two hours, and the agents did not use any "enhanced interrogation techniques" such as deprivation of food or sleep. There were no promises that were made, there were no offers of immunity, the agents did not try to manipulate or trick Weber, they did not lie to him, and they did not use any physical or psychological coercion. This was a simple question and answer session in a suspect's home and certainly not law enforcement conduct that is "so offensive to a civilized system of justice that it must be condemned." *Miller,* 474 U.S. at 109.

In sum, the totality of the circumstances surrounding Weber's interview reveal no untoward conduct by law enforcement that would render Weber's statements involuntary. Thus, Weber's motion to suppress should be denied.

### 2. "Entrapment" is a trial defense that has no impact on the analysis of voluntariness of a defendant's confession.

Weber argues his statements should be suppressed because they are the product of entrapment. (Doc. 21 at 1). Weber's argument is erroneous.

To begin with, an entrapment defense concedes that that defendant committed the criminal conduct at issue, but argues that he not be held responsible because the government improperly induced the conduct. More precisely, a valid entrapment defense has two related elements: "government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in criminal conduct." *Mathews v. United States*, 485 U.S. 58, 63 (1988). "Predisposition…focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *Id.* at 63 (citations and internal quotation marks omitted). "[T]he fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution." *Jacobson v. United States*, 503 U.S. 540, 548, (1992) (internal quotation marks omitted). If the defendant is able to put entrapment in issue, the

government bears the burden of negating the defense beyond a reasonable doubt. *See Id.* at 548–49.

However, these cases illustrate that entrapment relates to a defendant's conduct, not to a defendant's statements about the conduct. Weber's argument to the contrary confuses the issues. Thus, when determining whether Weber's statements should be suppressed, the proper analysis focuses on whether they were voluntary or involuntary. As argued more fully above, Weber's statements to law enforcement are clearly voluntary and are thus admissible against him at trial.

Moreover, the Supreme Court has held that whether the government entrapped the defendant is for the jury rather than the court to decide. *See Sorrells v. United States,* 287 U.S. 435 (1932). *See also Erwing v. United States*, 394 F.2d 829, 830 (9th Cir. 1968); *Pulido v. United States*, 425 F.2d 1391 (9th Cir. 1970). Thus, entrapment is a trial issue, not a pretrial issue.

Finally, it is highly doubtful that Weber will be entitled to an entrapment instruction at trial because he has denied committing the sexual assaults at issue and "[a]bsent the commission of a crime, there can be no entrapment." *Ramirez v. United States*, 294 F.2d 277, 283 (9th Cir. 1961); *Ortega v. United States*, 348 F.2d 874, 876 (9th Cir. 1965). As in *Dunbar v. United States*, 342 F.2d 979 (9th Cir. 1965), where Dunbar claimed he acted as a mere office boy in delivering the narcotics, but denied a sale, the defendant is precluded from urging this defense

and at the same time raising the defense that he was entrapped into the making of a sale. *Garibay-Garcia v. United States*, 362 F.2d 509, 510 (9th Cir. 1966) (internal citations and quotations omitted). Thus, unless Weber concedes that he sexually assaulted the victims in this case but only because he was improperly induced to do so by the government, the entrapment defense is irrelevant to this prosecution for sexual assault.

## CONCLUSION

Based on the foregoing, Weber's statements to Special Agents Muller and Bennett are clearly voluntary. Accordingly, his motion to suppress statements should be denied.

## REQUEST FOR HEARING AND POTENTIAL WITNESSES

Pursuant to Local Rule CR 47.2(e), the United States advises that it believes the Court can decide this motion by reviewing the defendant's recorded interview and the transcript of that interview without the need of a suppression hearing and oral argument. However, if the Court determines that a hearing and argument are necessary, the United States may call the following witnesses to testify at the hearing:

1. SA Curt Muller, HHS/OIG;
2. SA Fred Bennett, BIA

## EXHIBITS

As part of its response, the United States submits the following exhibits for the Court's consideration of the defense motion:

A. Compact disk containing audio recording of the defendant's interview with law enforcement on May 19, 2016.

B. Transcript of the defendant's interview with law enforcement on May 19, 2016, 135 pages (provided by electronic disk).

Respectfully submitted this 30th day of April, 2018.

                         KURT G. ALME
                         United States Attorney

                         /s/ Jeffrey K. Starnes
                         Assistant U.S. Attorney
                         Attorney for Plaintiff

## CERTIFICATE OF COMPLIANCE

Pursuant to D. Mont. CR 47.2, the attached response is proportionately spaced, has a typeface of 14 points or more, and the body contains 2,159 words.

/s/ Jeffrey K. Starnes
Assistant U.S. Attorney
Attorney for Plaintiff
