**JEFFREY K. STARNES**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**P.O. Box 3447**
**Great Falls, MT 59403**
**119 First Ave. North, #300**
**Great Falls, MT 59401**
**Phone: (406) 761-7715**
**FAX: (406) 453-9973**
**Email: Jeff.Starnes@usdoj.gov**

**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**STANLEY PATRICK WEBER**<br><br>**Defendant.** | **CR 18-14-GF-BMM**<br><br><br>**UNITED STATES RESPONSE TO DEFENDANT'S MOTION FOR DISCLSOURE PURSUANT TO RULES 404(b) AND 609, FEDERAL RULES OF EVIDENCE (Doc. 22).** |

## INTRODUCTION

Weber moves the Court for an order requiring the United States to disclose

evidence that it intends to use against the defendant under Federal Rules of

Evidence 404(b) and 609.    The United States hereby provides the following.

## LAW AND ARGUMENT

### I.        Rule 404(b) Evidence

As a general rule, evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.    Fed. R. Evid. 404(b)(1). However, such evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident, provided, in a criminal case, the prosecution provides reasonable notice of its intent to use such evidence.    Fed. R. Evid. 404(b)(2). Rule 404(b) is "one of inclusion which admits evidence of other crimes or acts relevant to an issue in the trial, except where it tends to prove *only* criminal disposition." *United States v. Rocha,* 553 F.2d 615, 616 (9th Cir.1977) (emphasis in original).

The Ninth Circuit generally applies a four-part test to determine the admissibility of evidence under Rule 404(b).    *United States v. Kindred,* 931 F.2d 609, 612–13 (9th Cir.1991).   The Court considers:   (1) whether there is sufficient evidence to conclude that the prior crime occurred; (2) whether the evidence is too remote in time; (3) whether the offenses are similar; and, (4) whether the prior act is offered to prove a material element of the offense.    *Id.*

2

The Ninth Circuit has held that "other acts" evidence, is properly admitted under Federal Rule of Evidence 404(b) if it directly corroborates significant testimony by prosecution witnesses.   *See United States v. Pitts,* 6 F.3d 1366, 1370-71 (9th Cir.1993) (Rule 404(b) evidence can be admitted solely to corroborate crucial prosecution testimony if "the matter corroborated [is] significant and the corroboration [is] direct").   "Significant" evidence is usually understood to mean important – as distinct from trivial – evidence in a trial.   *Id.* at 1370.   "Direct" corroborating evidence is evidence that is not wholly disconnected, remote, or collateral to the matter corroborated.   *Pitts*, 6 F.3d at 1370-71.

"In addition to satisfying the four part test, evidence of other crimes must also satisfy the Rule 403 balancing test – its probative value must not be substantially outweighed by the danger of unfair prejudice."   *United States v. Montgomery*, 150 F.3d 983, 1000 (9th Cir. 1998).   The government bears the burden of proving that the proffered 404(b) evidence passes the four-pronged Ninth Circuit test and the Rule 403 balancing test.

### A.   Summary of testimony for the charged offenses in the present case.

Weber was licensed to practice medicine in 1984.   In 1986, he began working for the Indian Health Service ("IHS").   The charged offenses in this case are alleged to have occurred between 1992 and 1995 when Weber was assigned to

the Blackfeet Indian Reservation.

**1.     Testimony of Montana Victim R.F.H.**

R.F.H. will testify that he first met Weber at the Nurturing Center in Browning, Montana, when he was approximately 10 years old.   R.F.H. stayed at the Nurturing Center because his parents were divorcing and were not around. Weber maintained a small office at the Nurturing Center where he would see and treat mostly adolescent males.   R.F.H. had behavior problems and was getting into trouble, so he would go to Weber's office and talk about his mom and dad and how it was affecting him.

R.F.H. will testify that there were times when he was alone with Weber in the office and Weber would try to get him to touch Weber's penis and Weber would try to touch his penis.   Weber coerced R.F.H. to engage in the sexual touching by telling him that if he did it, Weber would help him to go back to his parents.   Weber also told R.F.H. if he told anyone about the touching, they would get in trouble and he would not be able to see his parents again.

In another incident at the Nurturing Center in 1993 or 1994, Weber placed his mouth on R.F.H.'s penis and performed oral sex on him.   During this incident, Weber kissed him on his stomach, chest, neck, face, and lips.

R.F.H. recalls that Weber also made him perform oral sex during a "check-

up" on at least one occasion.   During this incident, R.F.H. recalls Weber

ejaculating into a tissue after Weber forced him to engage in oral sex.

In another incident, R.F.H. was lying on a table during an "exam" and

Weber attempted to insert his penis into R.F.H.'s anus.   R.F.H. prevented Weber

from inserting his penis because "it felt wrong" and Weber abandoned the attempt.

However, Weber told R.F.H. not to tell anyone or he wouldn't be able to see his

parents.   In a similar incident, Weber attempted to sit on R.F.H.' penis during a

"check-up" but had to abandon that attempt.

Finally, R.F.H. recalls that Weber would invite R.F.H. over to his home on

occasion.   While there, Weber would give him soda, candy, and small amounts of

money.

### 2.   Testimony of Montana Victim G.R.C.

G.R.C. first met Weber at Weber's house on the in Browning, Montana,

because several boys around his age would go to Weber's house to "hang out" at

Weber's invitation.   G.R.C. believes he was in middle school and approximately

13 years of age at the time he first met Weber.

G.R.C. made frequent trips to Weber's house and spent time inside the house

both with other boys and alone.   At the home, G.R.C. and other boys played a

stereo, watched television, played video games, ate food such as pizza and

popcorn, and drank sodas.   On several occasions, Weber provided alcohol –

typically vodka mixed with soda or a fruit beverage – for the boys to drink with

him.   Weber provided the food, drinks, and entertainment at no cost.

Weber gifted items like clothing to some of the boys and recalls Weber

giving him and others small amounts of cash.   Weber also took G.R.C. on several

trips.   On one occasion, Weber took G.R.C. and other boys to the Pizza Hut in Cut

Bank, Montana.   On another occasion, Weber took several boys on a hiking trip in

the mountains by Upper Two Medicine.   Weber always provided transportation

for these trips in his personal vehicle and always covered all of the expenses for the

trips including gas, food, and lodging.

G.R.C. recalls Weber touching him in uncomfortable ways.   For example,

Weber would rub his hand over G.R.C.'s head, neck, and shoulders and also gave

him hugs.   One night, when he was alone at Weber's home, Weber came home

intoxicated.   G.R.C. was on the couch in the living room playing video games

when Weber arrived.   Weber approached him asked G.R.C. to give him oral sex.

Weber was acting like he was going to unzip his pants during the request.   G.R.C.

refused Weber's sexual advances and walked out of the house.

On another occasion, G.R.C. passed out on Weber's couch after drinking

alcohol.   When he woke up, Weber was standing over him and was naked from

the waist down.   Weber was masturbating his own penis while using his other hand to fondle G.R.C.'s penis and testicles over the clothing.

**B.     Summary of evidence offered under Fed. R. Evid. 404(b)**

The following statements of proposed testimony have been previously disclosed to the defense.

**1.     M.F.H. (Victim R.F.H.'s brother):**   He recalls being treated by Weber when Weber worked on the Blackfeet Indian Reservation around 1992-1994.   Weber frequently came to speak with kids at the middle school.   The kids called Weber "Uncle Bad Touch" because he always tried to hug and rub them in uncomfortable ways.   He remembers seeing Weber at the hospital, the middle school, and the Nurturing Center in Browning.

**2.     Joshua Spotted Eagle:**   He met Weber when he was approximately 13 years old at a counseling session where middle school-aged kids would talk about their problems.   Various boys around his age would hang out at Weber's house in Browning at Weber's invitation.   At these visits, the boys drank soda, had snacks, played video games, and earned money by mowing his lawn.   Joshua never saw any adults at Weber's house and only saw a few girls there.   Eventually Weber invited Spotted Eagle and other boys to stay at his house overnight.   This happened around the summer of 1994.

7

Joshua recalls Weber took him and several other boys on an overnight trip to Kalispell where they stayed in a motel.   He remembers Weber taking several boys swimming and hiking at Many Glacier and Upper Two Medicine.   Joshua also remembers Weber would touch the boys on their head, neck, and shoulders and he would give hugs on occasion when he was intoxicated.

3.    **Wes Spotted Eagle**:   He first met Weber when he was approximately 14 or 15 years old.   He recalls going to Weber's house at Weber's invitation.   He and several other boys played video games, listened to music, watched movies, drank soda, and ate food.   He does not recall seeing alcohol at Weber's house but does recall that Weber had condoms openly available for any boy who wanted/needed them.   He also recalled spending the night on several occasions at Weber's house.

4.    **Robert Ahenakew, III**:   He first met Weber when he was 12 or 13 years of age at a group session for kids who got in trouble at Browning Middle School.   During the group sessions, Weber showed them movies about sex and the proper use of condoms.   He went to Weber's home with several other boys to eat pizza and drink wine.   He recalls staying overnight at Weber's house on several occasions with other boys about his age.   Ahenakew recalls Weber taking several boys on an overnight trip to Missoula and he also remembers Weber taking some

boys his age on a trip to Great Falls.

5.    **Justin Meineke:**   He met Weber at Weber's home when he was in middle school in Browning.   He spent time at Weber's house with several other boys around his age.   He recalls getting sodas, snacks and cash at Weber's house. He and his friends "stole" a box of wine from Weber.   He does not recall seeing any other adults or girls at Weber's house.   Meineke took an overnight trip with Weber and approximately five other boys to Kyiyo Days in Missoula.   Weber paid for the trip and they stayed in a motel room.   The boys stayed in one room and Weber stayed in a separate room.   He also recalls going to Upper Two Medicine Lake with Weber and several other boys when it was frozen.

6.    **Mark Galbreath**:   He first met Dr. Weber in 8th grade at the middle school in Browning.   He met Weber at a group session for boys who got in trouble.   He recalled going to Weber's house on two occasions.   During the first occasion, Weber provided them with pizza and during the second occasion, Weber took them to Subway for a meal.   Galbreath attended an overnight trip to Missoula with about five other boys for Kyiyo Days.   They stayed at a motel and Weber paid for the trip.

7.    **Dr. Becky Foster:**   She worked with Weber at IHS in Browning. She worked as a pediatrician and Weber worked mainly with adolescent males.

9

Weber tended to see boys who were between 11 and 14 years old, but recalls Weber preferring to see boys who were 12 or 13.   Weber was prone to treating boys who were from broken homes, poor, slender, and "on the fringes of life." Dr. Foster recalls that some of the boys Weber treated had the surname "F.H."

She recalls a time when she stopped for ice cream in Havre and saw five boys she recognized from Browning come in accompanied by Weber.   The boys appeared to be 12 or 13 years old and Weber was dressed as a teenager in "baggie clothes."   Weber was well known around the reservation for having parties with young boys at his house.

8.    **Dr. Dan Foster:**   He was employed at Blackfeet IHS Hospital in Browning from June 1994 to June 1995 where he first met Weber.   He became concerned that Weber was seeing boys in middle school for group counseling sessions.   Weber did not like to treat female patients.   Weber was also known to have boys over to his house.   He believes Weber saw multiple boys with the last name "F.H."   He voiced his concerns to IHS management including Mary Ellen LaFromboise.

9.    **Mary Ellen LaFramboise**:   She worked as the Browning IHS Hospital Service Unit Director from the early 1990's to 1996 and recalls working with Weber.   Her interest was spiked when Weber wanted to conduct group

counseling sessions with children. The sessions took place at his home in Browning and would also include group outings.   She recalls that, over time, "it became obvious that something was going on."   A complaint was raised by a family member of one of the boys and the complaint was sent to the Billings Area IHS but she does not who the complainant was or who received the complaint in Billings.

She recalls a complaint where a housekeeper walked into a room and found Weber with a boy.   Either Weber or the boy was in the process of pulling up the zipper of his pants and it looked suspicious.   She also recalls having concerns about after hours clinics that Weber was conducting.   She recalls speaking with a Billings IHS Assistant Area Director and Area Chief Medical Officer about her concerns.   At the time, it was standard procedure for a problem medical provider to be removed from a facility and assigned elsewhere.

**10.     Dr. Mary Cecillia DeRosier**:   She began working at the IHS hospital in Browning in June 1995 and worked with Weber for one month before he left the facility.   She recalls Dan Foster bringing his concerns about Weber to IHS Administration in Browning.   She recalls Foster was concerned about Weber taking trips with boys "to the mountains."   She recalls Foster was also concerned that boys had been seen at Weber's house in Browning and his interactions did not

seem to be appropriate.

**11.    Timothy Davis**:    He is a former IHS maintenance employee in Browning.   He began working in that capacity in 1988.   He recalls Dr. Weber living in IHS campus housing and he conducted an inspection on the housing unit assigned to Weber when Weber was in Browning.   During the inspection, he saw items in the basement of Weber's home including treats, games, candy bars, and sodas, all of which appeared to be for kids.   He recalls thinking it was strange for a medical provider with no spouse and no kids to have these items in his home. He also remembers speaking with security staff members who saw several 12-13 year-old boys at Weber's home on multiple occasions.

**13.    Dr. Mark Butterbrodt:**   He first met Weber when he moved to Pine Ridge, SD in 1995.   Weber tended to focus his practice on skinny teenage boys and did not like to treat teenage girls.   Weber also did not like to treat overweight teenagers, he didn't like to see babies.   Weber billed himself as an adolescent specialist.   This seemed strange because Weber focused his practice on the healthiest segment of the population – athletic, normal weight, teenage boys.

On one occasion, Weber showed Butterbrodt a method he utilized for alleviating headaches that consisted of shoulder and head massage.   Butterbrodt found this suspicious because it has no in conventional practice.

12

### C.    Analysis

First, it is doubtful that the evidence outlined above qualifies as "another crime" under Rule 404(b).   Most of the proposed evidence merely describes Weber's conduct, habits and interests, as observed by others, while he lived and worked on the Blackfeet Reservation.   Thus, the proposed testimony does not implicate Rule 404(b).   Even if the proposed testimony constitutes "other acts" evidence, it is properly admitted if it directly corroborates significant testimony by a prosecution witness.   *Pitts,* 6 F.3d at 1370-71.

Here, the proposed testimony satisfies that standard.   This is a case involving historical allegations of sexual abuse from more than 20 years ago. There are no photographs of injuries, no DNA kits, and no forensic testing. Consequently, the prosecution's case will rest almost exclusively on the testimony of the two victims.   Moreover, R.F.H. is presently serving a lengthy prison sentence for robbery.   Thus, the victim's credibility is highly significant and will be the key issue at trial.   Each of the government's corroboration witnesses will verify aspects of the victims' testimony that have a direct connection with the charged offenses, including Weber's preference to treat boys that are roughly 12-13 years old, his treating them at the hospital as well as the nurturing center, his engaging them at middle school, and providing entertainment, treats, and alcohol at

13

his home.

Apart from corroboration, the testimony of the government's proposed "other acts" witnesses should be admitted for other purposes authorized by Rule 404(b).   For example, Weber's conducting clinics at the middle school is relevant to his knowledge that the boys he interacted with were under the age of 16.   His teaching them about sexual education and providing them condoms is circumstantial evidence that he had a plan to desensitize the boys to sexual activity. His inviting them to his home, and providing entertainment, snacks, money and trips, is additional evidence of his plan to help them feel comfortable around him and perhaps make them dependent on him.   And finally, his providing underage adolescent boys with alcohol and allowing them to stay the night at his house is evidence that he had the opportunity to commit the crimes alleged.

Turning to the first factor in the Ninth Circuit's four-part test for admissibility under 404(b), Weber disclosed to law enforcement during his interview in May 2016 that he sometimes allowed boys to stay at his home in Browning.   Additionally, each proposed witness will testify their personal knowledge of Weber's behavior.   Thus, there is sufficient evidence to conclude that these prior acts occurred.

14

Second, the witnesses will testify about Weber's activities during the charged timeframe or shortly thereafter.   When considering the age of the 404(b) evidence, it is important to note that remoteness in time is examined in the context of the other prongs of the test.   *United States v. Spillone*, 879 F.2d 514, 519 (9th Cir.1989) ("Depending upon the theory of admissibility and the similarity of the acts, for example, some remote acts may be extremely probative and relevant.")

Third, most of the witness' testimony will mirror acts described by the victims.   Thus, they are sufficiently similar to be admissible under Rule 404(b).

Fourth, the other acts are offered to corroborate the victims' testimony. Because their credibility will be the most significant factor at trial, the corroboration testimony is offered to prove material elements of the charged offenses.

The final potential impediment to the introduction of 404(b) evidence is the balancing test under Rule 403.   The Court must determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. Here, that balancing test leans heavily in favor of the government.   The probative value of the evidence—corroboration of victim testimony in a historical sexual assault case—cannot be overstated, particularly when his defense will likely hinge on victims' lack of credibility.   Moreover, the danger of <u>unfair</u> prejudice under

15

Rule 403 can be overcome by providing a limiting instruction to the jury concerning their consideration of the 404(b) evidence.

## II.      Rule 609

A copy of the defendant's criminal history has been previously disclosed to the defense.    The United States does not intend to introduce any evidence against the defendant under Federal Rule of Evidence 609 during its case-in-chief.

## CONCLUSION

For the above reasons, the prosecution should be permitted to present evidence of the above-identified corroboration evidence under Federal Rule of Evidence 404(b).

DATED this 30th day of April, 2018.

KURT G. ALME
United States Attorney


/s/ *Jeffrey K. Starnes*
JEFFREY K. STARNES
Assistant U.S. Attorney

16

## CERTIFICATE OF COMPLIANCE

I hereby certify that this notice is proportionately spaced, has a typeface of

14 points or more, and the body of the brief contains 3,446 words.

DATED this 30th day of April, 2018.

KURT G. ALME
United States Attorney


/s/ *Jeffrey K. Starnes*
JEFFREY K. STARNES
Assistant U.S. Attorney

17