**JEFFREY K. STARNES**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**P.O. Box 3447**
**Great Falls, MT 59403**
**119 First Ave. North, #300**
**Great Falls, MT 59401**
**Phone: (406) 761-7715**
**FAX: (406) 453-9973**
**Email: Jeff.Starnes@usdoj.gov**

**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**STANLEY PATRICK WEBER**<br><br><br>**Defendant.** | **CR 18-14-GF-BMM**<br><br><br>**SECOND NOTICE PURSUANT TO FED. R. EVID. 413 & 414** |

### Introduction

The United States of America, represented by Jeffrey K. Starnes, Assistant

United States Attorney for the District of Montana, hereby provides this second

notice, pursuant to Fed. R. Evid. 413 and 414, of its intent to offer evidence that

the defendant committed other, uncharged acts of child molestation and sexual assault while he worked as a physician for the Indian Health Service ("IHS") on the Pine Ridge Indian Reservation in South Dakota.   This notice is intended to supplement the United States' first notice of intent to offer evidence under Rules 413 and 414 (doc. 33), and addresses newly discovered information by a previously unknown victim.

Trial in this matter is currently scheduled to begin on August 6, 2018.   The United States disclosed the evidence discussed in this additional notice to the defense on July 3, 2018.   The disclosure consisted of an audio recording of the victim's interview, a transcript of the recording, and a report summarizing the interview.

**Proposed Testimony of South Dakota Victim D.J.M.**

D.J.M. met Weber as a young IHS patient at the Pine Ridge Indian Reservation in South Dakota.   D.J.M. was in elementary school when he first started seeing Weber as a patient.   D.J.M. will testify that during the time that Weber treated him, Weber sexually abused him multiple times.   He specifically recalls the following four instances of abuse.

a)  First Incident:

D.J.M. saw Weber at the IHS hospital for a physical.   D.J.M. believes he

was in 3rd or 4th grade at the time and estimates he was perhaps 7 or 8 years old, but he does not recall his exact age.[1]   D.J.M. was alone in the examination room with Weber and was wearing sweatpants.   During the examination, Weber had D.J.M. lay down on his back in a supine position and started rubbing D.J.M.'s chest and stomach area with his hand.

Weber next moved to rubbing D.J.M.'s groin and the inside of D.J.M.'s leg near his genitals.   D.J.M. "giggled" because it tickled when Weber touched him there.   Weber next removed D.J.M.'s sweatpants, exposed D.J.M.'s genitals, and rubbed D.J.M.'s penis with his hand.   D.J.M. recalls that his penis became erect and "he did not know what to think" about it.   Weber then slid his hand down and inserted one of his own fingers, without gloves, into D.J.M.'s anus.   D.J.M. recalled that it hurt.   Weber withdrew his finger when a nurse unexpectedly knocked on the door to the examination room.

After the "examination," D.J.M. recalls that Weber spoke to his mother. D.J.M. heard Weber tell his mother that Weber would be his provider and that that he wanted to see D.J.M. again "soon" for another "check-up."   D.J.M. did not tell his mother what had taken place in the examination room.

---

[1] D.J.M. was born in 1986.   Weber did not transfer to Pine Ridge until 1995.   It is therefore almost certain that D.J.M. was at least nine years old when he first started seeing Weber as a patient at Pine Ridge IHS.

b) <u>Second Incident</u>:

A short time after the first incident, D.J.M. had another patient visit with Weber at Pine Ridge IHS.   During the second visit, D.J.M. and Weber were again with one another in an examination room.   D.J.M. will testify that Weber asked if D.J.M. remembered the last visit and Weber wanted to know if D.J.M. told anyone about the "examination" he performed.   D.J.M. told Weber that he did not tell anyone about what happened.   Weber then told D.J.M. that he needed to "finish" what he started during the first examination, but that they were going to do things "differently this time" because it hurt D.J.M. last time.

D.J.M. will testify that Weber had him take his shirt off while Weber pulled out some metal steps attached to the examination table.   Weber next had D.J.M. stand on the second step facing away from Weber.   Weber instructed D.J.M. to remove his (D.J.M.'s) pants and underwear and D.J.M. complied.   At this point, D.J.M. was naked and standing at the examination table while Weber was seated on a chair behind him.   Weber then opened a drawer in the room, and took out a rubber glove, and a bottle of "something."   Weber spread D.J.M.'s buttocks and inserted one of his (Weber's) fingers into D.J.M.'s anus.   D.J.M. recalls that having Weber's finger inside his anus hurt, but Weber told him to "relax" and this was something he "had to do to all the kids."

4

D.J.M. recalls Weber started moving his finger in and out of D.J.M.'s anus and asked D.J.M. how it felt.   D.J.M. told Weber it made him feel like he "had to go to the bathroom" but it did not hurt.   Weber next told D.J.M. that he was going to try two fingers and he began to penetrate D.J.M.'s anus with two fingers. D.J.M. told Weber it hurt but Weber told D.J.M. "we have got to do it, so just relax."   While penetrating D.J.M.'s anus, Weber simultaneously manipulated D.J.M. penis and testicles until D.J.M. ejaculated.   Weber told D.J.M. it was "normal for boys to do that."   D.J.M. recalls this was the first time in his that he ejaculated.

At the conclusion of this "patient visit," Weber told D.J.M. he would set it up so that D.J.M. saw Weber on a regular basis.   D.J.M.'s visits to the hospital became more frequent and D.J.M. recalls having patient visits with Weber on multiple occasions per month and sometimes they would take place once per month or once every few months.

c)  <u>Third Incident</u>:

D.J.M. cannot recall the reason he was being seen on this patient visit with Weber, but can remember being alone with Weber in an examination room.   At the beginning of the visit, Weber told D.J.M. that they were going to do the "same thing, just a little different" during this visit.   Weber asked D.J.M. if he

remembered the last visit and D.J.M. confirmed that he did.   Weber asked, "Does

that sound good with you, or that's all right with you, right?"   Weber then had

D.J.M. remove his own shirt and jeans.   Weber next had him stand on the first step

of the examination table instead of the second step.   Weber then said he needed

D.J.M. to "just lean forward and relax."   D.J.M. was positioned facing away from

Weber and continued standing on the first step of the examination table while

leaning forward on the table.

D.J.M. looked back and saw Weber with a bottle of clear liquid, which

D.J.M. thought to be a lubricant.   While standing behind D.J.M., Weber inserted

one finger into D.J.M.'s anus.   Weber was not wearing any rubber gloves at the

time, but he did have lubricant on his finger.   Weber eventually inserted two

fingers into D.J.M.'s anus.   D.J.M. next recalls hearing a sound like a belt buckle

loosen and Weber placing a cold hand on his back.   Weber then inserted his penis

in D.J.M.'s anus multiple times, causing D.J.M. pain and discomfort.

When Weber was finished, he helped D.J.M. put his clothes back on.

Weber asked D.J.M. if it hurt and offered to give D.J.M. some medication.   Weber

then took several pills out of a drawer and gave them to D.J.M. for the pain.

At the conclusion of this visit, Weber discussed the confidentiality of the things

that took place in the examination room.   D.J.M. will testify that he believed what

6

happened in the examination room was normal and he did not understand at the time that what happened to him was wrong.   D.J.M. further recalls that he felt sick to his stomach after this patient visit.   At home, D.J.M. used the bathroom for a bowel movement later that day and he observed blood in the toilet.

d) <u>Fourth Incident</u>:

D.J.M. recalled another time when he met with Weber at the IHS Hospital for a patient visit.   On this occasion, Weber performed fellatio on D.J.M.'s penis. During this event, D.J.M. ejaculated into Weber's mouth.   D.J.M. believes that he was approximately eleven years old at the time, but he cannot be sure of his exact age.

**Law and Argument**

The United States incorporates by reference the law and argument previously discussed in its first notice of intent to offer evidence under rules 413/414.   (Doc. 33).   For the same reasons discussed there, the United States should be entitled to offer the testimony discussed above during its case-in-chief.

As with the other victims previously discussed, Weber's acts of sexual abuse against D.J.M. are sufficiently similar to the charged offenses in this case to be admissible at trial.   Specifically, D.J.M.'s testimony further highlights how the defendant used his position as a pediatrician to gain access to adolescent males

under the guise of conducting "examinations" when, in reality, he was sexually abusing them.

Weber's abuse of D.J.M occurred during the same time frame that he was sexually abusing the other South Dakota victims.   The abuse of Montana victims R.F.H. and G.R.C. occurred between 1992 and 1995, beginning when R.F.H. was approximately 11 and G.R.C. was approximately 13 years old.   Weber's abuse in Montana ceased only when transferred from the Blackfeet Indian Reservation to the Pine Ridge Indian Reservation in 1995.   The abuse of South Dakota victims P.T.B., E.H.H., and F.G., began in May 1998 and continued through approximately June 2011.   D.J.M. was born in 1986 and would have been 11 years old in approximately 1997.   D.J.M.'s account is thus substantially similar in time to the accounts of the other South Dakota victims and the Montana victims and illustrates Weber's frequent and continuing pattern of abuse.   The evidence thus supports the testimony that will be provided at trial by Montana victims F.F.H. and G.R.C.

Finally, it must be reiterated that Rules 413 and 414 favor the admissibility of other sexual assaults for any "matter to which it is relevant," including the defendant's propensity to commit another sexual molestation.   *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1268 (9th Cir. 2000) ("It is generally accepted that a defendant with a propensity to commit acts similar to those charged

is more likely to have committed the charged act than another and therefore such evidence is relevant . . . .").   Moreover, congressional intent is to liberally admit evidence of prior uncharged sex offenses.   *United States v. Benally*, 500 F.3d 1085, 1090 (10th Cir. 2007).

Here, the evidence of Weber's sexual abuse of yet another adolescent male victim shortly after he left one reservation and took up the same position on another reservation is both helpful and necessary to the prosecution's case.   This is especially true where, as here, the prosecution's case will rest largely upon the testimony and credibility of the victims.

As previously argued in its first notice, and restated here, congress recognized that in "most rape or molestation cases, it is the word of the defendant against the word of the victim [;] if the defendant has committed similar acts in the past, the claims of the victim are more likely to be considered truthful if there is substantiation of other assaults."   140 Cong. Rec. H5437-03, H5439.   The fact that Weber continued to sexually abuse adolescent males on the Pine Ridge Reservation shortly after his transfer from the Blackfeet Reservation provides significant and compelling corroboration of R.F.H.'s and G.R.C.'s testimony.

## Conclusion

Based on the foregoing, the United States should be permitted to offer

D.J.M.'s testimony during its case-in-chief pursuant to Fed. R. Evid. 413 and 414.

DATED this 6th day of July, 2018.

KURT G. ALME
United States Attorney


/s/ *Jeffrey K. Starnes*
JEFFREY K. STARNES
Assistant U.S. Attorney

**Certificate of Compliance**

I hereby certify that this notice is proportionately spaced, has a typeface of 14 points or more, and the body of the brief contains 1,996 words.

DATED this 6th day of July, 2018.

KURT G. ALME
United States Attorney


/s/ *Jeffrey K. Starnes*
JEFFREY K. STARNES
Assistant U.S. Attorney