JEFFREY K. STARNES
LORI HARPER SUEK
Assistant U.S. Attorneys
U.S. Attorney's Office
P.O. Box 3447
Great Falls, MT  59403
119 First Ave. North, Suite 300
Great Falls, MT  59401
Phone:   (406) 761-7715
FAX:     (406) 453-9973
E-mail:  Jeff.Starnes@usdoj.gov
         Lori.Suek@usdoj.gov

ATTORNEYS FOR PLAINTIFF
UNITED STATES OF AMERICA

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

| UNITED STATES OF AMERICA, | CR 18-14-GF-BMM |
|---|---|
| Plaintiff, | |
| vs. | UNITED STATES' TRIAL BRIEF |
| STANLEY PATRICK WEBER, | |
| Defendant. | |

The United States of America by and through counsel, Jeffrey K. Starnes
and Lori Harper Suek, Assistant United States Attorneys for the District of
Montana, hereby submit the United States' trial brief.

# INTRODUCTION

On February 7, 2018, a Grand Jury in the District of Montana charged Weber by indictment with five counts of sexual misconduct with two different juvenile male victims between 1992 and 1995. Counts I and II charge Weber with aggravated sexual abuse of a child, in violation of 18 U.S.C. §§ 1152 and 2241(c). Count III charges Weber with attempted aggravated sexual abuse of a child, in violation of 18 U.S.C. §§ 1152 and 2241(c). Count IV charges Weber with attempted sexual abuse of a minor, in violation of 18 U.S.C. §§ 1152 and 2243(a). Count V charges Weber with abusive sexual contact of a minor, in violation of 18 U.S.C. §§ 1152 and 2244(a)(2).

# ELEMENTS

In order for the defendant to be found guilty of the charges contained in the indictment, the government must prove each of the following elements beyond a reasonable doubt.

Aggravated Sexual Abuse of a Child (Counts I and II):

- **First**, the defendant knowingly engaged in a sexual act with R.F.H.;

- **Second**, at the time, R.F.H. was under 12 years of age;

- **Third**, the victim, R.F.H., is an Indian person; and

- **Fourth**, the crime occurred within the exterior boundaries of the Blackfeet Indian Reservation.

As charged in Count I of the Indictment, "sexual act" means that the defendant placed his mouth on R.F.H.'s penis, and that the defendant caused R.F.H. to put his mouth on the defendant's penis.

As charged in Count II of the Indictment, "sexual act" means the defendant touched R.F.H.'s penis with his hands and caused R.F.H. to touch the defendant's penis with R.F.H.'s hands, with an intent to abuse, humiliate, degrade, arouse, and gratify the sexual desire of the defendant.

Attempted Aggravated Sexual Abuse of a Child (Count III):

- **First**, the defendant intended to engage in a sexual act with R.F.H.;

- **Second**, at the time, R.F.H. was under 12 years of age;

- **Third**, the defendant did something that was a substantial step towards committing the crime;

- **Fourth**, the victim, R.F.H., is an Indian person; and

- **Fifth,** the crime occurred within the exterior boundaries of the Blackfeet Indian Reservation.

As charged in Count III of the Indictment, "sexual act" means that the defendant attempted to insert his penis in R.F.H.'s anus and that the defendant attempted to cause R.F.H. to insert R.F.H.'s penis in the defendant's anus.

Attempted Aggravated Sexual Abuse of a Minor (Count IV):

- **First**, the defendant intended to engage in a sexual act with G.R.C., who

had reached the age of twelve years but had not yet reached the age of sixteen years;

- **Second**, G.R.C. was at least four years younger than the defendant;

- **Third**, the defendant did something that was a substantial step towards committing the crime;

- **Fourth**, the victim, G.R.C., is an Indian person; and

- **Fifth,** the crime occurred within the exterior boundaries of the Blackfeet Indian Reservation.

As charged in Count IV of the Indictment, "sexual act" means that the defendant exposed his penis to G.R.C. and asked G.R.C. to allow the defendant to place his penis in G.R.C.'s mouth.

<u>Abusive Sexual Contact of a Minor (Count V)</u>:

- **First**, the defendant knowingly engaged in sexual contact with G.R.C.;

- **Second**, G.R.C. was incapable of appraising the nature of the conduct;

- **Third**, the victim, G.R.C., is an Indian person; and

- **Fourth**, the crime occurred within the exterior boundaries of the Blackfeet Indian Reservation.

As charged in Count V of the Indictment, "sexual contact" means that the defendant touched G.R.C.'s penis through the clothing with his hand.

## PLEA CONSIDERATIONS

The United States notes for the record that the government and defense discussed a number of informal plea options that would have saved the government from the time and expense of preparing for trial and which would have been more beneficial to the defendant than a conviction following trial. *See Missouri v. Frye*, 132 S. Ct. 1399 (2012).

## LENGTH OF TRIAL AND WITNESSES

The United States anticipates calling approximately 23 witnesses. Its case-in-chief should take approximately three days after jury selection, subject to cross-examination.

## ANTICIPATED PROOF

Weber was a pediatrician for the Public Health Service and Indian Health Service ("IHS") for more than 20 years. Beginning in 1992, until approximately July 1995, he was assigned to the Blackfeet Indian Reservation. While assigned there, Weber made it known to medical personnel and hospital staff that he preferred to treat adolescent children, as opposed to infants or young children, and favored treating male patients over female patients. Weber was known to conduct after hours patient visits at the hospital and was seen on one occasion dragging a couch into his provider room and shutting the door behind him.

As part of his practice, Weber performed community outreach services,

such as providing physicals for juvenile males who would be participating in sports activities.  Weber also volunteered to provide counseling services at the local middle school for adolescent male students who got into trouble during class.

In addition to these activities, Weber frequently hosted juvenile males from the Browning community at his home.  To entice these adolescents to his home, Weber provided food, snacks, soda pop, candy, video games, and on occasion, alcohol.  Weber also spoke to these individuals about sex and made condoms and lubricant available free of charge.  Weber sometimes gave the adolescent males who came to his home gifts in the form of small amounts of money, and sometimes he would hire juvenile males to work in his yard for cash.  Girls were rarely seen at Weber's home and adults were never around.

On occasion, Weber took groups of adolescent males on overnight trips to places like Missoula and Kalispell.  Weber provided food, lodging, and transport for the trip at his own expense.  Weber also took groups of boys swimming and hiking in areas in an around the Blackfeet Reservation.

<u>Weber's Abuse of R.F.H.</u>

In 1993 or 1994, Weber came into contact with R.F.H., who was then 10 or 11 years old.  When R.F.H. first met Weber, he was staying at the Nurturing Center in Browning, Montana, because his parents were divorcing and were unable to care for him.  R.F.H. believes Weber maintained a small office at the Nurturing

Center where he would see and treat mostly adolescent males. R.F.H. had behavior problems and was getting into trouble, so he would go to Weber's office and talk with Weber about his parents' divorce and how it was affecting him.

R.F.H. will testify that there were times when he was alone with Weber in the office and Weber would try to get him to touch Weber's penis and Weber would try to touch his penis. Weber coerced R.F.H. to engage in the sexual touching by telling him that if he did it, Weber would help him get back to his parents. Weber also told R.F.H. if he told anyone about the touching, they would get in trouble and he would not be able to see his parents again.

In another incident Weber placed his mouth on R.F.H.'s penis and performed oral sex on him. During this incident, Weber kissed him on his stomach, chest, neck, face, and lips. R.F.H. recalls that Weber also made him perform oral sex during a "check-up" on at least one occasion. During this incident, R.F.H. recalls Weber ejaculating into a tissue after Weber forced him to engage in oral sex.

In another incident, R.F.H. was lying on a table during an "exam" and Weber attempted to insert his penis into R.F.H.'s anus. R.F.H. prevented Weber from inserting his penis because "it felt wrong" and Weber abandoned the attempt. However, Weber told R.F.H. not to tell anyone or he wouldn't be able to see his parents. In a similar incident, Weber attempted to sit on R.F.H.' penis during a

"check-up" but had to abandon that attempt.

Finally, R.F.H. recalls that Weber would invite R.F.H. over to his home on occasion. While there, Weber would give him soda, candy, and small amounts of money.

Weber's Abuse of G.R.C.

G.R.C. first met Weber at Weber's house in Browning, because several boys around his age would go to Weber's house to "hang out" at Weber's invitation. G.R.C. believes he was in middle school and approximately 13 years old.

G.R.C. made frequent trips to Weber's house and spent time inside the house both with other boys and alone. At the home, G.R.C. and other boys played a stereo, watched television, played video games, ate food such as pizza and popcorn, and drank sodas. On several occasions, Weber provided alcohol – typically vodka mixed with soda or a fruit beverage – for the boys to drink with him.

Weber gifted items like clothing to some of the boys and recalls Weber giving him and others small amounts of cash. Weber also took G.R.C. on several trips. On one occasion, Weber took G.R.C. and other boys to the Pizza Hut in Cut Bank, Montana. On another occasion, Weber took several boys on a hiking trip in the mountains by Upper Two Medicine.

G.R.C. recalls Weber touching him in uncomfortable ways. For example,

Weber would rub his hand over G.R.C.'s head, neck, and shoulders and also gave him hugs.  One night, when he was alone at Weber's home, Weber came home intoxicated.  G.R.C. was on the couch in the living room playing video games when Weber arrived.  Weber approached him asked G.R.C. to give him oral sex.  Weber was acting like he was going to unzip his pants during the request.  G.R.C. refused Weber's sexual advances and walked out of the house.

On another occasion, G.R.C. passed out on Weber's couch after drinking alcohol.  When he woke up, Weber was standing over him and was naked from the waist down.  Weber was masturbating his own penis while using his other hand to fondle G.R.C.'s penis and testicles over the clothing.

<u>Weber Abuses P.T.B. in South Dakota</u>

In approximately July of 1995, Weber left the Blackfeet Reservation and was assigned to the Pine Ridge Reservation in South Dakota.   While there, he met P.T.B., an IHS patient who was then approximately 11 years old.

Weber engaged in sexual intercourse with P.T.B approximately two to four times per week from the time P.T.B. was 12 to 15 years old.  The sexual activity usually occurred in Weber's bedroom in his government quarters on the Pine Ridge Reservation.  Weber provided P.T.B. with various items of value each time they engaged in sexual activity, including money, food, shoes, clothing, alcohol, and a video gaming system.

In December 2004, P.T.B. was in a juvenile detention center in Rapid City, South Dakota. Weber signed him out for a pass and engaged in sexual acts with P.T.B. at a Motel 6 while P.T.B. was on release.

This evidence will be offered under Rules 413 and 414. (*See* Doc. 33).

Weber Abuses E.H.H. in South Dakota

Weber was E.H.H.'s pediatrician from the time he was a baby until he was 21 years old. The first time E.H.H. went to Weber's home, occurred when E.H.H. was approximately 15 years old. On that occasion, E.H.H. encountered Weber in the Pine Ridge IHS parking lot when Weber was leaving work. Weber invited E.H.H. to his house to watch a football game. E.H.H. agreed and went to the basement area of Weber's home to watch the game. Weber offered soda and chips to E.H.H. Sometime after halftime, Weber moved over to the sofa and sat next to E.H.H., put his arm around E.H.H., rubbed E.H.H.'s leg and inner thigh, undid the button of E.H.H.'s jeans, zipped down E.H.H.'s jeans, and asked E.H.H. to take his jeans off. During this time, Weber removed his own pants and masturbated E.H.H.'s penis. Weber simultaneously masturbated his own penis until both he and E.H.H. ejaculated.

During a second incident when E.H.H. was approximately 15, Weber invited E.H.H. to his home for beer. When they arrived, Weber told E.H.H. to go to the basement where there was a jug of clear liquor mixed with a fruity beverage.

Weber gave E.H.H. two OxyContin tablets and told E.H.H. to wash them down with the alcoholic drink. After that, they watched pornography together for a period of time and Weber propositioned E.H.H. for both oral and anal sex, telling E.H.H. to "name your price." When E.H.H. refused the invitation, Weber became upset. E.H.H. eventually blacked out. When he came to, he was naked on Weber's bed and his rectum was sore.

In a third encounter at Weber's home, again when E.H.H. was approximately 15, Weber gave E.H.H. marijuana. He subsequently engaged in nonconsensual anal intercourse with E.H.H. Afterwards, Weber gave E.H.H. $600 in cash and took him shopping.

In a fourth encounter, Weber found E.H.H. walking around the Pine Ridge Reservation one day and demanded that E.H.H. get into his car. In the glove box, Weber had a bottle of pills and instructed E.H.H. to take three of them. He subsequently took E.H.H. to his home and penetrated E.H.H.'s anus without his consent. E.H.H. tried to get away but could not because Weber locked his bedroom door. When E.H.H. was finished, he gave E.H.H. several dozen "high quality pain killers" for his personal use.

This evidence will be offered under Rules 413 and 414. (*See* Doc. 33).

Weber Abuses F.G. in South Dakota

Weber was F.G.'s pediatrician at Pine Ridge. When F.G. was approximately

11 years old, Weber treated him at the hospital for a school physical. During the exam, F.G.'s mom was out of the room. Weber grabbed F.G.'s testicles and penis and "rubbed" F.G.'s penis with his hand until it became erect. Weber photographed F.G.'s penis and his buttocks. When he was finished, Weber said "this is our little secret and you don't need to tell your mom or nobody."

During a second visit to IHS when F.G. was approximately 11 years old, Weber treated F.G. for the flu. Weber told F.G. he "had to see if any liquids were coming from him" and told F.G. to drop his pants. Weber the rubbed F.G.'s penis until he ejaculated.

During a third visit to IHS when F.G. was approximately 12 years old, Weber performed another genital examination on F.G. During this "exam," Weber kneeled down with his face just inches from F.G.'s exposed penis and testicles. Weber then masturbated F.G. until F.G. ejaculated.

When F.G. was 13 years old, Weber invited F.G. to his home to make money by mowing the lawn and cleaning his basement. While F.G. was packing up items in the basement, Weber came downstairs with a six-pack of Budweiser beer and offered some to F.G. After F.G. drank three beers, Weber propositioned F.G. for oral sex, telling him "if you want to get paid, you have to earn it." F.G. eventually acquiesced and Weber inserted his penis into F.G.'s mouth. When Weber finished, he told F.G. that he would give him money any time F.G. needed

it.  He then gave F.G. $100 and said "you're not the only one who does this."

This evidence will be offered under Rules 413 and 414.  (*See* Doc. 33).

<u>Weber Abuses D.J.M. in South Dakota</u>

D.J.M. met Weber as a young patient at Pine Ridge IHS.  D.J.M. was in elementary school when he first started seeing Weber as a patient.

D.J.M. recalls seeing Weber at the hospital for a physical when he was in 3rd or 4th grade and estimates he was perhaps 7 or 8 years old.[1]  D.J.M. was alone in the examination room with Weber.   During the exam, Weber rubbed D.J.M.'s chest and stomach area with his hand, he rubbed D.J.M.'s groin and the inside of D.J.M.'s leg near his genitals, Weber rubbed D.J.M.'s penis with his hand, and penetrated D.J.M.'s anus with his finger.

A short time after the first incident, D.J.M. had another patient visit with Weber at Pine Ridge IHS.  During the visit, D.J.M. and Weber were again with one another in an examination room. Weber told D.J.M. that he needed to "finish" what he started during the first examination.  Weber had D.J.M. stand naked on the second step of an examination table facing away from Weber.  Weber subsequently inserted one of his fingers into D.J.M.'s anus and moved it back and forth until D.J.M. felt like he "had to go to the bathroom."  Weber next used two fingers to

---

[1] D.J.M. was born in 1986.  Weber did not transfer to Pine Ridge until 1995.  It is therefore almost certain that D.J.M. was at least nine years old when he first started seeing Weber as a patient at Pine Ridge IHS.

penetrate D.J.M.'s anus while simultaneously manipulating D.J.M.'s penis and testicles until D.J.M. ejaculated.

During a third visit to IHS, Weber told D.J.M. that they were going to do the "same thing, just a little different." Weber instructed D.J.M to stand on the first step of the examination table and to "just lean forward and relax." D.J.M. looked back and saw Weber with a bottle of clear liquid, which D.J.M. thought to be a lubricant. Weber next inserted one finger and eventually two fingers into D.J.M.'s anus. Finally, Weber inserted his penis in D.J.M.'s anus and thrusted multiple times, causing D.J.M. pain and discomfort. D.J.M. felt sick to his stomach after this patient visit. Later that day, at home, D.J.M. used the bathroom for a bowel movement and he observed blood in the toilet.

D.J.M. recalled another time when he met with Weber at the IHS Hospital for a patient visit. On this occasion, Weber performed fellatio on D.J.M.'s penis. During this event, D.J.M. ejaculated into Weber's mouth. D.J.M. believes that he was approximately eleven years old at the time, but he cannot be sure of his exact age.

This evidence will be offered under Rules 413 and 414. (*See* Doc. 49).

## ANTICIPATED EXHIBITS

1. R.F.H.'s tribal enrollment certificate;

2. G.R.C.'s tribal enrollment certificate;

3.   Excerpts of the Federal Registrar;

4.   R.F.H.'s Records from the Blackfeet Nurturing Center;

5.   R.F.H.'s treatment records from IHS

## ANTICIPATED WITNESSES

1.   R.F.H.;

2.   G.R.C.;

3.   P.T.B.

4.   E.H.H.

5.   F.G.

6.   D.J.M.

7.   M.F.H. (R.F.H.'s brother)

8.   Justin Meineke

9.   Joshua Spotted Eagle;

10.   Weston Spotted Eagle;

11.   Robert Ahenakew, III;

12.   Mark Galbreath;

13.   Aaron Reevis

14.   Dr. Rebecca "Becky" Foster;

15.   Dr. Dan Foster;

16.   Mary Ellen LaFramboise;

17.     Dr. Mary DeRosier;

18.     Timothy Davis;

19.     Ronald Crawford;

20.     Dawn Bremner;

21.     Dr. Mark Butterbrodt;

22.     Misty Hall

23.     SA Curt Muller, HHS/OIG

## ANTICIPATED LEGAL ISSUES

### I.    The defendant's statements to others are non-hearsay and admissible into evidence.

Rule 801(d)(2) defines a party-opponent's statement as non-hearsay, meaning it can be admitted as substantive evidence. Fed. R. Evid. 801(d)(2). This evidence, which is any statement made by a defendant, is admissible as a result of the "adversary system." *Advisory Committee Notes*, Fed. R. 801(d)(2). The party-opponent rule has enjoyed the "freedom" from the strict requirements that other rules might require, such as expert testimony. The courts should instead give "generous treatment" of such statements and admit them into evidence. *Id.*

In this case, the United States will introduce various statements that the defendant made to others. In particular, the defendant participated in an interview with law enforcement on May 19, 2016 wherein he discussed matters that are relevant to this case. The United States anticipates that some of the defendant's

statements to law enforcement will be introduced through the testimony of SA Curt Muller.  During an earlier hearing on a defense motion to suppress his statements, the Court found that the defendant was not in custody and that his statements to law enforcement were voluntary.  (*See* Docs. 21, 35, and 50).

The Court may also hear testimony from victim R.F.H. G.R.C., and others, that the defendant told them various things while he was sexually abusing them to earn their trust and keep them silent about the abuse.  The Court may also hear testimony from other members of the community and hospital staff who interacted Weber during the time that he worked as a pediatrician at IHS.  When the United States offers the defendant's statements into evidence at trial, they are non-hearsay statements by a party opponent and should be admitted for their truth.  Fed. R. Evid. 801(d)(2).

## II.     Other crimes, wrongs, or acts evidence (Fed. R. Evid. 404(b)).

As a general rule, evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.  Fed. R. Evid. 404(b)(1).  However, such evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident, provided, in a criminal case, the prosecution provides reasonable notice of its intent to use such evidence.  Fed. R. Evid. 404(b)(2).

Rule 404(b) is "one of inclusion which admits evidence of other crimes or acts relevant to an issue in the trial, except where it tends to prove <u>only</u> criminal disposition." *United States v. Rocha,* 553 F.2d 615, 616 (9th Cir.1977) (emphasis in original). The Ninth Circuit generally applies a four-part test to determine the admissibility of evidence under Rule 404(b). *United States v. Kindred,* 931 F.2d 609, 612–13 (9th Cir.1991). The Court considers: (1) whether there is sufficient evidence to conclude that the prior crime occurred; (2) whether the evidence is too remote in time; (3) whether the offenses are similar; and, (4) whether the prior act is offered to prove a material element of the offense. *Id.*

The Ninth Circuit has held that "other acts" evidence, is properly admitted under Federal Rule of Evidence 404(b) if it directly corroborates significant testimony by prosecution witnesses. *See United States v. Pitts,* 6 F.3d 1366, 1370-71 (9th Cir.1993) (Rule 404(b) evidence can be admitted solely to corroborate crucial prosecution testimony if "the matter corroborated [is] significant and the corroboration [is] direct"). "Significant" evidence is usually understood to mean important – as distinct from trivial – evidence in a trial. *Id.* at 1370. "Direct" corroborating evidence is evidence that is not wholly disconnected, remote, or collateral to the matter corroborated. *Pitts*, 6 F.3d at 1370-71.

As the Court is aware, the United States previously provided notice of its intent to offer evidence that might implicate Rule 404(b). (*See* Doc. 36). This

notice was the subject of an earlier motions hearing, during which the Court deferred ruling on the matter until trial. (*See* Doc. 50).

The United States wishes to again note that much of the notice previously provided does not implicate Rule 404(b). To the extent it does, the notice covers proposed evidence that will corroborate the testimony of one or more prosecution witnesses. It is therefore properly admitted under Rule 404(b) and *Pitts*.

Apart from corroboration, many witnesses will testify to their observations of the defendant's actions and statements that establish his pattern of offending. These activities include his grooming potential victims with gifts of money, candy, video games, alcohol, food, trips, teaching them about sexual activity, making condoms and lubrication available for them to use, etc., earning his victims' trust, isolating the victim, and sexually abusing the victim. This testimony is relevant to show that Weber had a plan, pattern, motive, method of offending, and opportunity to sexually abuse his victims. With a limiting instruction about the proper use of this evidence, Rule 404(b) expressly allows this testimony to be admitted at trial.

In addition to the above, the United States notes that it will continue to interview witnesses as it prepares for trial. It is possible that some of these witnesses may disclose information that would be admissible under Rule 404(b). Should that occur, the United States will provide notice of intent to use such evidence to the Court and the defense as soon as possible.

### III. Similar crimes in sexual abuse and child molestation cases (Fed. R. Evid. 413 and 414).

In a criminal case in which the defendant is accused of sexual assault or child molestation, Rules 413 and 414 allow the Court to admit evidence that the defendant admitted any other act of sexual assault or child molestation and that evidence may be considered on any matter to which it is relevant. Fed. R. Evid. 413(a) and 414(a).

In this case, the United States has provided three notices of its intent to evidence that Weber committed other acts of sexual abuse and child molestation. (*See* Docs. 33, 49, and 74). The first two notices were discussed at the motions hearing in this case and the Court deferred ruling on the admissibility of the proposed evidence until trial. (*See* Doc. 50).

Since the hearing, a witness that was previously known to the prosecution and defense as a potential fact witness in this case, disclosed to law enforcement, for the first time, that Weber had sexually abused him during the same general time period as the charged offenses in this case. The witness made the disclosure between 5:00 p.m. and 5:30 p.m. on July 24, 2018, 13 days before trial in this matter. (*See* Doc. 74-1). The United States provided a copy of the report containing the disclosure to the defense the following morning. On the evening of July 25, 2018, the United States filed its third notice of intent to offer evidence under Rules 413 and 414. (Doc. 74).

The defense objects to the admissibility of the newly discovered evidence and argues that the disclosure is untimely under Rules 413 and 414. (*See* Doc. 76). Under Rules 413(a) and 414(a), if the prosecution intends to utilize evidence that the defendant committed other acts of sexual assault or child molestation, it must provide notice at least 15 days before trial, <u>or a later time that the Court allows for good cause</u>. Fed. R. Evid. 413(b) and 414(b) (emphasis added).

The defense is correct in that the government did not provide notice of the evidence proffered in its third notice until 12 days before trial. However, the witness who will provide the proffered evidence did not disclose the incident to law enforcement, or any other person, until 13 days before trial. Once it learned of the disclosure, the prosecution promptly notified the defense and the Court of its intent to use the newly discovered information at trial. Clearly, the United States has shown good cause for providing notice within 15 days of trial and thus should not be prohibited from introducing the witness' testimony on grounds that disclosure was untimely. Fed. R. Evid. 413(b) and 414(b).

Moreover, the witness who will testify to the evidence described in the United States' Third Notice of 413/414 Evidence, is a witness whose factual testimony was previously known to the parties. In fact, a summary of his potential testimony – minus the sexual assault encounter with the defendant – was previously provided to the defense. (*See* Doc. 36). Thus, at least a portion of the

witness' testimony should not be a surprise to the defendant.  Finally, the circumstances surrounding the encounter with Weber began under the same circumstances as described in the United States' Notice under 404(b).  And, Weber will be free to cross examine the witness and probe the witness' veracity for failing to disclose the information to law enforcement during his first interview on the subject matter.  Thus, Weber will not be <u>unfairly</u> prejudiced by the admission of the victim's testimony at trial.  Accordingly, the United States should be permitted to introduce the evidence contained in its Third Notice of 413/414 Evidence at trial.

Finally, the United States notes that it will continue to interview witnesses as it prepares for trial.  It is possible that some of these witnesses may disclose information that would be admissible under Rules 413 or 414.  (*See e.g.* Doc. 74).  Should that occur, the United States will provide notice of intent to use such evidence to the Court and the defense as soon as possible.

DATED this 30th day of June, 2018.

KURT G. ALME
United States Attorney


<u>/s/ Jeffrey K. Starnes</u>
JEFFREY K. STARNES
Assistant U.S. Attorney