**JEFFREY K. STARNES**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**P.O. Box 3447**
**Great Falls, MT  59403**
**119 First Ave. North, Suite 300**
**Great Falls, MT  59403**
**Phone:   (406) 761-7715**
**FAX:     (406) 453-9973**
**E-mail:  Jeff.Starnes@usdoj.gov**

**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** Plaintiff, vs. **STANLEY PATRICK WEBER,** Defendant. | CR 18-14-GF-BMM **SENTENCING MEMORANDUM** |

### INTRODUCTION

Stanley Weber is a pedophile.  For over two decades, he used his position as a pediatrician with the Indian Health Service to gain access to vulnerable prepubescent males, and subsequently committed terrible acts of sexual abuse upon his victims under the guise of providing them with "medical treatment."  While

1

living and working on the Blackfeet Indian Reservation, Weber lured young juvenile males to his home by providing them with alcohol, pizza, soda, ice cream, video games, money, clothing, and overnight trips both on and off the reservation. Once isolated with these children, Weber seized his opportunity to act upon his deviant sexual desires by engaging in forced or coerced sexual activity with them. Weber leveraged his position within IHS and the communities where he worked and lived to gain the trust of many of his coworkers and supervisors, allowing him to survive multiple allegations and investigations into his suspicious behavior.

Although the crimes at issue in this case occurred more than 20 years ago, Weber has never had to face the consequences of his actions. In fact, when questions were raised about his behavior, he simply moved to a new community where he continued his pattern of criminality. Meanwhile, his victims grew up, saddled with confusion, shame, and fear that they could not reveal what happened to them as children, lest they face further embarrassment and ridicule from members of their community. The impact of Weber's crimes ultimately manifested in his victims in the form of legal problems, drug and alcohol abuse, the inability to maintain steady relationships, and a struggle to lead a normal and productive life.

Even after his conviction, Weber continues to be unapologetic for his actions and shows no remorse for his victims or the harm he inflicted upon them. In fact,

it is doubtful that he views his actions as criminal at all. His decades of predatory sexual abuse of children are among the most heinous and serious crimes cognizable by federal criminal law. At nearly 70 years of age, and with no sign of remorse, there is no reason to believe that Weber either recognizes the severity of his crimes or any realistic hope that he can ever be rehabilitated. Accordingly, justice demands that Weber face a severe sentence despite the age of his misconduct in this case. The United States recommends a punishment at the top of the guideline range, consisting of 235 months of imprisonment, a $200,000 fine, a $400 special assessment, and 17 total years of supervised release to follow his release from prison.

## OUTSTANDING OBJECTIONS TO THE PSR

As of the date of this filing, there are no outstanding objections to the updated draft PSR.[1]

## WEBER'S GUIDELINE SENTENCE CALCULATIONS

The updated draft PSR correctly calculates Weber's guideline sentence. Because Weber would face significantly harsher penalties for his convictions on Counts I-III of the indictment if he committed those crimes on or after July 27, 2006,

---

[1] The United States notes that, as of the date of this filing, only an updated draft PSR has been provided by the United States Probation Office and a final PSR will not be released until approximately one week before sentencing. In order to comply with the Court's scheduling order for the filing of sentencing memoranda, the United States is basing its analysis in this memorandum upon the updated draft PSR and may supplement this memorandum in the future if the final PSR proves to be materially different from the updated draft PSR.

including a mandatory 360 months to lifetime imprisonment and a base offense level of 38 on each of Counts I-III respectively, the 1995 Sentencing Guidelines Manual is properly used to calculate Weber's sentence here since use of the current Guidelines Manual would violate the *ex post facto* clause of the Constitution. USSG § 1B1.11(a). PSR ¶ 31.

## I. Weber's Guideline Imprisonment Range

The adjusted offense level for each of Counts I-III is 33. PSR ¶¶ 33-53. The adjusted offense level for Count V is 12. PSR ¶¶ 54-60. After applying the multiple count adjustments to each of Weber's counts of conviction, and receiving no reduction for acceptance of responsibility, Weber's total offense level on all counts of conviction is 36. PSR ¶¶ 61-67. Weber has no criminal history points, resulting in a criminal history category of I. PSR ¶¶ 71-72.

With a total offense level of 36 and a criminal history category of I, Weber's total guideline imprisonment range of imprisonment is **188 to 235 months**. PSR ¶ 118; USSG § 5A.

## II. Weber's Guideline Fine Range

According to the 1995 Guidelines manual, the fine range for a total offense level of 36 is $20,000 to $200,000. USSG § 5E1.2(c)(3).

//

//

### III. Weber's Guideline on Supervised Release

Counts I-III are each a Class A felony. Thus, Weber's guideline range of supervised release is three to five years on each count. USSG § 5D1.2(a)(1). Count V is a class E felony, resulting in a guideline range of supervised release of one year for that count. USSG § 5D1.2(a)(3).

## SENTENCING ANALYSIS

Section 3553(a) of Title 18 of the United States Code contains prefatory language —"The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Those purposes include the need for the sentence to:

- reflect the seriousness of the offense;
- promote respect for the law;
- provide just punishment for the offense;
- afford adequate deterrence to criminal conduct;
- protect the public from further crimes of the defendant; and,
- provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In addition, subsection (1) of § 3553(a) requires the Court to consider the nature and circumstances of the offense and the history and characteristics of the defendant; subsection (3) requires the Court to consider the kinds of sentences

available; subsections (4), (5), and (6) require the Court to consider the sentencing guidelines and policy statements, and to avoid unwarranted sentencing disparity; and subsection (7) requires the Court to provide restitution to victims.

## I. The Offense Conduct

Between 1992 and 1995, Weber served as a pediatrician for the Indian Health Service on the Blackfeet Indian Reservation. During that time, Weber saw patients at the IHS clinic in Browning, and he served on a multidisciplinary team that met weekly to identify at-risk youth on the reservation. PSR ¶ 24. After a time, it became apparent to his colleagues that Weber preferred to focus his practice almost exclusively on the treatment of prepubescent adolescent males from vulnerable home environments. *Id.*

At some point during his stint on the Blackfeet Reservation, Weber encountered victim R.F.H. and his brother, at the nurturing center in Browning. PSR ¶ 21. At trial, R.F.H. testified and described an unstable home life growing up. He indicated that he and his siblings would sometimes stay at the nurturing center which he described as an orphanage or group home for kids. *Id.* R.F.H. remembered that he was 10 or 11 years old when he encountered Weber at the nurturing center, and recalled that he was a physician. *Id.* R.F.H. recalled that Weber would "treat" him during medical appointments in a room at the nurturing center or sometimes at the clinic. *Id.*

6

R.F.H. testified that during these various "treatment sessions," Weber touched him in a sexual way by kissing his lips, face, neck and chest. *Id.* R.F.H. described that Weber touched his penis and had R.F.H. touch Weber's penis. *Id.* R.F.H. described more than one occasion when Weber performed oral sex upon him by placing his mouth on R.F.H.'s penis and that he had R.F.H. perform oral sex on him in the same manner. *Id.* R.F.H. also testified about an instance in which Weber attempted to have anal intercourse with him but was unsuccessful. *Id.*

R.F.H. revealed that Weber's abuse stopped when R.F.H. left the reservation prior to his twelfth birthday. R.F.H. admitted that he did not disclose any of the abuse that had occurred until a Bureau of Indian Affairs investigator located him in a federal prison approximately 21 years later and asked him about it. *See Id.* He admitted that he was angry and humiliated about what happened and did not want anyone to know about his abuse. In the intervening years, he joined a gang, used drugs, committed serious acts of violence, and spent significant time in prison. *See Id.*

G.R.C. testified at trial that he met Weber when he was 15 or 16 years old and he accompanied several of his juvenile male friends to Weber's home on multiple occasions. PSR ¶ 22. G.R.C. recalled Weber inviting boys who lived on the reservation to his home to "hang out." *Id.* At the home, Weber supplied the

boys, free of charge, with alcohol, pizza, ice cream, soda, condoms, a stereo, video games, and small amounts of cash. PSR ¶¶ 22-23. G.R.C. recalled boys becoming intoxicated and spending the night at Weber's home. PSR ¶ 22. On one occasion, G.R.C. fell asleep on Weber's couch after drinking and awoke to Weber standing over him and masturbating himself while he simultaneously rubbed G.R.C.'s penis over his clothing. PSR ¶ 22-23. On another occasion, he recalled being alone at Weber's home when Weber walked in, was obviously intoxicated, and asked G.R.C. to perform oral sex on him. PSR ¶ 23.

Another witness, J.M. testified that he recalled a time when he was 14 or 15 when Weber took him and a group of his friends on an overnight trip to Missoula, Montana, without any other adults. PSR ¶ 20. Weber and the boys stayed in a motel. *Id*. J.M. recalled that he went to take a shower when nobody else was in the motel room; and, when he got out of the shower, Weber was standing by the bathroom door. *Id*. When J.M. exited the shower and was completely naked, a fully-clothed Weber approached him and touched his penis. *Id*. J.M. pushed Weber's hands away and left the bathroom. *Id*. None of the other boys on the trip were around to see what happened. *Id*.

In mid-1995, Weber left the Blackfeet Indian Reservation and was reassigned to the Pine Ridge Indian Reservation. *See* PSR ¶ 12. Shortly after his arrival, Weber began to treat D.J.M. at the IHS clinic in Pine Ridge. D.J.M.

testified that he met Weber when he was brought to IHS to be treated for asthma. D.J.M. described several encounters with Weber at the hospital where Weber digitally penetrated his anus with his fingers, and instances where Weber forced him to engage in anal and oral intercourse.[2]

Yet another witness, F.G., testified that he met Weber at the IHS hospital in Pine Ridge when he was approximately 11 years old. F.G. testified that during multiple "examinations" over the years, Weber masturbated him to ejaculation on more than one occasion and photographed F.G.'s penis and buttocks on one occasion. He also described an occasion when Weber offered to pay F.G. to come to his home on Pine Ridge and clean his basement. When F.G. arrived, Weber provided him with alcohol and coerced F.G. into providing Weber with oral sex. F.G. testified that he was approximately 13 years old at the time.[3]

In addition to the above, the United States provided notice of two other potential witnesses who encountered Weber on the Pine Ridge reservation and who would have testified to similar acts of sexual abuse. (*See* Docs. 33). The request to present the additional testimonies of P.T.B. and E.H.H. were denied by the Court, but their allegations remain the subject of an indictment currently pending in the District of South Dakota.

---

[2] These allegations are the subject of an indictment currently pending in the District of South Dakota.
[3] These allegations are also the subject of an indictment currently pending in the District of South Dakota.

Finally, immediately prior to trial in this matter, the United States identified yet another individual who disclosed that Weber sexually abused him when he was in the 6th Grade and saw Weber at the Blackfeet IHS Clinic for a sports physical. PSR ¶ 25.  A.W. disclosed that, during the examination, Weber manipulated his testicles until his penis became erect. *Id.*  Weber next told him that he needed to "collect a sample" and Weber proceeded to masturbate him until he ejaculated.

## II.     Sentencing Recommendation

Based on the above, the United States recommends the Court impose a sentence at the top end of the guideline range, consisting of 235 months of imprisonment, a $200,000 fine, a $400 special assessment, and 15 total years of supervised release.

The serious nature of Weber's crimes cannot be overstated.  For more than 20 years, he abused his position as a pediatrician to gain access to and prey upon his victims.  He carefully selected his targets from the most vulnerable segment of an already vulnerable and impoverished community.  He then leveraged his authority as a physician to convince his victims that his actions were nothing more than "medical treatment."  In other instances, he groomed susceptible young men to spend time with him by plying them with alcohol, cash, and entertainment, all in an effort to gain their trust.  Then, once isolated from the herd, he took advantage of the opportunity, without witnesses, to rape and molest.

To date, nine young men have summoned the courage to disclose the abuse Weber inflicted upon them.  Weber's crimes left his victims traumatized, confused, embarrassed, and broken.  Many of his victims described their formative years as a nightmare – turning to drugs, alcohol, and a life of criminality in an effort to cope with the abuse they endured as children.  Clearly Weber's offenses – the rape and molestation of young children – are some of the most serious crimes cognizable by federal criminal law.  Thus, a sentence at the high-end of the guideline range, that being 235 months' imprisonment, is warranted and necessary to address the severity of Weber's crimes.

Moreover, a fine at the top end of the guideline range is likewise necessary and appropriate in this case.  The sentencing guidelines clearly mandate that a fine should be imposed when a defendant of means has the ability to pay: "The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay is not likely to become able to pay any fine." USSG § 5E1.2(a).  According to the PSR, Weber has a total net worth of more than $1,000,000.  PSR ¶ 113.  Moreover, he receives a significant monthly pension.  *Id*.  A fine of $200,000 is well within his means to pay and will help to defray the cost of his incarceration, which is estimated to be approximately $36,300 per year.  PSR ¶ 132.

Finally, a term of 17 years of supervised release should be imposed upon the defendant. The United States recognizes that, at the time of sentencing, Weber will be 70 years old and will likely be in his mid-80s when he is released from prison. Nevertheless, the maximum term of supervised release is sufficient and necessary here. Weber's history and characteristics show that he is a continuing threat to the community regardless of his age. While most criminals tend to age out of their crimes at some point in their lives, Weber has bucked that trend. In fact, Weber's most recent acts of abuse are alleged to have occurred when he was in his 60s. There is simply no reason to believe that Weber will ever shake his predatory nature. Thus, 17 years of supervised release, the maximum term authorized by statute in this case, is sufficient and necessary in this case.

## CONCLUSION

Based on the foregoing, the United States respectfully urges the court to impose a sentence at the high-end of the guideline range in this case, consisting of 235 months of imprisonment, a fine of $200,000, a $400 special assessment, and 17 years of supervised release.

## NOTICE OF POTENTIAL WITNESSES

At sentencing, the United States may present testimony from the following witnesses:

1. G.R.C.

RESPECTFULLY SUBMITTED this 7th day of December, 2018.

        KURT G. ALME
        United States Attorney

        /s/ Jeffrey K. Starnes
        JEFFREY K. STARNES
        Assistant U.S. Attorney
        Attorney for Plaintiff

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule, this certifies that the body of the attached response contains 2,809 words, excluding the caption and certificate of compliance.

                                        KURT G. ALME
                                        United States Attorney

                                        /s/ Jeffrey K. Starnes
                                        JEFFREY K. STARNES
                                        Assistant U.S. Attorney
                                        Attorney for Plaintiff