IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

UNITED STATES OF AMERICA,    )
                              )
            Plaintiff,    )
                              )  Criminal Docket
    vs.                    )  No.  CR 18-14-GF-BMM
                              )
STANLEY PATRICK WEBER,    )
                              )
            Defendant.    )
_____  )

### Partial Transcript of Trial with a Jury
### Closing Statements

Missouri River Federal Courthouse
125 Central Avenue West
Great Falls, MT 59404
Thursday, September 6, 2018
10:17 a.m. to 11:10 a.m.

### BEFORE THE HONORABLE BRIAN MORRIS

### UNITED STATES DISTRICT COURT JUDGE

Yvette Heinze, RPR, CSR
United States Court Reporter
Missouri River Federal Courthouse
125 Central Avenue West
Great Falls, MT 59404
yvette_heinze@mtd.uscourts.gov
(406) 454-7805

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

1                              **APPEARANCES**

2    PRESENT ON BEHALF OF THE PLAINTIFF,
     THE UNITED STATE OF AMERICA:
3
                      Jeff Starnes
4                     Assistant U.S. Attorney
                      OFFICE OF THE U.S. ATTORNEY
5                     119 1st Avenue North, Suite 300
                      Great Falls, Montana 59401
6
                      Lori A. Harper Suek
7                     Assistant U.S. Attorney
                      U.S. ATTORNEY'S OFFICE
8                     2601 Second Avenue North, Suite 3200
                      Billings, MT 59101
9

10   PRESENT ON BEHALF OF THE DEFENDANT:

11                    Harvey A. Steinberg
                      SPRINGER AND STEINBERG
12                    1600 Broadway, Suite 1200
                      Denver, CO 80202
13
                      Nicole L. Siefert
14                    RHOADES, SIEFERT & ERICKSON, P.L.L.C.
                      430 North Ryman, Second Floor
15                    Missoula, MT 59802

16                    Ryan T. Cox
                      SPRINGER AND STEINBERG
17                    1600 Broadway, Suite 1200
                      Denver, CO 80202
18

19                          --oOo--

20                       I N D E X

21

22   PROCEEDINGS                                          PAGE

23   Closing Statement by Mr. Starnes                        3
     Closing Statement by Mr. Steinberg                     18
24   Rebuttal Closing Statement by Mr. Starnes              32
     Reporter's Certificate                                 36
25

CLOSING STATEMENT BY MR. STARNES

PROCEEDINGS

1      (Open court.)

2      (Defendant present.)

3      (Jury present.)

4      (Whereupon, during the above-entitled trial, closing

5      statements proceeded as follows:)

6          MR. STARNES:  May it please the Court, Counsel,

7  ladies and gentlemen.  Guilt, shame, anger, resentment -- those

8  are some of the emotions that you saw in this courtroom over

9  the last three days when we talked about some of graphic

10  details of things that happened to two young boys on the

11  Blackfeet Indian Reservation more than 20 years ago.

12          When these things happened to them, these things that

13  we'll talk about here in a few minutes, they didn't tell

14  anybody.  They carried it with them.  They carried it with them

15  for two decades because they did not know who to tell or how to

16  tell that they had been molested by a pediatrician, somebody

17  who was trusted --

18          If we could please have Government's Exhibit 6.

19      (Displayed.)

20          MR. STARNES:  -- by this man, Dr. Stanley Patrick

21  Weber, the person you see in Government's Exhibit 6.

22          This is the man that inappropriately violated Ronald

23  Four Horns, Ronald Joe Four Horns, and came in those two

24  occasions; and Gilbert Running Crane, Big James, was sleeping

CLOSING STATEMENT BY MR. STARNES

1  on his couch or hanging out at his house, propositioned him and

2  touched him.

3          Now, this man doesn't look the same today.  We're

4  talking 23, 24, 25 years into the future.  That same man is in

5  this courtroom.  He's been sitting across from you.  It's this

6  man right here that was identified by a number of the

7  individuals you heard testify throughout the government's

8  case-in-chief.

9          I want to talk about some of the testimony you heard

10  because we're here today to discuss the five charges that you

11  have before you.  The first three relate to Ronald Joe

12  Four Horns.  We're going to call him Joe.

13          Remember what happened when Joe came out?  He walked

14  up here.  He took his oath.  He took his witness stand.  Now,

15  we told you way back in voir dire, when we had a chance to

16  speak with the large jury panel when you were selected to sit,

17  you were going to hear from some people in custody.  You were

18  going to hear from some people that had some issues.  He's one

19  of those people.

20          What do we know about Joe Four Horns?  We know he is

21  probably one of the hardest men you are ever going to meet in

22  your life.  We know that.  This man has been convicted multiple

23  times of violent assaults.  He had what?  Three or four felony

24  convictions on his record.  He was in leg irons when he came in

25  here.  He was covered in facial tattoos.  He had an attitude.

CLOSING STATEMENT BY MR. STARNES

1      But then what happened?  He sat in that seat.  We
2  started asking him some questions.  His shoulders slumped.  His
3  head went down.  He began to cry.  He didn't want to be here.
4  That's what he told you.  But what happened is he turned into
5  the boy that he was at age 11.  Before he was that hardened
6  criminal, before he was this person that became so angry at the
7  world, he was a little boy.  And that's who I want to talk to
8  you about.

9      If we could please have Government's Exhibit 4, Madam
10  Clerk.

11      (Displayed.)

12      MR. STARNES:  This is the Joe Four Horns that
13  encountered Dr. Stanley Patrick Weber in 1994, on the Blackfeet
14  Indian Reservation.  He encountered Dr. Weber after he had to
15  move down from Canada because his parents were divorcing, after
16  his mom started getting into alcohol and the boys started
17  splitting up from the parents and they had to be placed in the
18  Nurturing Center and that he found out his father committed
19  suicide.

20      And what happened?  This little boy -- this little
21  boy encountered this pediatrician.  And he told you what
22  happened to him as he fought back the tears and the resentment
23  about having to talk about it.  He told you on multiple
24  occasions that this man talked to him about some of his
25  problems but then went further:  How he fondled his penis.  How

CLOSING STATEMENT BY MR. STARNES

1  this man required that little boy to touch his penis.  How he
2  placed his penis in that little boy's mouth, and how that
3  little boy had his penis in the mouth of that man right there.

4         He talked about an occasion where he had to go to the
5  hospital and similar acts of abuse occurred.  His penis was
6  fondled by that man right there.  He talked about an occasion
7  where he was in an examination room, and he was lying on the
8  table, and that pediatrician attempted to put his penis in this
9  little boy's anus.  These are all of the things that Joe
10 Four Horns told you happened to him.

11        Now, ladies and gentlemen, at the very beginning of
12 this case, you got a set of instructions not unlike the set of
13 instruction that were just read to you by the Court.  One of
14 those instructions talked about the credibility of witnesses,
15 and I have it right here.  We don't need to put it up at this
16 point.  I just want to remind you there are several things that
17 you get to look at because it's you, and you alone, that gets
18 to judge the credibility of the witnesses that came into this
19 courtroom to determine whether or not you believe them, what to
20 believe, how much to believe.

21        Some of the things you can consider are the
22 following:  The opportunity and ability of the witness to see
23 or hear or know the things to which the witness testified; the
24 witness's memory; the witness's manner while testifying; the
25 witness's interest in the outcome of the case; any bias or

CLOSING STATEMENT BY MR. STARNES

1   prejudice; whether other evidence contradicted the witness's

2   testimony; the reasonableness of the witness's testimony in

3   light of all the evidence; and, finally, any other factor or

4   factors that bear on believability.

5           I want to focus for a minute on Joe Four Horns's

6   manner while testifying.  And it wasn't so much his manner

7   while testifying under direct examination, although I think you

8   saw the tears of that tattooed individual who is a hard, hard

9   man, breaking down on the witness stand talking about things

10  that happened to this little boy.  The most telling moment was

11  during cross-examination; the crucible of cross-examination

12  were truth comes out in our system.

13          What did he say?  He finally snapped, and he said, "I

14  don't want to talk about this.  Yeah, I never told anybody

15  about this.  I denied it to myself every day until Special

16  Agent Muller came to me in 2016.  Well, not Special Agent

17  Muller, but another investigator came to me in 2016.  And for

18  the very first time someone asked me if something happened, and

19  for the very first time I said something.  I never talked about

20  it since.  I didn't want to talk about it in this courtroom.  I

21  am going to walk out of this courtroom, and I'm never going to

22  say another word to another person because it's embarrassing.

23  I was molested as a child by that man."

24          That speaks volumes, ladies and gentlemen, and that

25  is something you can consider when you go back there and

CLOSING STATEMENT BY MR. STARNES

1  deliberate in that deliberation room and determine whether or

2  not his testimony is to be believed, his manner while

3  testifying.  And I ask you to talk about that.  Think about it.

4  Think about what that means for somebody like that to come in

5  here and say what happened to him.

6           Now, I want to turn your attention to our next

7  victim, Mr. Running Crane, Big James.  Slightly different set

8  of circumstances.  Big James has not spent a lot of time in

9  prison.  In fact, none that we heard about.  But Big James did

10 not have an easy life.  You heard that his home was pretty

11 tough growing up.  He didn't have a very stable environment.

12 But he found comfort in the home of a pediatrician who he

13 thought -- not unlike many other boys around his age on the

14 Blackfeet Reservation, where he could go hang out.  He could

15 get access to things that he didn't have access to regularly.

16 He could get chips and soda and play video games, play a stereo

17 system, all of the types of things that adolescent boys enjoy.

18 That's what kept him going over there.  And on occasion he got

19 alcohol.

20           Now, we heard some dispute about was alcohol provided

21 on every occasion?  Were there some people who went to

22 Dr. Weber's home and didn't get alcohol and some who did?

23 Absolutely.  Are we saying that Dr. Weber was plying every

24 single boy on the Blackfeet Indian Reservation with alcohol?

25 Absolutely not.  What we're saying is Dr. Weber, through the

1  testimony you heard, made his house available to young men.

2  Not adults.  Not girls.

3          And I say young men, but they weren't young men.

4  These were young boys.  These were boys between the ages of

5  about 11 and about 14.  And we know that's the age that

6  Big James was when he had his encounters with the pediatrician

7  because he told you he could have been, what?  15?  16?  17?

8  But what we know is that he was born in 1981.  That's what he

9  told you.  And we heard from Special Agent Muller who looked at

10 the files of Dr. Weber.  Dr. Weber was assigned to the

11 Blackfeet Indian Reservation from -- I have it right here --

12 July of 1992 to June of 1995.  The absolute oldest Big James

13 could have been was 14 years old.  The absolutely oldest.

14          So his memory wasn't so great about some of these

15 things, but he did remember two incidents because these were

16 big things that stick out in his mind.

17          And I remind you, again, back in voir dire, we had a

18 discussion about things that happened a very long time ago.

19 Right?  We'd want to know how is it that somebody can remember

20 something like that?  And I think we all agreed with big

21 things, those big things will stick out in your mind.  Maybe

22 not some of the details about what the weather was, exactly

23 what time of day it was, who else might have been around

24 earlier in the day, where exactly did I go after something

25 happened to me?  But when a grown man comes in while you are

CLOSING STATEMENT BY MR. STARNES

1  sleeping and begins playing with your penis while you're lying

2  asleep on that couch and you wake up to that, that's something

3  that stuck out to Big James Running Crane.

4         So let's talk about what he told you.  Not unlike

5  Mr. Four Horns, he came in here, and he did not want to talk

6  about what happened to him.  In fact, if you remember when I

7  asked him yesterday, "James what happened?  Let's talk about

8  this."  He said, "I don't want to."  It was the same line he'd

9  been saying for 20 years.  "I don't want to talk about this."

10 He had never told anybody before speaking with Special Agent

11 Muller in 2017.  Didn't have any plans to tell anybody

12 otherwise.  Why?  Because it's embarrassing.

13        And, again, not during direct examination, but during

14 cross-examination, you found out -- you found out why he was

15 struggling so hard.  Because he did not know why this happened

16 to him.  Remember that?  When defense counsel was

17 cross-examining him, he said, "What was I supposed to do?  You

18 are asking me all of these questions about things that I did

19 and didn't do."  But his question to everybody in this

20 courtroom was, "What was I supposed to do?  Did I deserve

21 that?"  And that's when he said, "I'm done with your

22 questions," and he had to take a break to compose himself.

23        And you know what, ladies and gentlemen?  He still

24 hasn't gotten a satisfactory answer to that question:  What was

25 I supposed to do?  Because he never should have been placed in

CLOSING STATEMENT BY MR. STARNES

 1 │ that situation in the first place.  The person who put him here
 2 │ is the person that's on trial, and that person is Dr. Stanley
 3 │ Weber.

 4 │          So this brings me back to the five charges that you
 5 │ have to consider when you go back into the jury room today.
 6 │ The first three counts relate to Ronald Joe Four Horns, and
 7 │ they are substantially similar.  They are basically the same
 8 │ thing.  It's really talking about the different acts that you
 9 │ heard about.

10 │          So Count I deals with oral sex; basically, that
11 │ defendant put his mouth on Ronald -- well, Joe's penis, and Joe
12 │ was required to put his mouth on the defendant's penis.  That's
13 │ Count I.  And if you believe Joe Four Horns and the other
14 │ testimony that you heard in support of Joe Four Horns then you
15 │ can go back there and you can quite comfortably check "guilty"
16 │ on that verdict form.  And we'll come back to his credibility
17 │ in a minute.

18 │          But Count II and III, very similar.  Count II has to
19 │ do with the touching that you heard about with intent to abuse,
20 │ humiliate, degrade, arouse, or gratify the sexual desires of
21 │ the defendant.  Count III has to do with that attempted anal
22 │ penetration charge on Joe Four Horns.

23 │          And there's no question that both Joe Four Horns and
24 │ Big James Running Crane are Indian persons.  You've got
25 │ Government Exhibits 1 and 2.  Those are enrollment

CLOSING STATEMENT BY MR. STARNES

1   certificates.  You heard from both of them.  They are enrolled

2   members of the Blackfeet Tribe.  All of this abuse occurred

3   within the exterior boundaries of the Blackfeet Indian

4   Reservation, either at Dr. Weber's home, which was on the

5   reservation; or at the hospital or the Nurturing Center, which

6   were both there on the Blackfeet Reservation.

7           The only question you really have to answer is do we

8   believe Big James?  Do we believe Joe Four Horns?  And we're

9   not asking you just to take their word for it.  Because, again,

10  back in voir dire we talked about this.  You would want

11  something a little bit more or something to support or

12  corroborate some of these things that happened to them.

13          That's what all of these other witnesses were about,

14  ladies and gentlemen.  Let's talk about some of those other

15  witnesses you heard from.  And you know the two I'm going to go

16  to first are going to be the two from South Dakota.  We heard

17  from Daniel Martin, and we heard from Fred Gayton.  We'll take

18  them one at a time.

19          Now, there's a very specific reason why we presented

20  that testimony to you, why we were allowed to do that in the

21  first place.  And there's a very specific reason that you can

22  consider this information.  You can't convict Dr. Weber just

23  because you believe Daniel Martin.  Dr. Weber is not on trial

24  for anything that happened to Daniel Martin or to Fred Gayton.

25  So don't worry about whether or not there's charges or should

1  be or anything like that.  That is not your task.  Your task is

2  to determine whether or not their testimony supports the

3  credibility of Joe Four Horns and of Big James Running Crane.

4  So let's talk about what they had to tell you, and we'll start

5  with Mr. Martin.

6          Mr. Martin is in custody.  He came out here, again,

7  with his leg chains on, and he sat in that witness seat after

8  taking his oath.  And it was pretty graphic and brutal

9  testimony.  He didn't want to talk either.  He sat there for a

10 good hour crying, choking through events that happened to him

11 as a child when he grew up on the Pine Ridge Indian

12 Reservation, and he met Dr. Weber as a pediatrician.  He talked

13 about times that Dr. Weber in a patient treatment room

14 digitally penetrated his anus.  That means he stuck his fingers

15 in his rectum.  You heard about how Dr. Weber masturbated him

16 during some of those sessions, and you heard about a time where

17 Dr. Weber actually anally penetrated him with his penis.  He

18 raped him in the anus.

19         And we heard this occurred when Mr. Martin was what?

20 9?  10 years old?  Maybe 11.  He was born in 1986.  So at age

21 9, 10, 11 would have been right around the time that Dr. Weber

22 left the Blackfeet Indian Reservation and moved to Pine Ridge.

23 The acts that Daniel Martin described to you are the same kinds

24 of acts that Joe Four Horns described to you.

25         That's why we presented that testimony, ladies and

CLOSING STATEMENT BY MR. STARNES

1  gentlemen, the similarity of those events, the timing of those

2  events.  We're not asking you to just take Joe Four Horns's

3  word for it, though you could.

4           And not only that, we presented the testimony of

5  Fred Gayton.  So he believes this occurred in, roughly, 2002,

6  when he was, again, 11 years old, 12 years old, somewhere in

7  that time period.  He talked about a couple of incidents.  I

8  say, "incidents."  A couple of acts of sexual abuse that

9  occurred at the hospital, not unlike Joe Four Horns and not

10 unlike Daniel Martin, where Dr. Weber sexually abused him.

11          But you also heard about an incident that occurred at

12 Dr. Weber's home on the Pine Ridge Indian Reservation, where

13 Fred Gayton made a deal with Dr. Weber to go to his home to

14 clean, to do some chores, to earn some money.  And, while

15 there, Dr. Weber gave him some beer.  Sounds similar to

16 Big James Running Crane.  And then, after he had had a few

17 drinks, Dr. Weber coerced him -- I think at the time he was

18 about 12 or 13, he testified -- coerced this 12- or 13-year-old

19 boy to give him oral sex, and Fred Gayton did it because he

20 felt he had to.  Acts of abuse that occurred at Dr. Weber's

21 home.  Very similar to what Big James Running Crane told you.

22          So let's talk about Counts IV and V.  So that takes

23 us to Big James Running Crane.  Counts IV and V.  Count IV has

24 to do with the first incident that Big James talked about; that

25 first incident where he was at Dr. Weber's house.  He was

CLOSING STATEMENT BY MR. STARNES

1   playing video games.  Nobody else was there.  He was alone.  He

2   was by himself.  He was sitting on the couch, and the defendant

3   walked in.  The defendant was intoxicated, and the defendant

4   wanted oral sex from Big James.  Now, Big James was awake.

5   When Dr. Weber made the request, he took his hand, and he put

6   it down under his belt buckle like he was about to unzip his

7   pants.  And then something happened.  Big James said -- I think

8   his words were "Fuck that," and he got up, and he ran out.

9   That's Count IV, ladies and gentlemen.  But for Big James

10  getting up and running out, that act would have been completed.

11          That turns us to Count V.  Slightly different

12  scenario.  Big James is still alone in Dr. Weber's house.

13  Big James had been drinking.  He was asleep.  He's awoke by

14  this man who comes in, unbuttons his pants, and begins fondling

15  his penis over his clothing -- or through the clothing, I

16  should say.  And he told you that's what woke him up, and he

17  looked over, and knew it was Dr. Weber because some things you

18  just don't forget.  And he said Dr. Weber had his other hand on

19  his own penis.  And when Dr. Weber saw that Big James

20  understood what was going on, had come to, had woken up and

21  caught him in the act, he sort of backed off and went on his

22  way.  And Big James was scared because he threw that blanket

23  over his head, and he did not know what to do.

24          I ask you, ladies and gentlemen, what's the

25  similarity between all four of these individuals that we've

CLOSING STATEMENT BY MR. STARNES

1    talked about so far?  Well, they were all alone with Dr. Weber.

2    They were all in places where Dr. Weber had them to himself,

3    where it was very unlikely that anybody else was going to be

4    able to step in, to interrupt, to see what was happening.

5           You see, that was the purpose of the testimony about

6    some of the video games and the alcohol and everything else.

7    This was a way for Dr. Weber to have an opportunity, an

8    opportunity to get adolescent boys in a place where nobody else

9    would see what was going on.

10          And that's the difficulty in prosecuting these types

11   of crimes.  It's the challenge that you have.  These crimes are

12   not committed out in the open.  None of Dr. Weber's crimes were

13   committed out in the open.  They were committed upon people

14   that have problems.  When you think about it, everybody that

15   testified about things that happened to them had significant

16   issues.  Either they had been in prison, or they were currently

17   in prison.  They had drug problems.  They had alcohol problems.

18   They came from broken families.  They lived in vulnerable

19   communities.

20          This is a doctor who is supposed to be helping

21   people.  And, instead, he took advantage of that.  That was an

22   opportunity for him.  That was an environment where he thrived

23   because he knew that if he ever was caught, nobody's ever going

24   to believe the word of a child over the word of a respected

25   pediatrician.

CLOSING STATEMENT BY MR. STARNES

1              And if you still don't believe that's the case, think

2    to the testimony of Justin Meineke.  He talked about one of

3    these trips that we heard about that this pediatrician was

4    taking young boys on to the Kyiyo days celebration in Missoula.

5    And he doesn't remember the exact time frame.  We knew it had

6    to be between 1992 and 1995, when Dr. Weber was assigned to the

7    reservation.  He believes he was in roughly, sixth, seventh

8    grade.  It would have made him between 11 and 14 years old.

9              He goes on the trip with a couple other boys and

10   Dr. Weber, thinking it's innocuous.  Thinking it's fun.

11   Thinking it's an opportunity for us to get out and do

12   something.  We don't usually get these opportunities.

13             And what happens?  When he's with a group of his

14   friends, no problems.  But when he's alone in the hotel room

15   taking a shower, right there waiting for him is Dr. Weber.

16   It's all part of the same pattern.  It's all part of the same

17   theme with Dr. Weber.  When you are in a group, you are okay.

18   When you are alone, you are at risk.

19             Ladies and gentlemen, Joe Four Horns didn't have a

20   choice.  Big James Running Crane didn't have a choice.  You

21   have a choice.  You have what you need to be able to go back

22   there and discuss the testimony and consider all of this other

23   evidence that was presented.  And at the end of the day --

24   well, I'm going to leave you where my colleague left off the

25   other day, Ms. Suek, when she talked about the burden of proof

CLOSING STATEMENT BY MR. STEINBERG

1  in this case.  The burden of proof is proof beyond a reasonable

2  doubt.  The highest burden that we have in our legal system.

3  You have an instruction about what that is.  It was just read

4  to you.  It's proof that leaves you firmly convinced.

5          Ladies and gentlemen, you've heard from ten witnesses

6  that the government presented and an additional three witnesses

7  from the defense.  You have enough evidence to make that

8  decision, to hold this man accountable for sexually abusing two

9  young boys on the Blackfeet Indian Reservation.  Thank you.

10          THE COURT:  Thank you, Mr. Starnes.

11          Mr. Steinberg.

12          MR. STEINBERG:  Thank you, Judge.

13          Good morning, Folks.  So I want to remind you of a

14  couple of things.  One, this trial is about two individuals.

15  It's about Mr. Four Horns, and it's about Mr. Running Crane.

16  Those are the two individuals that we're on trial for in this

17  courtroom these several days.  And you have to make a decision

18  in terms of the evidence, whether or not those individuals, in

19  terms of what the government has brought forward, have those

20  counts been proven beyond a reasonable doubt?

21          And I listened intently as Mr. Starnes went on, and

22  he said about Mr. Four Horns, "He did not know who to tell or

23  how to tell."  And then I remembered Ms. Suek's opening

24  statement where she said, "You are going to hear from Dr. Becky

25  Foster."  They decided not to call Dr. Becky Foster.  But

CLOSING STATEMENT BY MR. STEINBERG

1  remember her opening where she talked about the fact that Becky

2  Foster, who was a psychologist, saw Joseph Four Horns when he

3  was young because he couldn't deal with the fact that his dad

4  had died.  Remember those statements?  And I'm assuming they

5  didn't call Dr. Foster because --

6           MR. STARNES:  Speculation and facts not in evidence.

7           THE COURT:  Let's stick to what they did.

8           MR. STEINBERG:  It's the evidence or lack of

9  evidence, Judge.

10          And my position, so you know, is Foster saw

11  Four Horns.  We heard that from Mr. Four Horns.  Remember him

12  saying, "Yeah, I saw her"?  And remember him saying, "The

13  reason that I saw her was because I couldn't deal with the fact

14  that my dad had died, and that's when I saw her"?

15          And we anticipated they would bring her on because we

16  were going to ask her, "Hey" --

17          MR. STARNES:  Objection.  Facts not in evidence.

18          THE COURT:  Let's stick to what was presented to the

19  jury.  Okay?

20          MR. STEINBERG:  I will.

21          THE COURT:  Well, let's get to it now.  You are not

22  now.

23          MR. STEINBERG:  So what I'm trying to tell you is

24  that, in fact, Four Horns testified that Foster saw him.  They

25  talked.  But yet he never revealed this situation to her.  Why?

CLOSING STATEMENT BY MR. STEINBERG

1  Well, he wasn't asked or it wasn't on his mind or it didn't

2  happen.

3          He said -- my colleague said, "You didn't know who to

4  tell or how to tell."

5          I asked him when he was on the stand, "How many times

6  were you asked by psychologists in the prisons if you'd ever

7  been abused, molested?"  I said, "Was it at least ten different

8  occasions?"

9          He said, "Yes.  On ten different occasions, I was

10  asked that, and I denied that."

11          Then we brought out, "Listen, how is it that you were

12  in a situation where you finally told this?"

13          "Because," he said, you know, "I denied it initially.

14  I said no to" -- it was Mr. Bennett that interviewed him.  "I

15  said no to Mr. Bennett.  I said no to Mr. Bennett.  And then I

16  found out I was going to come to Montana."

17          And I said, "Hey, have you had any visits with your

18  family since you have been in Kentucky?  Since you've been in

19  Pennsylvania?"

20          "No."

21          "Did you get visits when you were in Montana?"

22          "Yes."

23          "And, by the way, were you trying to withdraw the

24  plea that you made where you said, 'I was guilty of that

25  robbery'?"

CLOSING STATEMENT BY MR. STEINBERG

1         He said, "Oh, yeah.  And now the government is giving

2  me a new hearing.  Even though it was denied initially, I'm

3  getting a new hearing."

4         This is a gentleman who, by their own admission is --

5         THE COURT:  Let's have a sidebar, please.

6     (Discussion on the record at sidebar.)

7     (Defendant present.)

8         THE COURT:  Mr. Steinberg, I'll give you some

9  latitude, but let's stick to the facts.  I give the hearing.

10  The government doesn't have a choice whether there's a hearing.

11  Do you understand that?

12         MR. STEINBERG:  The government is not objecting to

13  it, having a new hearing.  So this is -- you know, this is

14  closing.  You've done everything you can to interrupt me.

15  You've done everything to break up my approach and embarrass me

16  in front of the jury, and enough is enough.  I'm trying to

17  defend somebody.  And what I don't need is some little thing

18  like that that has nothing to do with it.  Clearly, the

19  government did agree to it, and you know that.

20     (Open court.)

21     (Defendant present.)

22         MR. STEINBERG:  So as I was saying, the government's

23  agreeing to give him a new hearing.  He knows that.  He's

24  somebody who has been institutionalized, who knows the system,

25  and knows how to work the system.  And isn't it ironic that on

CLOSING STATEMENT BY MR. STEINBERG

1  little things that were clear and important, he feigned a lack

2  of memory.

3          The question, "Hey, did you meet with these

4  attorneys?  Had you met with these attorneys before?"

5          "No.  I never have."

6          And then suddenly it was, "Well, yes, I guess I did

7  meet with them," after they got up and asked him.  He didn't

8  say it on cross.  He denied it.  But on redirect he said, "Oh,

9  yeah, now I remember.  I did meet with them."  And that was

10  just the day before.  "And they played me the entire tape."

11          And what's relevant about the tape, by the way, is he

12  says --

13          MR. STARNES:  Objection.  Facts not in evidence.

14          THE COURT:  Stick to the facts, please.

15          MR. STEINBERG:  I am.

16          They indicated and the witness indicated that, in

17  fact, they had played him the tape, a 52-minute tape.  That was

18  the evidence.

19          When I asked him the questions, "Oh, I don't

20  remember.  I never met with anyone."

21          Then you take it a step further, and the step further

22  is this:  We said to him, "Hey, look.  In terms of the

23  situation, in terms of your memory, did you have your

24  medication the very day that you made these statements?"

25          Remember what his answer was?  "No, I wasn't on that

CLOSING STATEMENT BY MR. STEINBERG

1  medication."

2          And I asked him, "When you are not on that

3  medication, how does that affect you?"

4          "Well, when I'm not on that medication, I am not

5  calm.  I hear voices.  I see things.  These voices tell me to

6  do things."

7          Then, when counsel said to him, "Hey, can you

8  identify Dr. Weber?  Can you tell us where he is?  Who he is?"

9  Who does he point to?  He points to me.

10          So then what do they do?  "Oh, do you have your

11  glasses?  Can you see?  Can you see?"

12          "Yes, yes.  I can see."

13          So when you take a look at reasonable doubt --

14          Would you mind putting up Number 28?

15      (Displayed.)

16          MR. STEINBERG:  28 talks about reasonable doubt.  And

17  it talks about, "A reasonable doubt" -- and this is the second

18  paragraph -- "is a doubt based upon reason and common sense.

19  It may arise from careful and impartial consideration of all of

20  the evidence or from lack of evidence."

21          I want to emphasize "from lack of evidence."  Okay.

22  You have a situation where you are being asked to believe

23  someone.  And it's someone who by definition -- and by, if you

24  will, the government's own concession in their closing -- is

25  someone who is a criminal; who has been institutionalized for,

CLOSING STATEMENT BY MR. STEINBERG

1  unfortunately, a long time; and knows how to manipulate the
2  system; and knows how, if you will, on direct, to tear up, but
3  when it came to cross, there was none of that emotion.  It was
4  hostility.  It was denial.

5          And what's poignant about his testimony was the lack
6  of detail in terms of the events.  It's easy to come in and
7  say, "Yes, I was forced to do certain things."  But where is
8  the detail?  Describe the room.  What was he wearing?  What
9  were you wearing?  What did you do afterward?  Oh, what's your
10 relationship with your brother?

11         The brother came in here.  And if the implicit
12 suggestion is somehow that because he was abused and he became
13 a criminal because of that -- I mean, I suppose that's the
14 thread that was trying to be planted -- that's belied by the
15 fact that unfortunately his brother, who says, "Hey, I was
16 never subject to any kind of touching.  We were close.  We
17 looked after each other."  So would Joseph want to protect his
18 brother?  And put aside that he's not going to talk about it
19 because he's embarrassed by it.  Put aside that he's 11 years
20 old and seeing a psychologist regularly for issues in terms of
21 his inability to accept his father's death.  Put aside the fact
22 that he goes back in terms of his version.  Wouldn't he want to
23 protect his brother and make sure his brother didn't go back?
24 Where is that?  Where is that?

25         And this is a kid who, remember, when he was 11, he

CLOSING STATEMENT BY MR. STEINBERG

1  told you that he was a member of the Crips and that he was a

2  gang member and has used drugs from 11 years on.

3           "And had that affected your mind?"

4           "Oh, yes.  It's affected it."  Well, common sense

5  tells you that.

6           And so all of a sudden, now, he's approached, not by

7  this officer, but by Officer Bennett.  And he says, "No, it

8  didn't happen.  No, there was not oral sex.  No, that never

9  happened to me.  Will I get to go to Montana?"

10          "Yeah."  Boom.

11          And that then the suggestion goes on.  The suggestion

12  goes on, and he's here, and sure he doesn't want to testify to

13  it.  And sure he says, "I'm never going to," if you will, "talk

14  about it again."  But he got what he wanted.  He got to go to

15  Montana.  He gets to see his family.  And I confess.  I can't

16  recall how many years it had been since.  But I do recall

17  absolutely that he said, "I haven't been able to see my family

18  in Kentucky.  I haven't been able to see my family in

19  Pennsylvania.  They took my visits away from me."  But he got

20  them here.  He knows how to work the system.

21          So when it comes to believing someone, in terms of

22  that credibility instruction and in terms of reasonable doubt,

23  you say, "Is this the kind of person that I would" -- let's do

24  something mundane, an important issue in your life:  buying a

25  house, buying a car, sending your kids to school.  And you say

CLOSING STATEMENT BY MR. STEINBERG

1  to yourself, "Hey, look.  I want to make a decision, and I'm

2  going to have to rely on this person."  And Mr. Four Horns is

3  the salesman.  And he's selling you the car, the house, the

4  school.  And then you find out that he says he suffers from

5  schizophrenia.  He's not on his medication.  He's been

6  convicted of numerous felonies, including violent felonies.  He

7  hasn't, basically, said anything about this for years.  He's

8  given a small thing in your mind, but, obviously, a big thing

9  in his mind, -- a big thing.  And that is the ability to come

10  see his parents.  The ability for the government to give him a

11  new hearing.  Maybe withdraw the plea.  Maybe get out of

12  prison.  What does he have to do?  They come to him.  And he

13  knows the system.  And, sure enough, he gives them what they

14  want.  He gives them what they want.

15         And then you say to yourself, "Okay.  Am I going to

16  buy this house?  Am I going to buy this car?  Am I going to

17  send my kid to this school based on what Four Horns has told

18  me?"  He's the salesman.  And you say to yourself, "Probably

19  not."

20         Because the little things, like, when I asked

21  Investigator Muller, "What about those records in terms of

22  these medical records?  How many times did my client see

23  Mr. Four Horns?"

24         And the response was, "I don't know.  I don't know."

25         "Do you have the medical record?"

CLOSING STATEMENT BY MR. STEINBERG

1     "Yeah, somewhere."

2     Well, wouldn't that be something you'd want to see?

3  Isn't that that little corroboration that you would want to

4  see?  Where is it?

5     In terms of Mr. Running Crane --

6     Can you put up Number 14, Instruction 14.

7    (Displayed.)

8     MR. STEINBERG:  This is the first count as it relates

9  to Mr. Running Crane, and that's Count XIV -- I'm sorry --

10  that's Count Number IV.  Take a look at the second paragraph

11  from the bottom.  This is what you have to find:  "For the

12  purposes of Count IV of the indictment, the term 'sexual act'

13  means that the defendant exposed his penis to G.R.C."

14     Do you have any evidence that on that first encounter

15  that he expose his penis?  Remember, I went to the witness, and

16  I put my hand down, and I said, "Is this as close as it got?"

17  And he got there.  And he said, "Yeah."  There was zero

18  evidence -- zero evidence presented that he ever exposed his

19  penis.  And these are the instructions you have to follow.  It

20  means that the defendant exposed his penis and asked to allow

21  the defendant to place his penis in his mouth.  No evidence

22  that he exposed his penis.  The law requires you to find my

23  client not guilty of 14.

24     In terms it of the next count, Number 17 --

25     Could you put up Instruction Number 17?

CLOSING STATEMENT BY MR. STEINBERG

1        (Displayed.)

2            MR. STEINBERG:   -- this relates to Count V.  Take a

3   look at Element Number 2:   "G.R.C." -- Mr. Running Crane --

4   "was incapable of appraising the nature of the conduct."  They

5   are to prove that he was incapable of appraising the nature of

6   the conduct.

7            Now, keep in mind this, and let's focus on this:

8   Clearly, the inference that the cross-examination was trying to

9   plant with the witnesses was that, "Hey, it's only the

10  vulnerable ones that my client picks on."

11           Well, there's no question in terms of the evidence

12  that of all of the individuals that were part of this group

13  that went over there, Mr. Running Crane was the toughest, the

14  one who got in fights, the one who was called Big James because

15  he was the biggest.  And, if I recall, he testified that he was

16  about 215 pounds at this time.  And I think he said he was

17  about five nine.  So, if the theory that the government is

18  trying to espouse here -- and this is what they want you to

19  follow -- is he picked out the weakest, the most vulnerable.

20  Of all of the ones you wouldn't want to pick out, it would be

21  the strongest, the toughest.

22           Then they tried to say, "Hey, look, he would always

23  have somebody alone so they were isolated."  So what do we do?

24  We bring you a witness who says, "I was alone.  By the way, I

25  went over there at 4:00 in the morning, and I knocked on the

CLOSING STATEMENT BY MR. STEINBERG

1  door.  And I was intoxicated.  And he let me in.  Told me to
2  sleep on the couch.  Went to bed and said, 'I have to get up at
3  7:00 a.m. because I have to go to work.'"

4       Then the cross-examination was "Hey, did any other
5  doctor, did any other dentist, did any other professional treat
6  you this way?"  And I told you before he was an odd duck, you
7  know.  He was an odd duck because he actually did things for
8  these kids.  He actually cared for these kids.  He let them
9  come to his house.  He fed them.  He gave them soda.  He let
10 them hang out.  And sure the rumors abound.

11       And you heard from -- what did we hear from?  Four?
12 Three kids?  All who were part of this group.  And
13 interestingly enough, Mr. Running Crane, who didn't come there
14 that often, is the only one they brought in that said, "Yeah,
15 he provided alcohol to the kids."  All of the other kids said,
16 "No."  And that is confirmed by their own witness Mr. Meineke.
17 Because he's the one who said, "I had to steal."  Remember he
18 said, "I stole" -- I think he said, "I stole a box of wine."

19       If, in fact, this were the situation that they tried
20 to plant that this was a situation where he would get these
21 kids drunk and there would be alcohol there and he was just
22 plying with alcohol, why is it that kids that we brought in --
23 all of them, as well as their own witness confirmed -- "he
24 wasn't giving any kids alcohol."

25       He made the mistake of befriending them.  He made the

1  mistake of treating them with care.  He made the mistake of

2  letting them come over.  And I suppose the lesson here is he

3  shouldn't have.  He shouldn't have provided a place for them

4  where they could go to.  He shouldn't have been nice to them.

5  He should have treated them just like everybody else did.

6  Hands off.  Don't care.  Don't provide them anything.  And he

7  wouldn't be here.  That's what this case stands for.

8          No good deed goes unpunished.  And so what do they

9  do?  They bring in other witnesses to say, "Hey, look.  He's a

10 bad guy.  He's involved in all of these other acts."

11         And then I hark back and I remember Mr. Martin saying

12 something.  "Who did you tell?"

13         "The only person I told was my friend Joe.  I knew

14 they were coming.  I knew they were coming."  He knew they were

15 coming to talk to him.

16         And when I asked Mr. Running Crane, "Do you know

17 Mr. Four Horns?"  Remember that exchange?  That exchange was

18 very limited.  "Well, yeah, I know of him."  These kids all

19 knew each other.  They all grew up together.  They're all

20 members of the same tribe.

21         When we tried to get Mr. Running Crane to talk about

22 his relationship with Mr. Four Horns -- remember that?  -- it

23 was, "Yeah, I knew of him," but that was it.  Didn't want to

24 admit any kind of relationship, any kind of understanding, any

25 kind of agreement, or anything like that.

CLOSING STATEMENT BY MR. STEINBERG

1    And isn't it odd that Mr. Martin said, "Yeah, I knew
2  they were coming.  The only person I ever told was my friend
3  Joe."

4    So when you look at this case and you say to
5  yourself, "It's a 20-plus-year old case that truly has no
6  corroboration in terms of trying to defend, in terms of the
7  evidence."  Is it the old hospital?  Is it the new hospital?
8  What does any of this look like?  Where are the medical
9  records?  Where is the camera?  Pictures?  Remember, we heard
10  that supposedly there were pictures taken?  Where is this?

11    You have to have reasonable doubt, and you have to
12  say to yourself, "I don't like it.  Something might have
13  happened.  Certainly, there's a lot of dust."  But when you are
14  going to be fair and when you are going to follow the law and
15  when you are going to -- which you must -- take out emotion and
16  not allow the passions to be inflamed and say, "I want to look
17  at this case as a juror must, with a dispassionate -- let's
18  look at the facts.  Let's look at the evidence."  You say to
19  yourself, "Who are the people who are the sales people here?
20  What's this really about?"  Is it about the rumor?  Is it about
21  the innuendo?  Or is it about the truth?  And that's the key to
22  this case.  You really don't know.  You really, really don't
23  know.

24    And because you don't know, and as that
25  Instruction 28 says, "Proof that leaves you firmly convinced."

REBUTTAL CLOSING STATEMENT BY MR. STARNES

1  You have to have your doubts, and those are reasonable based on

2  the evidence.  And because of that, the law requires you -- you

3  don't have to like it -- but the law requires you to find my

4  client not guilty.  Thank you.

5         THE COURT:  Thank you, Mr. Steinberg.

6         Mr. Starnes, brief rebuttal.

7         MR. STARNES:  Thank you, Your Honor.

8         Ladies and gentlemen, I just want to respond to a

9  couple of things that were brought out by the defense.  The

10  first has to do with this idea that somehow the government

11  implanted in the mind of Ronald Four Horns that if he

12  cooperates, then he'll get some benefit on the back end.  You

13  heard from Mr. Four Horns no promises had ever been made to him

14  by any member of the government regarding his situation.  All

15  right.

16         The other thing you have to think about is, if that's

17  truly the case, where are all the other incentives that are

18  theoretically offered to all of these other people that came in

19  and talked about all of these acts of sexual abuse that

20  occurred upon them?  Were's the incentive that Big James

21  Running Crane has?  Where's the incentive that Daniel Martin

22  has?  Where is the incentive the Fred Gayton has?  Where's the

23  incentive that Justin Meineke has?  And that's the problem with

24  that theory because it's just that.  There's no actual evidence

25  to support it.

REBUTTAL CLOSING STATEMENT BY MR. STARNES

1       You see, ladies and gentlemen, at some point -- at
2  some point you've got to take the evidence for what it is.
3  There's no evidence that anybody else, even theoretically,
4  could receive any type of benefit.

5       And on top of that, if you think that there was
6  something going on, you saw the confusion where Mr. Four Horns
7  couldn't even identify my cocounsel and I, the people that are
8  supposedly running this potential cooperate-for-benefit scheme
9  with him.  He had a hard time recognizing us here in the
10  courtroom when he was asked.

11       Now, you learned about what happened on the back end.
12  He was actually confused about the questioning, which was "When
13  did I first meet with some lawyers in this case?"  And it was
14  well after he first disclosed what happened to him because he
15  first disclosed back in November of 2016.  He didn't meet with
16  us until a few weeks before trial and then, again, the day
17  before trial.  That's what he clarified for you.  So there's
18  really no credence, no credibility, to that argument because
19  there's simply no other evidence to support it.

20       What you do have is an individual who came in here
21  and said, "I don't want to talk about this.  I have never
22  wanted to talk about this."  He told you straight up, "I've
23  denied this to anybody that has ever asked me about it because
24  it's embarrassing."  His language was a lot more colorful than
25  the language I am going to parrot back to you, but he said,

REBUTTAL CLOSING STATEMENT BY MR. STARNES

1   "That is embarrassing.  I was molested as a I child.  That man
2   molested me.  I don't ever want to admit that to anyone.  I'm
3   going to walk out of this courtroom, and I'm going to deny it
4   every day for the rest of my life, just like I've been denying
5   it every day until the day that I had to say it to the
6   investigator I met with and today when I have to testify.  But
7   I do not want to be here."

8       And he said the only reason he told you about it is
9   because it happened to him.  And because when something like
10  that happens to that 11-year-old little Joe Four Horns,
11  somebody needs to be held accountable.  Ladies and gentlemen,
12  you are in the position to hold that person accountable.

13      And that brings me to my last point about
14  Mr. Running Crane, and we're talking about Dr. Weber preying on
15  the vulnerable.  That's exactly right.  Yeah, his name is
16  Big James.  He was a big kid.  He was the fighter.  He was the
17  one that might have the ability to do something about this.
18  There's an expectation that he should have stood up, decked
19  Weber, run around and told everybody everything that happened
20  to him right then and there.  But Big James didn't know what to
21  do.  Big James was a 13-year-old kid, and he froze.

22      And what else do we know about when this happened?
23  This happened when he was asleep, when somebody is at their
24  most vulnerable, when Big James couldn't do anything about it.
25  When we talk about unable to apprise the nature of the conduct,

REBUTTAL CLOSING STATEMENT BY MR. STARNES

1  we're talking about the fact that that man grabbed Big James's

2  penis and started manipulating it through his clothing while he

3  was asleep.  That's what we mean when we say "people when they

4  are most vulnerable," a vulnerable person in a vulnerable

5  situation.  Besides, nobody else was at the house.  Who else

6  was he going to tell?

7          Ladies and gentlemen, the defense says this case is

8  about no good deed going unpunished.  I don't know about that.

9  What this case needs to be about, what you're tasked that you

10 have before you when I finish my remarks in just a moment, is

11 about punishing or at least holding accountable somebody who

12 committed some very bad deeds 20 years ago on the Blackfeet

13 Indian Reservation.

14         So when you go back to that deliberation room and you

15 talk about the evidence, think about the anger and the

16 frustration of Mr. Four Horns, the anger and the frustration of

17 Mr. Running Crane, and come back here with a verdict of guilty

18 on all five counts in the indictment.  Thank you.

19         THE COURT:  Thank you, Mr. Starnes.

20     (Whereupon the trial continued.)

21                    --o0o--

22

23

24

25

REPORTER'S CERTIFICATE

1        REPORTER'S CERTIFICATE

2    I, Yvette Heinze, a Registered Professional

3 Reporter and Certified Shorthand Reporter, certify that the

4 foregoing transcript is a true and correct record of the

5 proceedings given at the time and place hereinbefore mentioned;

6 that the proceedings were reported by me in machine shorthand

7 and thereafter reduced to typewriting using computer-assisted

8 transcription; that after being reduced to typewriting, a

9 certified copy of this transcript will be filed electronically

10 with the Court.

11    I further certify that I am not attorney for, nor employed

12 by, nor related to any of the parties or attorneys to this

13 action, nor financially interested in this action.

14    IN WITNESS WHEREOF, I have set my hand at Great Falls,

15 Montana, this 3rd day of January, 2019.

16

17         /s/ *Yvette Heinze*

18         _____
            Yvette Heinze

19           United States Court Reporter

20

21

22

23

24

25