1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF MONTANA

3    GREAT FALLS DIVISION

4

5    UNITED STATES OF AMERICA,      )
                                    )
6            Plaintiff,             )
                                    )    Criminal Docket
7        vs.                        )    No. CR 18-14-GF-BMM
                                    )
8    STANLEY PATRICK WEBER,         )
                                    )    Court of Appeals
9            Defendant.             )    No. 19-30022
     _____)

10

11                   Transcript of Motion Hearing

12

13              Missouri River Federal Courthouse
                    125 Central Avenue West
14                   Great Falls, MT 59404
                    Tuesday, July 10, 2018
15                 10:00 a.m. to 12:36 p.m.

16

17           BEFORE THE HONORABLE BRIAN MORRIS

18           UNITED STATES DISTRICT COURT JUDGE

19

20                 Yvette Heinze, RPR, CSR
                  United States Court Reporter
21              Missouri River Federal Courthouse
                    125 Central Avenue West
22                   Great Falls, MT 59404
                 yvette_heinze@mtd.uscourts.gov
23                      (406) 454-7805

24          Proceedings recorded by machine shorthand
     Transcript produced by computer-assisted transcription
25

1                              **APPEARANCES**

2     PRESENT ON BEHALF OF THE PLAINTIFF,
      THE UNITED STATE OF AMERICA:
3

4                         Jeff Starnes
                          Assistant U.S. Attorney
5                         OFFICE OF THE U.S. ATTORNEY
                          119 1st Avenue North, Suite 300
6                         Great Falls, Montana 59401

7

8     PRESENT ON BEHALF OF THE DEFENDANT:

9                         Harvey A. Steinberg
                          SPRINGER AND STEINBERG
10                        1600 Broadway, Suite 1200
                          Denver, CO 80202
11
                          Nicole L. Siefert
12                        RHOADES, SIEFERT & ERICKSON, P.L.L.C.
                          430 North Ryman, Second Floor
13                        Missoula, MT 59802

14                        Ryan T. Cox
                          SPRINGER AND STEINBERG
15                        1600 Broadway, Suite 1200
                          Denver, CO 80202
16

17                              -oOo-

18

19

20

21

22

23

24

25

1

2

<u>I N D E X</u>

<u>WITNESSES CALLED BY THE GOVERNMENT</u>                                    <u>PAGE</u>

 FRED BENNETT
      DIRECT EXAMINATION BY MR. STARNES                            9
      CROSS-EXAMINATION BY MR. STEINBERG                          15
      REDIRECT EXAMINATION BY MR. STARNES                         25
 CURT MULLER
      DIRECT EXAMINATION BY MR. STARNES                           27
      CROSS-EXAMINATION BY MR. STEINBERG                          37


<u>PROCEEDINGS</u>                                                        <u>PAGE</u>

 Motion 2 - Argument by Mr. Starnes                               45
 Motion 2 - Argument by Mr. Steinberg                            55
 Motion 2 - Rebuttal by Mr. Starnes                              68
 Motions 3 and 4 - Argument by Mr. Steinberg                     73
 Motions 3 and 4 - Argument by Mr. Starnes                       97
 Motions 3 and 4 - Argument by Mr. Steinberg                    107
 Court's Comments/Rulings                                       109
 Motion 5 - Joint Discussion                                    110
 Motion 6 - Joint Discussion                                    110
 Motion 7 - Joint Discussion                                    113
 Motion 8 - Joint Discussion                                    113
 Motion 9 - Joint Discussion                                    113
 Court's Ruling on Motion 9                                     116
 Motion 10 - Joint Discussion                                   116
 Court's Comments/Rulings                                       117
 Reporter's Certificate                                         122

<u>EXHIBITS</u>

<u>GOVERNMENT'S</u>                                                  <u>ADMITTED</u>

 Government's Exhibit A                                           36
 Government's Exhibit B                                           37

1                            PROCEEDINGS

2          (Open court.)

3          (Defendant present.)

4                THE COURT:  Please be seated.

5                Madam Clerk, please call the first case on the

6    Court's calendar.

7                THE CLERK:  This Court will now conduct a motion

8    hearing in Cause Number CR 18-14-GF-BMM, United States of

9    America versus Stanley Patrick Weber.

10               THE COURT:  Good morning, Mr. Starnes.

11               MR. STARNES:  Good morning, Your Honor.

12               THE COURT:  And who is with you at counsel table?

13               MR. STARNES:  Your Honor, this is Special Agent Curt

14   Muller.  He is Office of Inspector General, Department of

15   Health and Human Services.

16               THE COURT:  Welcome, Mr. Muller.

17               MR. MULLER:  Good morning, sir.

18               THE COURT:  And Mr. Steinberg.

19               MR. STEINBERG:  Good morning.  My name is Mr. Harvey

20   Steinberg.  I appear with Mr. Cox, who is my cocounsel, as well

21   as Ms. Siefert, who is local counsel.  And also seated at the

22   table is the defendant Dr. Weber, sir.

23               THE COURT:  Good morning.

24               All right.  We are here on a series of motions filed

25   on behalf of Mr. Weber.  Let's go through the motions first.

1           I have a motion to suppress a search warrant issued
2   in South Dakota by a magistrate judge there; a motion to
3   suppress statements made by Mr. Weber during an interview or
4   meeting with some federal officials, officers; a motion for
5   disclosure pursuant to Rule 404(b) and 609; a motion for
6   disclosure by the government of intent to introduce evidence
7   pursuant to Rules 413 and 414; a motion for disclosure by
8   government of intent to introduce evidence pursuant to
9   Rule 807; a motion to disclose and produce Brady material; a
10  motion for disclosure of government's intent to use certain
11  evidence -- that's Document 26 -- a motion for early production
12  of Jenks material -- two motions for -- no, I'm sorry.  That's
13  the same, Document 27.  Finally, a motion to disclose intent to
14  call expert witnesses in discovery pursuant to Rule 16(a)(1)(F)
15  and (G).
16          Are those all the motions at issue this morning,
17  Mr. Starnes?
18              MR. STARNES:  I believe that's correct, Your Honor.
19              THE COURT:  All right.  And, Mr. Steinberg?
20              MR. STEINBERG:  I think that, actually, one is not at
21  issue.  And I'd look to Mr. Starnes for confirmation.  The
22  Court mentioned that we had filed a motion to suppress fruits
23  of the search pursuant to a search warrant.  Based on my
24  conversations with Mr. Starnes, it's my understanding that that
25  is now moot because he doesn't intend to --

1        THE COURT:  That's my understanding as well.  I just

2   wanted to make sure I listed all of the motions that have been

3   filed first.

4        MR. STEINBERG:  Yes.  Those are the main ones at

5   issue.

6        THE COURT:  All right.  With regard to the motion to

7   suppress the statements from South Dakota, as I understand, the

8   magistrate judge in South Dakota has reviewed the warrant and

9   determined that it was a valid warrant, and that's subject to

10  objections to be filed.

11       Has that period run yet, Mr. Steinberg?

12       MR. STEINBERG:  It's running, and the objections have

13  been filed.  It's kind of an interesting issue, but --

14       THE COURT:  All right.  So you're waiting for the

15  Article III judge to rule on that?

16       MR. STEINBERG:  Yes, sir.

17       THE COURT:  All right.  So, as I understand,

18  Mr. Starnes, your position on the motion to suppress, you don't

19  intend to use any evidence discovered during that search in

20  your case in Montana.

21       MR. STARNES:  That is correct, Your Honor.

22       THE COURT:  All right.  And so that motion is moot

23  then, I assume, Mr. Steinberg.

24       MR. STEINBERG:  Thank you, sir.

25       THE COURT:  Okay.  Second motion is a motion to

1    suppresses statements made by Mr. Weber.  That's in dispute, I

2    assume.

3              MR. STARNES:  That is correct, Your Honor.

4              THE COURT:  All right.  And, Mr. Starnes, do you have

5    witnesses who you would call for that one?

6              MR. STARNES:  I do, Your Honor.  And before we get to

7    them, I just want to make sure the Court has received the two

8    items that we submitted, along with the government's response

9    to the motion.  One is a two-hour recording of the interview

10   that took place, the interview that's actually at issue in this

11   motion.  We've marked as Exhibit A.  I went ahead this morning

12   and provided an additional copy to the clerk.  So the Court has

13   that.

14             There's also a transcript that's Exhibit B, and

15   that's just a verbatim transcript of that same interview for

16   the convenience of both the Court and parties.  That has also

17   been provided to the clerk.  It is approximately one hundred

18   and, I believe, thirty-five pages, Your Honor.  Yeah,

19   135 pages.

20             THE COURT:  Okay.  I did receive both of those items,

21   Exhibits A and B.  You will be introducing those at the hearing

22   today?

23             MR. STARNES:  That's correct, Your Honor.

24             THE COURT:  All right.  And then the burden is on the

25   government to prove the validity of the statements.

1          MR. STARNES:  That's correct, Your Honor.  So I do

2     have two witness that I'd like to talk.  I anticipate they

3     would both be rather short this morning.

4          THE COURT:  Pardon?

5          MR. STARNES:  I anticipate the two witnesses that I

6     intend to call on this motion will be rather short this

7     morning.

8          THE COURT:  All right.  Why don't you go ahead and

9     call your witnesses then, please.

10          MR. STARNES:  The first person I'd like to call is

11     Special Agent Fred Bennett.

12

13                         FRED BENNETT,

14     called for examination by counsel for the government, after

15     having been first duly sworn to testify the truth, the whole

16     truth, and nothing but the truth, testified as follows:

17          THE WITNESS:  May I switch chairs?

18          THE COURT:  You may.  Just pull that one back.

19        (Switching chairs.)

20          THE COURT:  I hope you can operate that one.

21          THE WITNESS:  Yeah, I know.

22          THE COURT:  Good morning, sir.

23          THE WITNESS:  Good morning.

24          THE COURT:  Would you please state your full name and

25     spell your last name.

THE WITNESS:  My name is Frederick Jetson Bennett,
III, B-E-N-N-E-T-T.

THE COURT:  All right.  Mr. Starnes, go ahead,
please.

MR. STARNES:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. STARNES:

Q.   Sir, where do you work?

A.   I work with the Bureau of Indian Affairs in the Pine Ridge
Indian Reservation in Pine Ridge, South Dakota.

Q.   In what capacity?

A.   I am a Special Agent.

Q.   What kinds of cases do you investigate?

A.   Particularly felony crimes that occur within the
jurisdiction of the Indian reservation:  sex abuse, homicide,
robbery, assaults.

Q.   A fair number of violent crimes it sounds like?

A.   Yes, the list goes on and on.

Q.   How long have you worked as a special agent on the Pine
Ridge Indian Reservation?

A.   I started there in 2001, and I did it for about five
years, a little over five years.  Then I left.  Then I came
back in.  So I don't know how long you want to -- on the
reservation, probably about eight years total.

Q.   Were you working in that capacity in May of 2016?

1   **A.**   Yes, I was.

2   **Q.**   Do you know an individual by the name of Stanley Weber?

3   **A.**   Yes, I do, Dr. Weber.

4   **Q.**   How do you know Dr. Weber?

5   **A.**   I knew Dr. Weber through -- I'd done work, you know, on

6   Pine Ridge Reservation prior.  A lot of our work ends up at the

7   emergency room at the Indian Health Services Hospital.  I've

8   had contact with him through there.  I've seen him before.  I

9   haven't had no, like, direct conversations and stuff like that

10  with him, but I am aware of who he is.

11  **Q.**   In May of 2016, did you become aware that Dr. Weber was

12  under a federal investigation?

13  **A.**   Actually, in 2015.

14  **Q.**   The investigation began in 2015?

15  **A.**   Yes.

16  **Q.**   Did you participate in the investigation of Dr. Weber?

17  **A.**   Yes, I did.

18  **Q.**   What types of crimes was he under investigation for?

19  **A.**   Sexual abuse.

20  **Q.**   Did you have an occasion to speak with Dr. Weber about the

21  substance of those investigations in May of 2016?

22  **A.**   Yes.

23  **Q.**   How did you encounter Dr. Weber that day?

24  **A.**   At the time in Pine Ridge, there was a construction zone

25  going on, so traffic had slowed through that particular time,

1 and I had seen him in his truck.  And I was able to get him

2 stopped and talked to him.  And then Agent Muller came up and

3 spoke with him.  And then, eventually, we ended up going back

4 to his residence.

5 **Q.**   Okay.  So just so I'm clear, you encountered Dr. Weber

6 while he was sitting in traffic?

7 **A.**   Yeah, it was a slow construction zone.

8 **Q.**   And where were you?  Were you in a vehicle of some kind?

9 **A.**   Oh, yeah.  I was in an unmarked vehicle at that particular

10 time.  I was driving a Chevy, Tahoe.  It was an unmarked

11 government vehicle, silver in color, black tinted windows.

12 **Q.**   If you'd do me a favor, just pull that microphone slightly

13 closer to you.

14 **A.**   (Complying.)

15 **Q.**   Thank you very much.

16       What time of day was it when you saw Dr. Weber

17 sitting in traffic?

18 **A.**   It was after 3:00 o'clock in the afternoon, 3:30, quarter

19 to 4:00, somewhere in that general area.

20 **Q.**   So you saw him.  What did you do?

21 **A.**   I got his attention.  I stopped him over there by the old

22 IHS turnoff and talked to him in the parking lot.  There was a

23 little cafe up on the hill, Lakota Cafe.

24 **Q.**   So you say, "IHS."  Is that the Indian Health Services

25 Hospital?

**A.** Yes. There was an old -- the old place where they were up
on the hill.

**Q.** So when you first encountered Dr. Weber, what did you say
to him?

**A.** Shoot, I -- I most likely introduced myself, and...

**Q.** Did you tell him why he was -- why you were speaking with
him?

**A.** I wanted to talk with him, and Agent Muller wanted to come
up and talk to him also. Trying my best to remember. I
just -- I don't know exactly what all was said.

**Q.** How long did it take for Agent Muller to get to your
location?

**A.** About five minutes.

**Q.** And how did Agent Muller know to come to that location?

**A.** We spoke by telephone -- or cell phone.

**Q.** Did you speak at all with Dr. Weber during the time period
that you were waiting for Agent Muller to arrive?

**A.** I could have, but I don't know what we would be talking
about at that particular time.

**Q.** Was he still in his car the whole time, or did you get out
with him?

**A.** I believe I got out of the vehicle, yeah.

**Q.** You got out of the vehicle. Where was Dr. Weber at the
time that you were waiting?

**A.** In his truck.

**Q.** And when Special Agent Muller showed up, what happened?

**A.** I explained what was going on. And at that time I told him that basically it wasn't an arrest and that there was an-- about an allegation of an investigation going on. And from there we determined where it would be best to speak with him. You know, we had a couple options of maybe go back to the hospital and get a room there and talk. There was also maybe the police department, you know, for our criminal investigation unit. And then, ultimately, he decided it would be best to just go back to his house.

**Q.** So just so I'm clear, you and Agent Muller informed Dr. Weber that you wanted to speak to him about an allegation?

**A.** Yes.

**Q.** And he agreed to speak with you?

**A.** Yes.

**Q.** And that interview subsequently took place in his home?

**A.** Yes, it did.

**Q.** Do you know who suggested you go to his home to speak with him?

**A.** I believe it was him.

**Q.** "Him" being Dr. Weber?

**A.** Yes, sir.

**Q.** How far away was his house?

**A.** You know, from where we were at, within a mile. It's right there in Pine Ridge. We were on the north end of town,

1  and his residence was in the IHS -- or Indian Health Services
2  compound housing area.
3  Q.   How did Dr. Weber get from the IHS parking lot where he
4  was initially stopped to his home to speak with you?
5  A.   He drove his own vehicle.
6  Q.   Anybody else with him in the car?
7  A.   No.
8  Q.   Once you got to his home, where did the interview actually
9  take place?
10 A.   It took place inside of his kitchen area, the inside of
11 his home.
12 Q.   At any point during the interview with Dr. Weber, did you
13 advise him that he was going to be placed under arrest?
14 A.   No.
15 Q.   When he spoke with you, was he placed in handcuffs?
16 A.   No, he was not.
17 Q.   Was he told he was not free to leave at any time?
18 A.   He was free to leave at any time.
19 Q.   At any point during the interview with Dr. Weber, did it
20 appear as though he did not understand what was going on?
21 A.   No.
22 Q.   Was Dr. Weber arrested at the end of the interview?
23 A.   No.
24 Q.   How long was the interview, approximately?
25 A.   About two hours.

1  Q.   And do you know was that recorded?

2  A.   Yes, sir.

3  Q.   Who was recording it?  Do you recall?

4  A.   Special Agent Muller.

5  Q.   Okay.  I have no further questions.  Thank you, sir.

6          THE COURT:  Cross-examination.

7          MR. STEINBERG:  Thank you, Judge.

8                    CROSS-EXAMINATION

9  BY MR. STEINBERG:

10 Q.   Good morning, sir.

11 A.   Good morning.

12 Q.   So I noted that you said on two separate occasions you got

13 him stopped or "after I stopped him."  And it's correct that

14 you did have his vehicle stopped.  Correct?

15 A.   Yes, sir.

16 Q.   And I'm also correct that prior to this particular time

17 frame, he had been under surveillance; correct?

18 A.   I don't know if it's surveillance but have -- looking for

19 him, yes.

20 Q.   Okay.  And how long had you been using your term "looking

21 for him"?

22 A.   I'm not sure.

23 Q.   Was it an hour?  Was it a week?

24 A.   Oh, for that day, I was looking for him too, yes.

25 Q.   And you had been looking for him prior to that as well;

1  correct?

2  A.   Yes, sir.

3  Q.   And had you left a note, had you left a card, had you left

4  any information for him indicating you were looking for him?

5  A.   Not that I recall.

6  Q.   And were you doing this looking for him -- I'm going to

7  use the term "surveillance" so we're on the same page because

8  it's easier for me to get out of my mouth.  I mean no

9  disrespect.

10         Were you conducting the surveillance by yourself, or

11  were other agents involved as well?

12  A.   I had been locking for him.  I even went to Spearfish,

13  South Dakota at one time.

14  Q.   And do you know if other agents were also assisting you in

15  that regard in looking for him?

16  A.   I believe Special Agent Muller was also.

17  Q.   And tell me how long this had been going on prior to the

18  day in question where you stopped him?

19  A.   That I had been being looking for him?

20  Q.   Yes, sir.

21  A.   Or surveilling him, as you say?

22  Q.   Yes, sir.  Either one.

23  A.   I don't know exactly.

24  Q.   If I said a week, would that be fair?

25  A.   Possibly.

Q.   And then is it also fair to say that you were aware that he was moving out of his home?

A.   On that particular week, yes.

Q.   And prior to his stopping, he was leaving; correct?

A.   I believe he was, yes.

Q.   And, therefore, it became more important in your mind to, if you will, stop him before he was able to leave; correct?

A.   Well, because I believe to stop him because Agent Muller was also in Pine Ridge at the time, and seeing if we could talk to him about the investigation.

Q.   Fair enough.

Now, when you stopped him, obviously, you had not met him or spoken to him before; is that correct?

A.   I have, I believe, briefly, in the emergency room at the hospital because he's a doctor, and he was in there.  I don't know what he was in there for, but I've bumped into him.  I've casually said "hi" or "good morning" to him before.

Q.   Don't take this the wrong way, but you appear to be somewhat memorable in terms of just your size.  You're a big fellow.  I'm sure you've heard it before.

A.   Every day.

Q.   And I don't mean to cast aspersions, and that's not my intention.

A.   No, I am not offended.

Q.   So during your conversation previously, had you announced

1  who you were to him?  Do you know?

2  A.    I believe so, yeah.  I always do.  It's just a common

3  habit I had at the particular time.  I always wear a badge

4  around my neck, you know.  And then I also carry my credentials

5  with me.

6  Q.    And on this particular day, the day of the stop, although

7  you were wearing -- excuse me -- although you were in an

8  unmarked car, is it fair to say that when you made contact with

9  him, you had your ID on you?

10  A.    Yes, I always have my ID.

11  Q.    And your ID identifies you as a federal law enforcement

12  officer?

13  A.    Special agent, yes.

14  Q.    And you knocked your -- or not knocked on your -- knocked

15  on his window?

16  A.    I believe so.

17  Q.    And said, "Hey, I am" -- and then you said --

18  A.    Yeah, just introduce yourself, you know.

19  Q.    And you introduced yourself as Special Agent Bennett and

20  you're with --

21  A.    The Bureau of Indian affairs.

22  Q.    And "We'd like to talk to you"?

23  A.    Yes.

24  Q.    Or words to that effect?

25  A.    Yes.

Q.    Did I get that right?

      And you tell him, "By the way, you're going to have

to wait because I need to have a second agent assist me."

Correct?

A.    Yeah, because there was another agent coming.

Q.    Okay.  So what do you have him do?  I assume that you have

him pull out of traffic.

A.    Yeah, I believe we're in the parking lot at the Lakota

Cafe.  And we just sit there, and we wait approximately -- I'm

guessing it was about five minutes when Special Agent Muller

showed up.

Q.    All right.  And during that time frame, how do you get him

off the -- and maybe I got this wrong in my mind's eye.  But I

thought that he was on a roadway, and you had him pull off the

roadway into the parking lot to wait.  Is that right?

A.    Yeah.  There's construction going on.  So it wouldn't make

sense for us to stay out there on the roadway to block traffic

you know.  So we pull off to the side.

Q.    So you said, "Hey, would you pull over here and" --

A.    Could have been something to that effect.

Q.    And then do you wait in your car, and he waits in his car?

A.    I believe so.  Or I could have been outside.  I'm not

sure.  I like to stretch because of my small, you know, and I

was in a small vehicle.

Q.    Okay.  Is it fair to say that you were literally outside

1  his vehicle waiting for Agent Muller?  Is that how you

2  pronounce his name?

3  **A.**    "Muller," yes.

4  **Q.**    You were waiting for Agent Muller to arrive, and you were

5  standing right outside the defendant's vehicle; correct?

6  **A.**    I could have.  I'm not quite sure.

7  **Q.**    All right.  And it took about five minutes, and then

8  Muller comes up; correct?

9  **A.**    Yes, sir.

10  **Q.**    And can you hear the conversation that Muller had with the

11  defendant?  Were you able to hear any of it?

12  **A.**    I believe part of it, yeah.

13  **Q.**    Tell me what you recall hearing Muller say to the

14  defendant.

15  **A.**    I believe it was just along the lines of tell him about

16  the allegation and like talked to him.  It wasn't that he had

17  to talk to us.  It would be voluntary.

18  **Q.**    What was the allegation that Muller recounted to the

19  defendant?

20  **A.**    I don't exactly know.

21  **Q.**    What do you recall?

22  **A.**    I recall he talked to him about particular stuff that

23  happened at IHS.

24  **Q.**    And was it allegations of sexual abuse?

25  **A.**    You know, I'm not sure if that initially came out at that

1  point or not.

2  **Q.**   Had you mentioned that to Dr. Weber?  When you made your

3  initial contact with him on the street, did you tell him, "We

4  want to talk to you about allegations concerning sexual abuse"?

5  **A.**   You know, I can't remember.

6  **Q.**   What would have been your normal habit and routine?  I

7  mean, I'm assuming that most people would want to know what you

8  want to talk to them about.

9  **A.**   Sure.  I understand what you are saying.  Usually I would.

10  You know, if I was doing the investigation, then most of the

11  time I would like to have them contacted somewhere, you know,

12  at the residence or somewhere.  But for this particular one, I

13  can't remember that I specifically said it was about sex abuse

14  or about an investigation going or what.

15  **Q.**   Is it fair to say that your normal habit and routine would

16  be to say that this is about a sexual abuse allegation?

17  **A.**   Yes.

18  **Q.**   Okay.  Now, after the 5-minute wait for Agent Muller to

19  arrive, how long does he have contact or discussion with Weber

20  before you leave that area?

21  **A.**   I would say less than five minutes or so.

22  **Q.**   Where are you positioned during that discussion?

23  **A.**   I cannot remember.

24  **Q.**   You are still out of your vehicle?

25  **A.**   Yes, sir.  Yes, sir.

1  Q.    And you provided cover.  Is that a standard operating

2  procedure where you provide cover to another agent when he's

3  making contact with a suspect?

4  A.    Could be, yeah.  I mean, we're both outside, yeah.

5  Q.    And would you have been on the other side of the vehicle,

6  or would you have been on the same side as Muller?  What's the

7  normal routine here?

8  A.    I had been on both sides of the vehicle.  I could have

9  been right next to him, near him.  I just don't recall or

10 remember exactly.

11 Q.    And do you recall what you were wearing that day?  Were

12 you in a suit as you are today?

13 A.    No, sir.

14 Q.    What were you wearing that day?

15 A.    BBUs, they were khaki in color, and I wear just a regular

16 button-up type shirt.  I don't have a -- the issued shirts that

17 come out for the Bureau of Indian Affairs, the polos don't come

18 in my size.  So actually I just wear whatever I can fit.  So

19 it's usually a button-up shirt, and I do have my badge around

20 my neck.

21 Q.    So it's clearly visible?

22 A.    Yes, it is.  Sometimes it's inside my shirt, though, too.

23 You know, and I can bring it back out.

24 Q.    And were you armed?

25 A.    Yes, sir.

1   **Q.**   And tell me what Muller was wearing?

2   **A.**   I can't remember.

3   **Q.**   To your knowledge was he armed?

4   **A.**   Yes.

5   **Q.**   So then you returned to Weber's residence -- correct? --

6 after this approximate five-minute -- we're about ten minutes

7 at the parking lot total.  I'm suggesting that because it was

8 five minutes before Muller arrived, and you said it was about

9 five minutes during the contact between Muller and Weber.  Is

10 that fair?

11   **A.**   Yes, sir.

12   **Q.**   So about ten minutes in the parking lot.  And then,

13 although you don't remember the discussion between Muller and

14 Weber, you then return to Weber's home; correct?

15   **A.**   Yes, sir.

16   **Q.**   And it's fair to say that Weber's home is in the process

17 of being vacated?

18   **A.**   Yes.

19   **Q.**   There's boxes all over.  There's not much furniture.  It's

20 clearly being -- if you will, he's moving out.

21   **A.**   Yes.  There was -- yeah, there was no furniture.  I

22 believe I stood most of the time or leaned.

23   **Q.**   Since there was no furniture, where was Weber during the

24 conversation?

25   **A.**   Inside the residence in the kitchen area.  I believe I was

1  back here, and he would be across from me.

2  **Q.**    And you had to stand.  Is that fair?  All of you?

3  **A.**    I did because there wasn't really nothing there to support

4  my size.  So I'm used to standing wherever I go, but I believe

5  I also leaned against something at the time too.

6  **Q.**    My question is, so the judge is clear, there was no

7  furniture in the area where Weber was interviewed; isn't that

8  correct?

9  **A.**    I believe that is correct, yeah.

10  **Q.**    So you basically stood around him for approximately two

11  hours conducting this interview; correct?

12  **A.**    Yeah, I stood.  He was here, and I stood back over here.

13  **Q.**    And so when you say, "he was here," he was standing;

14  correct?

15  **A.**    You know, I'm not sure.

16  **Q.**    Okay.  Was Muller standing?

17  **A.**    I believe he sat down at a particular area.  I'm not sure

18  what kind of make shift area it was that he sat, but he was

19  sitting.

20  **Q.**    And you don't remember if Weber was sitting?

21  **A.**    I can't remember exactly.

22  **Q.**    And were you within -- if I said two to three feet of

23  Weber at all times, would you agree?

24  **A.**    No.

25  **Q.**    What would your response be in terms of your distance from

1  Weber?

2  **A.**    I'd say over five feet.

3  **Q.**    What was your role?  Did you ask questions?

4  **A.**    Yes, sir.

5  **Q.**    And did Muller ask questions?

6  **A.**    Yes, sir.

7  **Q.**    And was Muller within two to three feet of Weber at all

8  times?

9  **A.**    In that approximate area.

10         MR. STEINBERG:  I have nothing further.  Thank you

11  for your patience, Judge.

12         THE COURT:  Redirect, Mr. Starnes.

13         MR. STARNES:  Thank you, Your Honor.

14                    REDIRECT EXAMINATION

15  BY MR. STARNES:

16  **Q.**    Agent Bennett, just a few questions for you.  The defense

17  counsel, Mr. Steinberg, asked you about carrying weapons when

18  you first encountered Dr. Weber.

19         Do you recall that?

20  **A.**    Yes, sir.

21  **Q.**    What were you actually armed with?

22  **A.**    A Glock 40.

23  **Q.**    And that's a pistol?

24  **A.**    Yes, a handgun.

25  **Q.**    Did you at any time draw your weapon on Dr. Weber?

1  **A.**   Absolutely not.

2  **Q.**   Did Special Agent Muller ever draw his weapon on

3  Dr. Weber?

4  **A.**   No.

5  **Q.**   And where is that weapon normally carried?

6  **A.**   I carry it on my right hip.

7  **Q.**   And is that where you carried it when you first

8  encountered Dr. Weber?

9  **A.**   Yes, sir.  Mine is usually -- I have my shirt over my

10 firearm.

11 **Q.**   So it's not always visible?

12 **A.**   No, and I don't tuck my shirt in like I am today.

13 **Q.**   That's the other thing I wanted to ask you, just so we're

14 clear on the record.  There's been a lot of mention of your

15 size.  If you wouldn't mind just telling us how tall are you?

16 How much do you weight?

17 **A.**   I weigh about 450 pounds.  I stand 6 feet 12 inches tall,

18 and I wear a size 22 shoe.

19          MR. STARNES:  Thank you, sir.  I have no further

20 questions.

21          THE COURT:  Is the witness excused?

22          MR. STARNES:  Yes, please, Your Honor.

23          THE COURT:  You may step down.  Thank you.

24          THE WITNESS:  Can I leave that chair there?

25          THE COURT:  That's fine.  Thank you.

CURT MULLER - DIRECT EXAMINATION BY STARNES

1          Mr. Starnes, next witness.

2          MR. STARNES:  Thank you, Your Honor.  The United

3  States calls Special Agent Curt Muller to the witness stand,

4  please.

5

6                    CURT MULLER,

7  called for examination by counsel for the government, after

8  having been first duly sworn to testify the truth, the whole

9  truth, and nothing but the truth, testified as follows:

10          THE COURT:  Good morning, sir.

11          THE WITNESS:  Good morning.

12          THE COURT:  Would you state your full name and spell

13  your last name.

14          THE WITNESS:  My name is Curt Muller, and the last

15  name spelling is M-U-L-L-E-R.

16          THE COURT:  Go ahead, Mr. Starnes.

17          MR. STARNES:  Thank you, Your Honor.

18                    DIRECT EXAMINATION

19  BY MR. STARNES:

20  **Q.**   Good morning, sir.  Could you please tell us who do you

21  work for?

22  **A.**   I am an inspector with the US Department of Health, and I

23  work in the office of the Inspector General.  My office is in

24  Sioux Falls, South Dakota.

25  **Q.**   What capacity do you work?

1  **A.**   I am the inspector/special agent, and I investigate

2  currently dealings that involve with -- internal affairs with

3  HHS employees.

4  **Q.**   How long have you worked in the office of inspector

5  general for HHS?

6  **A.**   It will be 18 years next month.

7  **Q.**   So in that capacity, did you come to investigate an

8  individual named Dr. Stanley Weber?

9  **A.**   Yes.

10  **Q.**   And the individual that you investigated and know as

11  Dr. Weber, do you see him in the courtroom here today?

12  **A.**   I do.

13  **Q.**   Would you please identify that individual by pointing to

14  that individual and stating an article of clothing that

15  individual is wearing.

16  **A.**   The individual is seated on the left side of defense

17  counsel, glasses, and a checkered shirt.

18          MR. STARNES:  The record reflects that Special Agent

19  Muller has identified the defendant as Dr. Weber.

20          THE COURT:  The record will reflect.

21  BY MR. STARNES:

22  **Q.**   Sir, when did you first begin to investigate Dr. Weber?

23  **A.**   October of 2015.

24  **Q.**   What types of offenses were you investigating?

25  **A.**   Sexual abuse of minors.

1  **Q.**   Where did those allegations arise?

2  **A.**   On the Pine Ridge Indian Reservation, Pine Ridge, South

3  Dakota.

4  **Q.**   And were you investigating Dr. Weber in May of 2016?

5  **A.**   Yes.

6  **Q.**   Did you have an occasion to interact with him that day?

7  **A.**   I did.

8  **Q.**   So I want to talk to you a little bit about that.  Where

9  were you when you encountered Dr. Weber in May of 2016?

10  **A.**   It would have been at the Lakota Cafe in the parking lot

11  in Pine Ridge, South Dakota.

12  **Q.**   And how did you come to interact with Dr. Weber that day?

13  **A.**   Special Agent Fred Bennett went to Bureau of Indian

14  Affairs and contacted me and said that he saw Dr. Weber stuck

15  in a construction zone in Pine Ridge, on the outskirts of Pine

16  Ridge, and asked if we should try to make contact with him for

17  an interview.  And I said, "Yes, we should."  He later got back

18  to me, within minutes, and said that he and Dr. Weber were

19  parked at the Lakota Cafe parking lot area, and I went to that

20  location and arrived about five minutes later.

21  **Q.**   So when you first got to that area, what did you see?

22  **A.**   I saw two vehicles.  The parking lot was nearly empty,

23  other than that.  Saw a construction zone as I approached.  And

24  once I approached, both Dr. Weber and Special Agent Bennett

25  were outside the vehicles.

1  **Q.**   They were both standing outside?

2  **A.**   They were.

3  **Q.**   What were they doing?

4  **A.**   Looked like they were talking.  I couldn't tell.  As I

5  walked up, they were both standing looking at each other.

6  **Q.**   What was -- well, let me ask you this:  Was Dr. Weber

7  placed in any sort of restraints at that point?

8  **A.**   No.

9  **Q.**   Did Special Agent Bennett have his firearm out?

10 **A.**   Not that I saw.

11 **Q.**   When you walked up, what did you do?

12 **A.**   I just walked up.  I showed my credentials to Dr. Weber.

13 Reminded him that we had met one month prior in his capacity as

14 the acting clinical director for Indian Health Services when he

15 was located in Sioux Falls, South Dakota.  He indicated that he

16 remembered me from the conversation we had one month prior.

17 Told him we had a matter I'd like to talk to him about based on

18 an investigation from the Indian Health Service and if he would

19 be willing to talk to us.  And he said he would.

20 **Q.**   Did you specifically tell him the matters that you wanted

21 to speak to him about at that time?

22 **A.**   No.

23 **Q.**   But he agreed to speak with you?

24 **A.**   Yes.

25 **Q.**   Where did you ultimately end up speaking?

1   **A.**   At his residence in Pine Ridge.

2   **Q.**   Why did you choose to go to his residence?

3   **A.**   It seemed like the most comfortable location for him.  We

4   couldn't go back to the hospital because he had been suspended

5   and resigned several days before that.  So I didn't think that

6   would be a comfortable location but would be a normal location

7   that we would take for interviews.  And he offered up his

8   residence, so we went to that location.

9   **Q.**   How far aware was his house?

10  **A.**   Approximately -- with the construction that we had to get

11  through, it was about an 8-minute drive.  But it was probably a

12  mile to a mile and a half.

13  **Q.**   And how did you get from the parking lot to Dr. Weber's

14  house?

15  **A.**   I personally drove my own government vehicle to

16  Dr. Weber's house from that parking lot.

17  **Q.**   Do you know how Dr. Weber got to his house?

18  **A.**   He drove his own personal vehicle as well, a Ford F150

19  pickup.

20  **Q.**   Did anybody, to your knowledge, ride with Dr. Weber from

21  the Lakota Cafe parking lot to his home?

22  **A.**   No.

23  **Q.**   What happened when you got to his house?

24  **A.**   Dr. Weber pulled into the approach, which was a space for

25  one vehicle.  I parked onto the street and hopped out of my

1  vehicle, and we had some small talk about a new pickup that he
2  had purchased, a Ford pickup.  And he invited us into his
3  residence.  We went through the garage and accessed the kitchen
4  and living room area, which was kind of a combined area through
5  an access door through the garage with myself, Dr. Weber, and
6  Special Agent Bennett.

7  **Q.**   To your knowledge, did Special Agent Bennett also drive
8  separately?

9  **A.**   He did.

10 **Q.**   Okay.

11 **A.**   He also parked on the street.

12 **Q.**   So you get inside the house.  Where did you go to?

13 **A.**   We went through, initially, through the garage.  It had an
14 access door that Dr. Weber opened that opened up into a
15 kitchen/living room combination area and went into the -- it
16 would be more of the kitchen area at that point where we were
17 at.

18 **Q.**   Did you begin to record the interview with Dr. Weber?

19 **A.**   We had a brief conversation that, once again, we just
20 wanted to discuss some matters with him.  That, you know, he
21 didn't have to have us there in his residence.  We could end it
22 at any time and it was a voluntary contact.

23        I asked Dr. Weber -- I said that I'd prefer to record
24 the conversation with his permission, and he said that he would
25 be agreeable to that.  So we started to record the

 1  conversation.

 2  **Q.**   So he agreed to the recording of the interview?

 3  **A.**   He did.

 4  **Q.**   Did you provide Dr. Weber with any advisement prior to

 5  beginning the substantive interview with him?

 6  **A.**   Yes.

 7  **Q.**   What was the general nature of that rights advisement?

 8  **A.**   I went through a fairly detailed advisement that he didn't

 9  need to talk to us.  He wasn't in custody.  We had no

10  indictments or warrants for his arrest.  And if he wanted to

11  answer specific questions and didn't want to answer other

12  questions, he could refuse any questions, and he could end the

13  interview at any time.

14  **Q.**   All right.  At any point during the time that you were in

15  Dr. Weber's home, did you tell him he was not free to go?

16  **A.**   No.

17  **Q.**   Did you tell him he was free to go?

18  **A.**   He was always free to go, and I told him as much.

19  **Q.**   Was he ever placed in handcuffs?

20  **A.**   No.

21  **Q.**   Was he ever placed in any other type of restraint?

22  **A.**   No.

23  **Q.**   How long did the interview last?

24  **A.**   Just slightly over two hours.

25  **Q.**   Did it all take place in the same location inside the

1  home?

2  **A.**    Yes.

3  **Q.**    And we heard Special Agent Bennett talk about his

4  recollection of sort of where everybody was during that

5  interview.  Can you tell us what's your recollection of where

6  everybody was located during the interview?

7  **A.**    I'll start with myself first.  There wasn't much furniture

8  that was left, but there was some furniture in the residence.

9  I sat on the far wall, which I believe would be the north side.

10 There was a plank and a couple of cinder blocks that plants

11 were located on, and I sat at that location.  Dr. Weber had, as

12 I recall, a metal folding chair that was more toward the center

13 of the room.  And Special Agent Bennett did stand through the

14 entire interview.

15 **Q.**    Was there ever a point in time during the interview where

16 Dr. Weber expressed that he did not want to answer certain

17 questions?

18 **A.**    Yes.

19 **Q.**    And was he allowed to decline to answer certain questions?

20 **A.**    Yes.

21 **Q.**    At the time you interviewed Dr. Weber in May of 2016, do

22 you know approximately how old he was?

23 **A.**    I think he was approximately 68 or 67.

24 **Q.**    And what was his profession?

25 **A.**    He was a medical doctor.

1 **Q.** Do you know how long he had been a medical doctor?

2 **A.** Well, he had mentioned that he worked for the federal

3 government in that capacity for approximately 21 years, and I

4 believe he was a medical doctor prior to that service starting.

5 **Q.** Was there any special interrogation techniques or

6 interview techniques that were used, enhanced interrogation

7 techniques?

8 **A.** No, sir.

9 **Q.** Is it fair to say this was a general question-and-answer

10 session?

11 **A.** Yes, it was.

12 **Q.** At the conclusion of the interview, was Dr. Weber

13 arrested?

14 **A.** No.

15 **Q.** Was he cited?

16 **A.** No.

17 **Q.** Was he free to go about his business?

18 **A.** Yes.

19 **Q.** You indicated that you recorded that interview?

20 **A.** Yes, I did.

21 **Q.** How long was it?

22 **A.** It's approximately two hours.

23 **Q.** And did you provide a copy of that interview to me?

24 **A.** Yes.

25 　　　　MR. STARNES: And I've provided a copy of that to the

 1  Court.  It's been labeled as Exhibit A, Your Honor.  I would
 2  ask that the Court accept that as evidence as part of this
 3  hearing in consideration of the defense motion?
 4          THE COURT:  Ms. Steinberg?
 5          MR. STEINBERG:  No objection, sir.
 6          THE COURT:  Exhibit A is admitted.
 7      (Government's Exhibit A admitted into evidence.)
 8  BY MR. STARNES:
 9  Q.   Then did you have that same interview transcribed?
10  A.   Yes, sir.
11  Q.   Who transcribed it?
12  A.   It would have been Word Wizards, out of, I think, Silver
13  Spring, Maryland.
14  Q.   And have you subsequently reviewed the transcript?
15  A.   Yes.
16  Q.   And have you compared that to the audio recording?
17  A.   Yes.
18  Q.   Is that a verbatim transcript of the audio recording?
19  A.   Yes.
20          MR. STARNES:  Your Honor, I would mark that
21  transcript as Exhibit B.
22  BY MR. STARNES:
23  Q.   Special Agent Muller, do you know how long the transcript
24  is?
25  A.   It's 135 pages.

1          MR. STARNES:  Okay.  So I have provided what I have
2    marked as Exhibit B to the Court.  I would move that the Court
3    consider that as part of this hearing as well.
4          MR. STEINBERG:  No objection, sir.
5          THE COURT:  Exhibit B is admitted.
6          (Government's Exhibit B was admitted into evidence.)
7          MR. STARNES:  Bear with me just one moment, Special
8    Agent Muller.  That may be all of the questions I have for you.
9          (Reviewing documents.)
10          MR. STARNES:  Nothing further, Your Honor.  Thank
11   you.
12          THE COURT:  Cross-examination.
13                    CROSS-EXAMINATION
14   BY MR. STEINBERG:
15   **Q.**   You had stated you had met Dr. Weber a month prior?
16   **A.**   Yes, sir.
17   **Q.**   Where was that, sir?
18   **A.**   It was at an Indian Health Service -- I don't know if they
19   would call it summit.  It was in Sioux Falls, South Dakota,
20   where the director of Human Health Services had met and
21   assembled a variety of Indian Health Service representatives
22   and others to deal with issues that related to the Pine Ridge
23   Indian Reservation and to the Great Plains Area IHS.
24   **Q.**   And were you aware at that meeting of any allegations
25   concerning sexual abuse?

1   **A.**   Yes, sir.

2   **Q.**   When you had the meeting a month prior, although you were

3   armed with that information, did you mention that to Dr. Weber?

4   **A.**   No, sir.

5   **Q.**   During the discussion you had with Dr. Weber at that

6   conference -- is it fair to call it a conference?

7   **A.**   I wouldn't call it a conference because there wasn't

8   necessarily a conference atmosphere.  It was more of a large

9   meeting for one day.

10  **Q.**   Okay.  At that meeting, you met with and spoke to

11  Dr. Weber and never mentioned anything about him being a

12  suspect; correct?

13  **A.**   That's correct, sir.

14  **Q.**   And how long do you think you discussed anything with him

15  during that meeting?

16  **A.**   Maybe a minute.  It was more of an introduction of who I

17  was.  Because of my position and because of his position at the

18  hospital, we were likely to have interactions, and I mentioned

19  that to him.

20  **Q.**   Okay.  And you told him that the interaction would be

21  about what kind of thing that you were likely to have?

22  **A.**   Well, Dr. Weber was the acting clinical director at the

23  hospital at the time, and the facility was under extreme

24  scrutiny with the Center for Medicare and Medicaid services for

25  quality of care.  And Dr. Weber also supervised medical staff

1    in that facility that we would have potential to investigate

2    for things such as quality of care, diversion, and other

3    matters.

4    **Q.**   And clearly you never told him he was a suspect of any

5    type of crime at that meeting?

6    **A.**   That's correct, sir.

7    **Q.**   Then you see him on the day in question; correct?

8    **A.**   The day in question being May 19th?

9    **Q.**   Yes, sir.

10   **A.**   Yes.

11   **Q.**   You don't mention to him, before you suggest that you go

12   to the house, that you were there because he was a suspect of

13   any crime, do you?

14   **A.**   No, sir.

15   **Q.**   In fact, you purposely did that because, although you

16   didn't use enhanced techniques, you wanted to surprise him with

17   the allegations; correct?

18   **A.**   I wanted to discusses it in a little more private manner

19   instead of a parking lot next to a construction zone.

20   **Q.**   Well, you also didn't want to tip him off that the purpose

21   of your meeting was because you believed he was involved in

22   criminal activity; correct?

23   **A.**   I felt that he probably was tipped off already when he was

24   suspended and resigned his position a few days prior.

25   **Q.**   Well, did you know what he was told?  Was he ever told, to

1   your knowledge, that he was a suspect in a criminal case or

2   that he was just asked to resign?

3   **A.**   He wasn't asked to resign.  The specific document that

4   went forward was he was put on administrative leave related to

5   a factfinding investigation due to misconduct of an employee.

6   **Q.**   So did he resign, or was he fired?

7   **A.**   He resigned.

8   **Q.**   Okay.  So I asked if he had resigned.  So he did resign.

9   And there was no hearing or anything with regard to that;

10  correct?

11  **A.**   That's correct.

12  **Q.**   Then you encounter him in the parking lot, and you say,

13  "Hey, remember me?  I'm the guy you talked to"?

14  **A.**   Yes.

15  **Q.**   And you say, "I'd like to talk to you."  Correct?

16  **A.**   Correct.

17  **Q.**   Never telling him about what; correct?

18  **A.**   I told him it was related to an investigation at IHS.

19  **Q.**   Okay.  But you don't give him the specifics that, in fact,

20  he was the target?

21  **A.**   Correct.

22  **Q.**   And then you're the one who suggests that you go to his

23  house; correct?

24  **A.**   Incorrect.

25  **Q.**   Okay.  Did you suggest that you go to -- I assume there's

1  some kind of government agency department that you could have

2  taken him to?

3  **A.**   Yes.

4  **Q.**   You chose not to do that; correct?

5  **A.**   That's correct.

6  **Q.**   Did you offer him that opportunity?

7  **A.**   We talked about locations we could go to.  We discussed

8  the hospital.  We discussed going into a law enforcement center

9  which is available.  And we talked about his house.  And I

10 said, "Where would you be comfortable?"

11         And he said, "Let's do it at my house."

12 **Q.**   So you did offer him those three, including his house?

13 **A.**   Those were the three we talked about, yes.

14 **Q.**   I mean, you offered those three, am I right?

15 **A.**   That's correct.

16 **Q.**   Okay.  And then you talked about this extensive

17 advisement.  It wasn't pursuant to Miranda; correct?

18 **A.**   No.

19 **Q.**   And you never mentioned anything about a lawyer; correct?

20 **A.**   Correct.

21 **Q.**   And you don't begin to tell him that he's the focus and

22 target of this criminal investigation until you are already

23 inside his house; correct?

24 **A.**   Actually, he brings it up before we get into the house.

25 He mentions prior allegations that another doctor had provided.

1 He was curious if this is what it was related to, based on his

2 administrative leave and our visit with him.

3 **Q.**    That was recorded?

4 **A.**    No, sir.

5 **Q.**    Okay.

6 **A.**    Because we were walking into the house.  I hadn't asked

7 his consent at that point.

8 **Q.**    So did you tell him why you wanted to talk to him before

9 that?

10 **A.**    The only thing I mentioned to him is it related to an

11 investigation to do with IHS.

12 **Q.**    Okay.  And did he ask you what that investigation was?

13 **A.**    No.

14 **Q.**    And then he volunteers something about another doctor?

15 **A.**    Yes, sir.

16 **Q.**    And did he tell you that he had been cleared of those

17 allegations?

18 **A.**    Later on in the interview, he mentioned he had been

19 cleared with a variety of allegations.

20 **Q.**    Including the ones that he had mentioned to you prior to

21 your entering his house?

22 **A.**    He didn't go into specific allegations before we went into

23 the house.  He just mentioned there was an allegation made

24 prior by another doctor.  He never went into specific

25 allegations of what the doctor had said.

1 **Q.**   So it could have been malpractice, didn't treat patients

2 in terms of a proper medical care, that kind of thing?

3 **A.**   It was left open-ended.

4 **Q.**   Okay.  So --

5 **A.**   Never --

6 **Q.**   I'm sorry.  I didn't mean to speak over you.

7 **A.**   I said it was left open-ended on that part of the

8 discussion.

9 **Q.**   So it's fair to say that in no way, shape, or form did he

10 suggest to you before you entered his house that he believed or

11 thought that this was about some kind of criminal investigation

12 where he was the target; correct?

13 **A.**   It was unclear whether he realized that or not at that

14 point.  Because he brought up the allegations from the other

15 doctor, and he had clearly -- knew that -- obviously, he had

16 resigned his position with IHS days before under the

17 investigation.  So I don't know what was in his mind on that

18 part.

19 **Q.**   And then when did you tell him that you were investigating

20 the sexual abuse?

21 **A.**   It became pretty evident in the interview once the audio

22 recording had started and the warnings had been provided to him

23 that we were investigating allegations of sexual abuse and we

24 used specific names of alleged victims.

25 **Q.**   Now, you say, "Warnings."  Are these warnings written out

1    somewhere?  Are they codified anywhere?

2    A.   No, sir.  I just advised him that he was free to leave and

3    the questioning was voluntary.  It was up to him whether he

4    kept us there or asked us to leave.

5    Q.   Okay.  And at all times you and your fellow agent were in

6    his presence; correct?

7    A.   Yes sir.

8    Q.   And you were within 3 to 5 feet of him at all times;

9    correct?

10   A.   No, I would say that I wasn't within 3 to 5 of him.  I

11   would say that it might have been up to 6 feet away.  He was

12   more in the center of the room.  I was against the wall, and

13   Agent Bennett was against a different wall.

14   Q.   And both of you were asking him questions?

15   A.   Yes, sir.

16   Q.   Both of you were armed?

17   A.   Yes, sir.

18            MR. STEINBERG:  I have nothing further.  Thank you,

19   Judge.

20            THE COURT:  Redirect, Mr. Starnes?

21            MR. STARNES:  No questions, Your Honor.  Thank you.

22            THE COURT:  Is the witness excused?

23            MR. STARNES:  Yes, please.

24            THE COURT:  You may step down.

25            THE WITNESS:  Thank you, sir.

1        THE COURT:  Any other witnesses, Mr. Starnes?

2        MR. STARNES:  No additional evidence on this motion,

3  Your Honor.

4        THE COURT:  All right.  You have any witnesses,

5  Mr. Steinberg?

6        MR. STEINBERG:  No, sir.  Thank you, sir.

7        THE COURT:  All right.  Then, Mr. Starnes, you want

8  to make your argument.

9        MR. STARNES:  Thank you, Your Honor.

10        Your Honor, what we have here is a voluntary contact

11  between the defendant and law enforcement on May 19, 2016.  You

12  know, Miranda is instructive in that if a person is in custody

13  and there's interrogation, then rights are required to be read.

14  We don't have that situation here.  Clearly, there was no

15  custody.

16        THE COURT:  So you're sitting in your truck stopped

17  at a construction zone and a large man knocks on your window

18  and says, "Hey, how is it going?  Would you mind" -- shows a

19  badge and says, "Would you mind pulling over into the parking

20  lot?"

21        Is that what happened?

22        MR. STARNES:  Initially, that's correct.

23        THE COURT:  Okay.  Is that voluntary?

24        MR. STARNES:  At that point, no, there's probably --

25  it's akin to a Terry stop at that point or a traffic stop,

1   something along those line, right.

2           Now, what happens is they then inform him, "Hey, we'd
3   like to talk to you.  We have this investigation, and we want
4   to speak with you."  And he agrees to actually speak with them.
5   So he's there for about 5 minutes.

6           Now, it's important to note --

7           THE COURT:  He's where for 5 minutes?  The parking
8   lot?

9           MR. STARNES:  The parking lot, for about 5 minutes.

10          THE COURT:  How long were they on the street?  When
11  Agent Bennett approached Mr. Weber, how long were they on the
12  street together?

13          MR. STARNES:  A short period of time, a couple of
14  minutes, long enough for Agent Bennett to say, "Hey, I'm Agent
15  Bennett with the BIA.  I'd like to speak with you.  Can you
16  pull over so we can talk not in this construction zone."

17          THE COURT:  All right.  So they get to the parking
18  lot.

19          MR. STARNES:  To the cafe.

20          THE COURT:  The parking lot of the cafe, yes.

21          MR. STARNES:  That's right, Your Honor.  The IHS
22  compound, that area there.  Now, I've never been to Pine Ridge,
23  so I can't tell you the layout of it, but it sounds like it was
24  pulled over just, you know, a few hundred yards, or something
25  to that effect, off the side of the road.

1     And then Agent Bennett explains to Dr. Weber,

2  "There's another investigator that wants to speak with you.

3  Would you mind hanging out here for a few minutes?"  He agrees.

4  So that's what happens.  They wait for about 5 minutes.  That's

5  what we heard from both --

6     THE COURT:  What obligation, if any, did the agents

7  have to disclose the purpose of the interview?

8     MR. STARNES:  I don't think they have an obligation

9  to disclose the exact purpose of an interview.  I can't find a

10 point of law that says that a law enforcement agent is required

11 to tell somebody directly, "We're investigating you for crime

12 X," to initiate an initial contact.

13    In fact, we know that can't be true because officers

14 are allowed to come up with ruses during interviews with

15 defendants all of the time, and that's something that's not

16 prohibited.  It may be something that defendants don't like,

17 defense counsel don't like, perhaps even courts disfavor.  But

18 it's not a prohibited practice.

19    So we know that based on the time line there's about

20 5 minutes of lag where Agent Bennett and Dr. Weber are speaking

21 with each other.  Agent Bennett puts Dr. Weber in the car.

22 Special Agent Muller, when he arrives, he recalls --

23    THE COURT:  Did anything happen during that 5-minute

24 lag that's relevant here to our analysis?

25    MR. STARNES:  I don't think, Your Honor, other than

1   Dr. Weber waited there for a few minutes at the request of
2   Special Agent Bennett.  That's really it.  They didn't discuss
3   anything substantive.  I don't think Agent Bennett told him,
4   "Hey, you are being looked at for various allegations of child
5   sex abuse."  If anything, it was probably talk about the
6   goings-on, the weather, any small idle chitchat until --
7               THE COURT:  You're just speculating?
8               MR. STARNES:  That's correct.  We really don't --
9               THE COURT:  You don't know.
10              MR. STARNES:  And neither does -- Agent Bennett could
11   not recall.
12              THE COURT:  Okay.  And the record here this morning
13   is we don't recall.
14              MR. STARNES:  We simply don't know.  We know that he
15   did not discuss anything substantive.  That's what he said.
16   Beyond that, we don't know.
17              THE COURT:  Okay.
18              MR. STARNES:  So Agent Muller shows up.  He recalls
19   seeing Dr. Weber standing outside the vehicle.  He approaches
20   him.  Tells him his name.  "I'm Special Agent Muller with
21   HHS-OIG.  I'd like to talk to you about some allegations," or
22   something to that effect.  And Dr. Weber agrees to speak with
23   them.  They discuss locations where the interview can take
24   place.  There were three locations.  We heard from both Special
25   Agent Bennett and from Special Agent Muller that they could

 1  have gone to the hospital.  They considered the police station
 2  or some law enforcement center.  And they considered
 3  Dr. Weber's house.
 4          It was quickly ruled out that they couldn't go to the
 5  hospital because Dr. Weber had previously resigned his position
 6  or retired from his position at the hospital, probably not
 7  under the best terms.  There were certainly allegations that
 8  were made, and so Dr. Weber resigned.  They knew that.
 9          THE COURT:  What kind of allegations?
10          MR. STARNES:  Well --
11          MR. STEINBERG:  I'm going to object to this because
12  it's not part of the record.
13          THE COURT:  Excuse me?
14          MR. STEINBERG:  I'm going to object because I don't
15  think it's part of the record what allegations were made, and I
16  think that the Court has to make its determination from the
17  record, and the prosecution determined not to go into this.
18          THE COURT:  All right.
19          MR. STARNES:  I actually, agree.
20          MR. STEINBERG:  And I --
21          THE COURT:  Hold on.  I'm talking now.  You've made
22  your objection.
23          MR. STEINBERG:  Yes, sir.
24          THE COURT:  I'm going to speak now.  Okay.  Would you
25  sit down, please.

1      MR. STEINBERG:  Yes, sir.

2      THE COURT:  All right.  The allegation, unless it's

3  contained in the transcript, I don't think the allegation was

4  fleshed out as to what the earlier complaint is.

5      MR. STARNES:  That's correct because it -- but really

6  for this analysis it's not important.  We know that there was

7  some sort of allegation that he resigned under that --

8      THE COURT:  So the hospital is ruled out for that

9  reason?

10      MR. STARNES:  For practical reasons, basically.

11      THE COURT:  All right.

12      MR. STARNES:  So the two options that they discussed

13  were going to a police station of some kind or going to

14  Dr. Weber's home.  And it sounds like, from the testimony

15  that's in the record, that Dr. Weber suggested he would prefer

16  to go to his house to do the interview, and that's what they

17  did.  And each of the three individuals --

18      THE COURT:  Was he free to leave at that point?

19      MR. STARNES:  He was.  And if he didn't believe that

20  he was free to leave, he was certainly made aware that he was

21  free to discontinue contact by the time they got to his home.

22      Now, I believe, based on what Special Agent Muller

23  and Special Agent Bennett said initially that -- in fact, I

24  think Special Agent Muller testified to it -- they told him

25  this was a voluntary contact before they ever left the parking

1  lot.  But he reaffirmed that statement to Dr. Weber, and that's
2  on the recording and in the transcript, on page 1 of the
3  transcript.  It carries over into page 2, but it's like one of
4  the first things he --

5         THE COURT:  Did Mr. Weber invite the agents into his
6  house?

7         MR. STARNES:  According to Special Agent Muller, yes,
8  he did.  So the three of them depart the location of the Lakota
9  Cafe.  They drive, whatever it is, 5 to 8 minutes to get to his
10 home.  They each drive separately.  So nobody is escorting him.
11 Nobody is in the vehicle with him.  Weapons aren't drawn.  He's
12 not in custody at that point in time.

13        They get to his house.  According to Special Agent
14 Muller, Dr. Weber invites them in through the garage and into
15 the kitchen area.  And then both Special Agent Bennett and
16 Special Agent Muller testified that they set up in the kitchen.
17 There was minimal furniture available because Dr. Weber had
18 resigned his post and was moving out of his house.  Special
19 Agent Muller took up position on a makeshift bench that was
20 some planks and a couple of cinder blocks.  It sounds like
21 Dr. Weber was in a chair of some type, some kind of folding
22 chair, camp chair, something to that effect.  And then Special
23 Agent Bennett stood, according to his testimony, 5 feet away
24 during the entirety of the rest of the contact.

25        And from that point forward we know that it's a

1  voluntary contact because Special Agent Muller tells him as
2  much at the very beginning of the interview.  He doesn't give
3  him a Miranda warning because he's not required to.  There is
4  no custody in this situation.

5        And so, now, the analysis turns on whether or not
6  Dr. Weber's statements are voluntary.  That's really where
7  we're at.  Because there's no custody, it's, was this
8  voluntary?  And voluntariness, according to *United States v*
9  *Haswood*, has approximately six factors this Court can look at.
10  And these are factors that I briefed in my motion on page 5.
11  And it states the factors that bear on voluntariness include:
12  One, the defendant's youth; two, the defendant's intelligence;
13  three, lack of advice of constitutional rights; four, the
14  length of detention; five, the repeated and prolonged nature of
15  the questioning; and, six, the use of physical punishment such
16  as deprivation of food or sleep.

17        So in addressing those factors and based on the
18  record that is before the Court for this motion -- and most of
19  this is included in the transcript itself.  But we have an
20  individual who has been a licensed medical doctor for quite
21  some period of time, over 20 years.  So, clearly, he's somebody
22  that, at minimum, has at least average intelligence, likely has
23  much higher intelligence than the average individual.  So this
24  is not somebody that we have to worry about being particularly
25  youthful; somebody who is being preyed upon because they have

1  borderline intelligence.

2         Although no Miranda warnings were given, there were

3  actual warnings given to Dr. Weber where he was told, "This is

4  a voluntary contact.  You are free to stop us at any time.  If

5  you want us to go, we leave.  If you don't want us to answer a

6  question -- or if you don't want to answer a question that we

7  pose to you, you are free to not answer it."

8         And we know that Dr. Weber heard that message and

9  understood that message because there's at least two points

10 during the interview where questions were asked.  He says, "I

11 don't want to answer that question," and they moved on.  And

12 that occurs on pages 71 and pages 78 of the transcript, Your

13 Honor.

14         THE COURT:  When I evaluate the length of detention,

15 is that the length of the questioning or the length of time

16 Mr. Weber was detained at the parking lot and on the street?

17         MR. STARNES:  Well, I would say it's probably the

18 period of time that they are in the home actually going through

19 substantive questioning.  I can see that there is a potential

20 argument that it actually began a little bit earlier.  But we

21 do have the issue of this intervening 5- to 8-minute time

22 period where Dr. Weber voluntarily drove by himself from the

23 parking lot to his home and invited them in.

24         But when you're talking about length of detention, I

25 think that it's got to be relative.  This is a 2-hour interview

1  that's taking place in his home.  He's in a comfortable,

2  familiar surrounding.  He's not in a police center where

3  there's all the sights and stress associated with seeing law

4  enforcement.

5          THE COURT:  Did Special Agent Bennett or Muller

6  testify as to the time of day?  Was it the afternoon?

7          MR. STARNES:  Yes.  So Special Agent Bennett

8  testified that he believes it was about 3:00 o'clock in the

9  afternoon.

10          And I'm just looking to see if it may be -- I can't

11  remember if there's a timestamp.  Yeah, so in the transcript

12  itself, it has the time of the initial interview, the recorded

13  portion of the interview, at 3:57 p.m. mountain time.  And

14  that's on page 1 of Exhibit B, Your Honor.

15          THE COURT:  Okay.  So from 3:57 -- well, from

16  4:00 o'clock to 6:00 o'clock or so.

17          MR. STARNES:  That's about right, Your Honor.  That's

18  correct.  And I can look to see.  I just don't recall.  The

19  timestamp is -- it's approximately 6:00 p.m. mountain time.

20  That's the last statement that's made on the recording.

21          And then you have the nature and tenor of the

22  question itself.  The Court can listen to Government's Exhibit

23  A.  This was not a I harsh interrogation by any stretch of the

24  imagination.  This was a vanilla or generic question-and-answer

25  session between law enforcement and an individual who clearly

1  understood what was going on, was clearly able to recollect and

2  provide conscious and coherent answers.  And at time the

3  interview was concluded, it was concluded there was nothing

4  further.  He was never placed under arrest.  That came later

5  after he was indicted, but there's just simply no reason, no

6  set of facts that we can point to to say that this was anything

7  other than a voluntary statement by the defendant to law

8  enforcement.

9            THE COURT:  Anything else?

10            MR. STARNES:  Nothing further, Your Honor.

11            THE COURT:  Thank you.

12            MR. STARNES:  Thank you.

13            THE COURT:  Mr. Steinberg.

14            MR. STEINBERG:  Thank you, Judge.

15        So I think that the focus has to be initial

16  encounter, and I think *Florida v Royer* is a seminal case.  And

17  if memory serves me right, that's 460 US 491, a 1983 United

18  States Supreme Court case, and it defines consensual

19  encounters.

20        This clearly is not a consensual encounter, and I

21  think implicit in the prosecutor's statement is that it was

22  what he called a, quote, a Terry stop, unquote.  And it's

23  clearly not a Terry stop either.  Terry is for the purposes of

24  if you were immediately finding out -- one, with a belief that

25  a crime is about to be committed, has just been committed,

1  police are entitled to do a pat down search, obviously, and

2  find out what the purpose of the person being at the location,

3  they're being contacted.

4       THE COURT:  So you believe the agents had an

5  obligation to knock on the window and say, "Mr. Weber, we're

6  here to investigate you about sexual abuse allegations."

7       MR. STEINBERG:  Right.  That makes it consensual.

8  What you can't do is knock on the window, say, "I'm a

9  government agent; we'd like talk to you"; go over there, which

10 they admit doing; wait; stand outside his vehicle, as the

11 record reflects, a large agent stands outside his vehicle; and

12 wait.  Don't tell him why you are waiting.  Don't tell him,

13 "You can leave."  Don't tell him what you are going to talk

14 about.  And that goes into --

15       THE COURT:  Wait a minute.  I thought they told him

16 he could leave; this was all voluntary.  That's the testimony

17 here today, wasn't it?

18       MR. STEINBERG:  I think that's at the house.  I don't

19 think there's any question that he's told -- and I think the

20 transcript reflects that.  I think what happens, though, is --

21 our position is there's a seizure when the agent knocks on his

22 window and says, "We'd like to talk to you.  Can you park over

23 there?"  And the agent says, "I got him stopped."  And I think

24 he says that on more than one occasion, "I got him stopped."

25       And then, once he gets him stopped, he has him moved,

1    and then he has him wait.  So I don't think under any

2    circumstances this fits the criteria for a Terry stop because

3    they never asked him, if you will, "What are you doing here?"

4    They never sought to pat him down.  And this was not an

5    encounter that can be consensual at all.  It was a seizure.

6    They stopped him.  They literally, by their own admission,

7    stopped him.  And then they directed him to another location,

8    and he had to wait, albeit, 5 minutes.  I think it's relevant

9    because it shows that it was a seizure.

10           So the question for the Court is if in fact there is

11   not a consensual encounter, and there's no break --

12           THE COURT:  Did Mr. Weber ever say, "No, I don't want

13   to do this"?

14           MR. STEINBERG:  I don't believe so.  There's no

15   evidence that would suggest -- no, he didn't.  But I don't

16   think that that's the seminal test.

17           THE COURT:  What is the seminal test?  Tell me about

18   that.

19           MR. STEINBERG:  Here's the seminal test.  In terms of

20   what's a consensual encounter, it seems to me that the case

21   law, including the *Royer* and its progeny talk about, is this a

22   situation where there's an actual seizure that implicates

23   Fourth Amendment?  Our position is whether a police officer

24   pulls you over with his overhead lights or if he walks up to

25   your window in traffic.  This isn't like the guy is in a store

1  or -- if I remember *Royer's* facts, it was an airport where it's

2  a public place and he's walking and picking up his luggage.

3  Here, the guy is in his car, stopped, waiting for traffic to

4  clear when a 450-pound law enforcement agent knocks --

5       THE COURT:  Why is that relevant?  What if he were

6  200 pounds?  Would it matter?

7       MR. STEINBERG:  Yeah, I think size does matter.

8       THE COURT:  Why?

9       MR. STEINBERG:  Because I think of the intimidation

10  factor.  And I think in terms of if I'm going to say no to

11  somebody, I'm probably more likely to say no to somebody who --

12       THE COURT:  If a short, skinny officer with a gun

13  came up to him, would that be different than a 450-pound

14  officer who doesn't have a gun drawn?

15       MR. STEINBERG:  No.  I think once you have a gun, the

16  gun does the talking.

17       THE COURT:  All right.  So Agent Bennett has a higher

18  burden to prove voluntariness because of his size?

19       MR. STEINBERG:  No, I think that it's one of the

20  facts.  The Court has to look at the totality of the

21  circumstances, and when you have --

22       THE COURT:  Can you point me to a case that's ever

23  discussed the size of the officers?

24       MR. STEINBERG:  No.  But I think that the Court can

25  say, "Hey, it's one thing to have one agent versus three

1   agents."  Obviously, that's a factor.  And using that same

2   theory, if you have a large agent come up to you, you think you

3   are less -- I mean, human nature is common sense.  I'm less

4   likely, if you will -- and I'm sure that had I taken the time

5   to ask the question, Agent Bennett probably doesn't have

6   people, if you will, take rude, if you will, encounters with

7   him.

8           THE COURT:  Let's set the scene here.

9           MR. STEINBERG:  Yes, sir.

10          THE COURT:  The testimony was that there was a

11  construction zone --

12          MR. STEINBERG:  Yes, sir.

13          THE COURT:  -- in front of this IHS facility.

14          MR. STEINBERG:  Yes, sir.

15          THE COURT:  And that Mr. Weber was stopped in his

16  truck.

17          MR. STEINBERG:  Yes, sir.

18          THE COURT:  All the cars were stopped.

19          MR. STEINBERG:  Apparently so, sir.

20          THE COURT:  And Agent Bennett walked up and knocked

21  on the window.

22          MR. STEINBERG:  Gets out of his car.  Agent Bennett

23  gets of his car, comes up to --

24          THE COURT:  So how would that be different than if

25  the initial encounter had taken place in the parking lot at the

1   Lakota Cafe and Agent Bennett had knocked on his window in the

2   same way?

3         MR. STEINBERG:  Probably, it is less likely.  And I

4   would say in most people's experience, you don't have people

5   coming up to your car when you are stopped in traffic, whether

6   it be for a red light or whether it be for a construction zone,

7   knock on your windows.  I think it's a startling event because

8   it's unusual and uncommon.  I don't think that happens to most

9   people.

10        THE COURT:  Well, given Agent Bennett's size, I

11   suppose Mr. Weber wasn't surprised he looks in his mirrors and

12   sees this large man walking up.

13        MR. STEINBERG:  Well, there's an assumption.  Yeah,

14   maybe.  Maybe he did.  I don't know that we can say that, but

15   let's say that.  I think that common sense would say, using the

16   Court's analogy, that Weber is in his car, stopped, lawful, not

17   doing anything wrong.  Here comes Agent Bennett walking up, as

18   the Court described, a large man -- and as the evidence

19   confirms, a large man with a badge knocks on his window.  Is

20   that a common experience?  It's clearly uncommon.  It's clearly

21   unusual.  And then the guy says to you, "Hey, look, I'd like to

22   talk to you.  Can you pull over in that parking lot?"  How is

23   that a consensual encounter as opposed to a seizure?

24        THE COURT:  This is a relatively small community.  I

25   assume there are not that many people of Agent Bennett's size

1  in that community.  And Agent Bennett testified that he had met
2  Mr. Weber before.  So Mr. Weber sees Mr. Bennett show up.  He
3  knows who he is.  He knows his employment.  Doesn't that take
4  away some of the surprise or shock?

5          MR. STEINBERG:  I think it's a bit speculative
6  because the assumption is that he remembers that encounter.  I
7  understand the Court is saying he probably does remembers the
8  encounter because of the size of the individual.  But whether
9  he does or doesn't, if I know that the person is a police
10  officer and tells me that he wants to talk to me and to pull
11  over into a parking lot, the question is, is that a consensual
12  encounter?  I don't think so.  A consensual encounter is when I
13  am, if you will, at a place where I think the common experience
14  is, "Hey, I run in to people."  And when I'm walking --

15          THE COURT:  Well, what if they showed up at
16  Mr. Weber's place of business or his home?  Would that bear on
17  the voluntariness?

18          MR. STEINBERG:  Absolutely.  It would be a totally
19  different situation.  It's a seizure aspect.  If they showed up
20  and knocked on his door and he opened the door, it would be
21  different.  But when you're in your car and you are confronted
22  with a situation where somebody knocks on your window -- and
23  I'm going to suggest in most people's experience that never
24  happens when you are in traffic.

25          THE COURT:  So what prevented Mr. Weber from rolling

 1  down the window, saying, "No, thank you," and rolling it back
 2  up and sitting in his car?
 3          MR. STEINBERG:  Nothing.  But that's not the test.
 4  The test is, was there a seizure?  The fact that --
 5          THE COURT:  Well, my question -- you're telling me
 6  there was a seizure because Mr. Weber agreed to pull over.
 7          MR. STEINBERG:  No.  I'm just suggesting there was a
 8  seizure because Weber is in traffic having committed no crime
 9  and law enforcement comes up to his window, knocks on his
10  window, as he's committed no crime and has done nothing wrong,
11  and says, "We want to talk to you."  And, remember, the agent's
12  words were, "I got him stopped."  And so --
13          THE COURT:  Agent's words to whom?
14          MR. STEINBERG:  To the Court when he testified.  He
15  said, not once but twice, "I got him stopped."  And so --
16          THE COURT:  He was sitting in traffic.  He was
17  sitting in a construction zone.  He didn't pull him over.
18          MR. STEINBERG:  Well, that's the question.  The
19  question for the Court is if somebody is lawfully stopped --
20  let's change it if I could, and I hope you're not offended by
21  this.  But let's say it was a red light.  I'm at a red light.
22  There's a car behind me.  It's a police officer.  The police
23  officer, rather than turning on his red lights -- which I don't
24  think there would be any question that would constitute a
25  seizure -- gets out of his car in the middle of traffic, walks

1  up to my car and knocks on my window and says "I need to talk
2  to you.  I want to talk to you.  Pull over."  Is that not a
3  seizure?

4        I mean, the fact -- to me, it's more of a common
5  experience, if you will, to have a law enforcement officer turn
6  on his overhead lights and pull you over as opposed to someone
7  pull up and get out of their car, walk to up you, and knock on
8  your window when you are in traffic.

9        THE COURT:  How long was Mr. Weber sitting in his
10 truck at the time?

11       MR. STEINBERG:  At the traffic?

12       THE COURT:  Yes.

13       MR. STEINBERG:  That wasn't flushed out.  I have no
14 idea.

15       From our perspective, the question before the Court,
16 under *Royer*, *Mendenhall,* and its progeny, is this a consensual
17 encounter?  If it's not a consensual encounter, then it becomes
18 a seizure.

19       Does it meet Terry?  It clearly doesn't meet Terry.
20 And is the statement that was offered a fruit?  And our
21 position is the statement that was offered by the defendant was
22 a fruit because there was no break in the causal chain.

23       The evidence is clear.  He's seized.  He waits for
24 Muller to come.  And then they go right to the home, and the
25 interrogation takes place.

 1          And there's some cases that talk about Miranda can
 2   cure, if you will, an illegal stop and the fruits thereof, but
 3   that's not what takes place here.  There is no Miranda warning.
 4   And the reason -- they keep it a warning, and you can call it
 5   what you want.  But the only warning that I'm aware of that has
 6   legal ethicacy is the Miranda warning, which we clearly don't
 7   have.  So we have seizure, immediate interrogation.  Is the
 8   interrogation a fruit of the illegal seizure, and our position
 9   is that it is.
10          THE COURT:  Was Mr. Weber free to leave his home
11   during the 2-hour interview?
12          MR. STEINBERG:  According to the officers, clearly.
13   That's what they say.  But why would he have to -- you know,
14   I'm obviously thinking why would I have to leave my home?  Do I
15   leave the agents in my home?
16          THE COURT:  Wasn't he free to ask the officers to
17   leave?
18          MR. STEINBERG:  If you believe the officer's
19   testimony in terms of what they said in the transcript.  He was
20   told that.  Would a reasonable person under his position think
21   that?  Probably.  I think that that's probably the case.  I
22   don't want to fight that battle.  I think the battle that I'm
23   prepared to fight and the one that I think the Court needs to
24   determine is, was this a consensual encounter or not?  If it's
25   not a consensual encounter, then everything that happens post

1  is the fruit of that poisonous tree, and that's our position.

2       THE COURT:  Well, if I get past that point, what
3  about these six factors?

4       MR. STEINBERG:  Look, I concede the fact, Judge, that
5  the evidence seems to suggest -- and the Court can listen to
6  the tape or read the transcript if it wishes.  I think the six
7  factors are clear about --

8       THE COURT:  So it's all about -- go ahead.  Finish
9  your point.  I'm sorry.

10       MR. STEINBERG:  I think that in terms of
11  voluntariness, I'm not going to suggest that that's a battle
12  the defense can win.

13       THE COURT:  All right.  So it's all about whether the
14  first encounter constitutes a seizure.

15       MR. STEINBERG:  And also I think that the Court has
16  to make a finding as to whether or not he was in custody too.
17  Because, obviously, if he's in custody in terms of the Court's
18  determination, then there's a Miranda violation.

19       But I think that the argument that I think is the
20  compelling one from our standpoint is that there was an illegal
21  seizure, and that the statement was a fruit of the seizure.
22  And then, secondary to that, if the Court finds that he was in
23  custody given the circumstances, then there's a Miranda
24  violation.  I'm not going to tell you that I think it was
25  a voluntary --

1     THE COURT:  Is someone in custody when they are
2 driving their own vehicle back to their house?

3     MR. STEINBERG:  That's a tough one.  But the
4 bottom -- I think the concern that I have is when he's in his
5 house.  Is he in custody at that point?

6     THE COURT:  Well, let's talk about before he gets to
7 his house.  So you are telling me the seizure took place on the
8 street.

9     MR. STEINBERG:  Yes.

10     THE COURT:  And then the officers said, "Why don't
11 you go ahead and drive your car back to your house."

12     MR. STEINBERG:  That's tougher.  I'm not going to
13 suggest that.  But I don't think that the question becomes --

14     THE COURT:  It that a fruit as well?

15     MR. STEINBERG:  Of course.

16     THE COURT:  Does that break the causal chain?

17     MR. STEINBERG:  It doesn't because there's no
18 suggestion that the officers weren't anywhere but right behind
19 him.  So you have an illegal seizure.

20     THE COURT:  It's not been my experience that when an
21 officer arrests someone they have them drive their own vehicle,
22 though.

23     MR. STEINBERG:  I've never had one like that either.

24     THE COURT:  Okay.

25     MR. STEINBERG:  But I've never had a case where

1    somebody was literally pulled over in traffic by having a
2    police officer knock on his window and told, "Hey, pull into
3    the parking lot."
4              THE COURT:  Well, you keep saying, "Pulled over in
5    traffic."  How many cars were there sitting and waiting for
6    this construction zone?  How long had they been --
7              MR. STEINBERG:  I have no idea.
8              THE COURT:  So you keep saying, "in traffic."  You
9    make it sound like there are cars racing down the road at 50
10   miles an hour.  There's no reference to any of that.
11             MR. STEINBERG:  Well, the testimony from the officer
12   was that he was stuck in traffic.  I believe that was the --
13             THE COURT:  Sitting in a construction zone.
14             MR. STEINBERG:  Right, in traffic.
15             THE COURT:  What do you mean by "in traffic"?  When I
16   think of "in traffic, I'm stuck on the 405 in Los Angeles
17   trying to get to home to Westwood and it's --
18             MR. STEINBERG:  It's funny you mention that.
19             THE COURT:  Okay.  So where on the Pine Ridge
20   Reservation.  He's stuck in traffic.  And this is a two-lane
21   road, I assume, and there's cars backed up because one of the
22   lanes is blocked, and someone comes up and knocks on the
23   window.
24             MR. STEINBERG:  Well, the 405 -- let's assume you're
25   on the 405, and you have the same thing.  Obviously, you have

1   some familiarity with being stuck in traffic on the 405.  You

2   can be there literally 15 minutes.

3         THE COURT:  I agree.  If someone knocks on my window

4   in that circumstance, I'm going to be a little more jolted.

5         MR. STEINBERG:  Right.  Why is that any different

6   than this situation?  I'm struck in traffic.  Okay.  So it's a

7   two-lane highway, and we don't know how long.  But the only

8   testimony is, is that he's stuck in traffic and somebody comes

9   up to his window.  If you're on the 405 or you're on the Pine

10  Ridge Reservation, it's the same impact.  It's the same effect.

11  And that is what is this guy doing?  What's going on?  It's

12  never happened to most people.  I'm prepared to suggest that

13  it's never happened to most people where you are stuck in

14  traffic, whether it's on the 405 or the Pine Ridge Reservation.

15        And I'm going to, again, say this:  A large

16  individual wearing a badge knocks on your window and says,

17  "Hey, I want to talk to you.  Can you pull over there?"  How is

18  that anything but a seizure?  It would be better on the 405

19  because at least you'd get out of traffic, and you probably

20  couldn't get over actually.

21        THE COURT:  All right.  Anything else, Mr. Steinberg?

22        MR. STEINBERG:  No, sir.  Thank you.

23        THE COURT:  Brief rebuttal, Mr. Starnes.

24        MR. STARNES:  Thank you, Your Honor.

25        Your Honor, I'm still not convinced that the initial

1  detention asking Dr. Weber to pull over and speak with him for

2  a few minutes qualifies as custody within the meaning of

3  Miranda, such as a Miranda warning would be required.  Although

4  we haven't really briefed this because the initial attack on

5  the statement was aimed at the voluntariness versus the

6  involuntariness of it.

7         The general test for custody is whether or not

8  somebody is -- based on the totality of the circumstance,

9  whether or not somebody's freedom of movement is curtailed in a

10  significant way.

11         What we know, what Special Agent Muller told the

12  Court under oath today, is that when he first got up there, he

13  explained to Dr. Weber that they wanted to speak with him and

14  that it was a voluntary contact.

15              THE COURT:  That's Agent Muller in the parking lot.

16              MR. STARNES:  Yes.

17              THE COURT:  Rewind to Agent Bennett.  When he knocks

18  on the window and Mr. Weber is in his truck on the road, is

19  that a seizure?

20              MR. STARNES:  I don't think so because -- I don't

21  know that that's any different than going and knocking on

22  somebody's office door or going and knocking on somebody's

23  home.  I mean, at some point we heard through Special Agent

24  Bennett that they had been looking to speak with Dr. Weber for

25  over a week.  That was testimony that was drawn out by the

1  defense during their cross-examination of Special Agent
2  Bennett.  They were having a hard time locating him.  They
3  wanted to speak with him.  They happened to see him across the
4  way.

5       If we follow the defense's logic, we're not allowed
6  to even go up and talk with him at that point or at least offer
7  to speak with him at that point because he's out in traffic.
8  The analysis doesn't make any sense.  It would seem to me, if
9  we were following that logic, it would be even more cumbersome
10  on a defendant who was sitting in their home who has somebody
11  randomly come up to their home and is disturbing their peace
12  and quiet or whatever it is.  At some point law enforcement has
13  to be able to walk up to somebody on the street and say --

14       THE COURT:  In your home, you can say, "This is a bad
15  time for me right now.  I am packing up to move.  Come back
16  later."  You close the door.  It's over.

17       MR. STARNES:  And he absolutely had that option when
18  they got to his home.

19       THE COURT:  But would a reasonable person believe
20  they had that option sitting there in their truck on this road
21  when the agent knocks on their window?

22       MR. STARNES:  From the initial knock, probably they
23  are not going to think they have the right to just pull away at
24  this point because I'm -- all of this is for the record.  My
25  first thought is going to be thinking I have a traffic

1 violation or my registration is out of date or something that's
2 causing me to be pulled over.  I'm about to get a ticket, but
3 at least I'm going to get talked to by the officer about a
4 ticket.

5          But at that point we know that Special Agent Bennett
6 said, "Hey's there's another agent that wants to talk to you
7 real quick.  Can you hang tight?"  And he did for about 5
8 minutes.  From the time Special Agent Muller got there, he
9 testified under oath today, he told Dr. Weber that this was --
10 they had some things that they --

11          THE COURT:  At the Lakota Cafe parking lot.

12          MR. STARNES:  That is correct, before they ever got
13 there.  And to the Court's point, they then left, and the
14 defendant drove under his own power all the way back to his
15 home.  And then when they got to his home, Dr. Weber invited
16 them in.  And then, as the Court can see from the transcript,
17 they told him, "This is a voluntary contact.  There's no
18 custody here.  You can tell us to leave.  You can tell us to go
19 pound sand, and we have to do it."

20          THE COURT:  But the warning offered was not a Miranda
21 warning.

22          MR. STARNES:  That is correct.  But I would remind
23 the Court that unless there's custodial interrogation, Miranda
24 does not apply.

25          THE COURT:  All right.  Anything else?

| | |
|---|---|
| 1 | MR. STARNES:  No, Your Honor.  Thank you. |
| 2 | THE COURT:  Thank you, Mr. Starnes. |
| 3 | All right.  We are going to take a brief recess, and |
| 4 | we'll come back and get through the rest of the motions. |
| 5 | I misspoke at the outset.  I said that Motion 8 is |
| 6 | for early production of Jencks material, and Motion 9 is for |
| 7 | separate trials, I believe, with the two different defendants. |
| 8 | Is that correct, Mr. Steinberg? |
| 9 | MR. STEINBERG:  Yes, sir. |
| 10 | THE COURT:  Okay. |
| 11 | MR. STEINBERG:  Two different victims. |
| 12 | THE COURT:  Pardon? |
| 13 | MR. STEINBERG:  Victims. |
| 14 | THE COURT:  I'm sorry.  Two different alleged |
| 15 | victims, excuse me. |
| 16 | MR. STEINBERG:  Yes, sir. |
| 17 | THE COURT:  So those are the ten motions at issue |
| 18 | today. |
| 19 | MR. STEINBERG:  Yes, sir. |
| 20 | THE COURT:  Okay.  Anything else today? |
| 21 | MR. STARNES:  No, Your Honor.  I did file on Friday |
| 22 | an updated 413. |
| 23 | THE COURT:  I received that. |
| 24 | MR. STARNES:  I just wanted to make sure -- |
| 25 | THE COURT:  That's part of the 414. |

1           Anything else, Mr. Steinberg, other than these 10
2   motions?
3           MR. STEINBERG:  No, sir.
4           THE COURT:  Okay.  We'll be in recess for about 10
5   minutes.
6           MR. STARNES:  Thank you.
7       (Proceedings in recess from 11:21 a.m. until 11:34 a.m.)
8       (Open court.)
9       (Defendant present.)
10          THE COURT:  All right.  Let's move on then.  The next
11  motion is for disclosure pursuant to 404(b) and 609.
12          Mr. Steinberg, tell me the basis of your motion here.
13          MR. STEINBERG:  I don't know, Judge, if you think
14  it's appropriate to also consider the 413 litany at the same
15  time because --
16          THE COURT:  We can do that.
17          MR. STEINBERG:  I only suggest that because, you
18  know --
19          THE COURT:  That will be fine.
20          MR. STEINBERG:  -- 404(b) had a standard that made
21  some sense to me.
22          THE COURT:  Okay.
23          MR. STEINBERG:  And I have to confess to you that I
24  don't understand 413 very well.  I was telling counsel that I
25  remember the movie Casablanca and at the end of the movie the

1  lieutenant turns to Humphrey Bogart and says, "I'll round up
2  the usual suspects."  And everybody says, "Yeah, that's not the
3  way it's supposed to happen."

4          413 basically makes the courts the gatekeeper, and
5  the concern I have is, in terms of being able to have a fair
6  trial, in the government's motion -- and I don't want to go
7  through all of them, but they have things like, "Hey, he was
8  known as Dr. Bad Touch, and we want to put that in."  And a
9  litany of other things that are conjuncture, that are
10 speculative, that are --

11          THE COURT:  Let me interrupt you for a second.  Do
12 you agree that the government has disclosed all the potential
13 prior bad acts that they seek to introduce?

14          MR. STEINBERG:  Yeah, I hope so.  I can't agree with
15 that because I don't know if there's any --

16          THE COURT:  Well, you've had disclosure?

17          MR. STEINBERG:  Yes.

18          THE COURT:  So now we're talking about that -- if
19 they go beyond that, obviously, they've violated their
20 obligation.

21          MR. STEINBERG:  Correct.

22          THE COURT:  But at least we know what we're arguing
23 about.

24          MR. STEINBERG:  Right.

25          THE COURT:  So you said, "Dr. Bad touch."  That's

1  coming from one of the alleged South Dakota victims.

2         MR. STEINBERG:  Yeah.  And I don't know if it's

3  really a victim or if it's a person who is going to testify

4  that was his reputation and that's what he was known as.  But I

5  just wanted to use that as an example of how would that ever

6  come into a court of law?  I mean, I was called stupid when I

7  was a kid.  Does that mean if I were ever in a court of law

8  they can say, "Harvey was known as stupid when he was a kid"?

9  I mean, I just can't --

10        THE COURT:  Well, you know very well that if

11  Mr. Weber testified and said, "I would never inappropriately

12  touch a child in my life," then it might be relevant that

13  someone would come in and say, "He was known as Dr. Bad Touch;

14  that's his reputation."

15        MR. STEINBERG:  If he opens that door, there's no

16  question.  But I'm not here to argue that.  I'm concerned about

17  the prosecution's case-in-chief and what they can and cannot do

18  in their case, and that's what the huge concern is here.  And

19  413 basically says if you've ever done anything in your life,

20  it comes in.  It may come in.  That's the key.  Thank God that

21  word "may" is in there.

22        THE COURT:  Well, wait a minute.  "If you've ever

23  done anything in your life," that's a little bit of an

24  exaggeration.  We're talking about sexual misconduct.

25        MR. STEINBERG:  I agree.  That is --

1          THE COURT:  Let's focus on what we're talking about
2    here.  All right?
3          MR. STEINBERG:  Yes, sir.
4          THE COURT:  So 413 and 414 are rules set by Congress
5    in sexual abuse cases.
6          MR. STEINBERG:  Yes.
7          THE COURT:  414 is awfully broad; 413, a little less
8    so given the ages.  So I believe that they still have to --
9    regardless of 413/414, I still think it's appropriate to do a
10   404(b) balancing test.  So why wouldn't these -- why wouldn't
11   this proposed testimony, its probative value outweighs the
12   prejudice?
13         MR. STEINBERG:  Because the unfair --
14         THE COURT:  Substantially outweighs.
15         MR. STEINBERG:  Because the unfair prejudice is so
16   great that I can't get a fair trial.  I mean, common sense will
17   dictate that if you have a jury and they hear that --
18         THE COURT:  Common sense would dictate you would
19   prefer to pick these guys off one at a time, bring in an
20   alleged victim to testify in one case, one count, and you can
21   pick apart that alleged victim's credibility.  That's what you
22   would like.
23         MR. STEINBERG:  Oh, no.  I am --
24         THE COURT:  And the government would like to bring it
25   in and dump all of this stuff in.  So we're somewhere in the

 1   middle here.  So let's talk -- we're about a month away from
 2   trial.  Let's talk practicalities here.  I don't want to have
 3   you tell me -- you know what the rule says.  Let's focus on
 4   what the rule says.

 5         MR. STEINBERG:  Yes, sir.  And I think that the Court
 6   says -- the Court still has to make a determination on 403.  I
 7   still think that applies, and I think these are unfairly
 8   prejudicial.  And when you have a situation where the
 9   government's basically conceding that their alleged victims
10   have credibility problems and in an effort to convict the
11   defendant, not based on the truth of what the facts are, but
12   rather if he did something before, then you have to believe
13   that he did it again.  And I understand the propensity is --

14         THE COURT:  Do you agree that the *Glanzer* case
15   controls here?

16         MR. STEINBERG:  Yeah.

17         THE COURT:  All right.  So the similarity of the
18   prior acts of the acts charged, how do they rate?

19         MR. STEINBERG:  Well, I think they are clearly
20   different because some of the acts occur, if you will, at the
21   house.  Some of the acts occur during what I call medical
22   procedures.  And I think those are distinguishing factors in
23   terms of how you look at those.  Other --

24         THE COURT:  So if you feel up a boy at home versus
25   feeling them up during a medical procedure, those are

1   different?

2          MR. STEINBERG:  Yeah, because one is in terms of
3   authority, position of trust, the ability to control a
4   situation.  And the --

5          THE COURT:  Well, I mean, the allegations here are
6   Mr. Weber, during some medical procedures, touched
7   inappropriately.  And also in his home, having invited these
8   alleged victims there, touched inappropriately, engaged in
9   inappropriate conduct.  There in his home, I'm assuming because
10  the parents thought he was an authority figure, that he's
11  someone safe.

12         MR. STEINBERG:  That may or may not be true in terms
13  of it sounds like, at least in terms of one of the victims,
14  that that person wasn't -- or that child at the time wasn't
15  able to have contact with his parents.  And according to the
16  evidence, as I understand it, he claimed that Dr. Weber said,
17  "Hey, if you do these certain things, maybe I can reunite you
18  with your parents."

19         But I think the focus has to be -- look, do I think
20  you're going to grant severance?  No, you are not going to
21  grant severance.  Do I think that in terms of 404(b) that those
22  two acts, since they're charged together, should come in?  Yes.
23  Can I suggest that anything more, in terms of the litany,
24  should come in?  I'm suggesting that if those come in, I am
25  never going to get a fair trial because the jury is going to be

 1  so overwhelmed and going to reach the conclusion that he is a
 2  pervert and that he is a bad person, and his character is such
 3  that he's a pedophile, and, therefore, we're going to convict
 4  him.  And they are not going to care whether or not he's guilty
 5  of the case at bar.  They are going to say, "Look, he's a bad
 6  guy."
 7          THE COURT:  Again, time out.  You are going off again
 8  on doing -- you would like to come in and have an Indian
 9  defendant come up here -- an Indian victim testify and you
10  shred him up to pieces because he's a felon now and say, "This
11  kid against this man who has dedicated his life" without any of
12  this coming in.
13          So let's focus on the test here.  Which statements --
14  which acts do you think would qualify and which ones wouldn't.
15          MR. STEINBERG:  Yes, sir.  Let me grab the motion, if
16  I might.
17          THE COURT:  Okay.
18          MR. STEINBERG:  So if we can begin with the 404(b) --
19          THE COURT:  Okay.
20          MR. STEINBERG:  -- document.  And I'm sorry.  I don't
21  have that number.
22          THE COURT:  It's Document 22, your motion.  And the
23  government filed a Document 36.
24          MR. STEINBERG:  I was focusing on the United States's
25  response to the defendant's motion for disclosure, which

1  appears to be 36.

2         THE COURT:  Yes, go ahead, please.

3         MR. STEINBERG:  Okay.  So this is the victim's --

4  R.F.H.'s brother, Number 1, and it talks about "Uncle Bad

5  Touch".  Those suggest that this individual, based on this

6  offer of proof, had been subjected to the conduct of sexual

7  misconduct.  "He always tried to hug and rub them in

8  uncomfortable ways."  That's general.  It could be sexual.

9  Couldn't be sexual.  And it's not clear as to the specifics as

10 to what occurred.  So I think that under (b)(1), that doesn't

11 meet the test.  It's too general.  It's not specific enough.

12        THE COURT:  Well, Mr. Weber spoke with kids in the

13 middle school.  Is that really in dispute?  As I understand it,

14 he came in and gave talks to students in the middle school as

15 part of an approved program by the middle school staff.

16        MR. STEINBERG:  Not in dispute.  But under 403,

17 irrelevant in my suggestion.  The fact that he spoke to kids in

18 a middle school a lot, that's not relevant in terms of whether

19 or not he committed the acts he's been indicted for.

20        THE COURT:  All right.  Now, R.F.H. will testify that

21 he saw Mr. Weber at the hospital.  I'm not sure -- "saw him,"

22 is that seeing him as a professional capacity or saw him

23 walking around the hospital or the middle school or in the

24 Nurturing Center.

25        MR. STEINBERG:  I concur.  That's why I don't think

1    this comes in.

2            THE COURT:  Then the "Uncle Bad Touch" seems to be
3    more relevant.

4            MR. STEINBERG:  I am going to suggest to you that
5    allowing a name, a moniker -- how many kids said that?  One
6    kid?  I mean, people form opinions about other people.

7            THE COURT:  Well, isn't that part of
8    cross-examination?

9            MR. STEINBERG:  No.  Because it's about the unfair
10   prejudice.  To allow that in puts me on my heals, and now the
11   jury is going to assume "Uncle Bad Touch."  That's what his
12   nickname was.  Well, how many people said that?  Was it just
13   one kid?  Was it 12 kids that said that?  Was it females that
14   said that?  It's just not specific enough.  A name call -- it's
15   just basically -- name-calling, I'm going to suggest, has no
16   place in terms of making a determination of whether someone is
17   guilty or not guilty of a crime.

18           THE COURT:  But, again, if your defense is "I'd never
19   do something like this," you run the risk of opening the door
20   to this kind of testimony.

21           MR. STEINBERG:  I understand that, and I'm willing to
22   run that risk rather that have it.

23           THE COURT:  Have you reviewed the *LeMay* case?

24           MR. STEINBERG:  I know cases by their facts.

25           THE COURT:  All right.  *LeMay* is a Ninth Circuit

 1  case.  It adopts the *Glanzer* test.  This is the one where the

 2  defendant was convicted with two counts of child molestation.

 3  He was babysitting his -- I think it was his nephews or niece

 4  and nephew.  And then the government is allowed at trial to

 5  introduce an incident from 1997.  The case at issue was from --

 6  I'm sorry -- '97 was when the assaults took place.  The earlier

 7  case -- let me see the date on that -- '89, so eight years

 8  earlier from the incident in question.

 9          MR. STEINBERG:  But, if I recall, there was specific

10  testimony about specific sexual misconduct that was allowed in,

11  not name-calling.

12          THE COURT:  Well, but we have that with other people,

13  if you want to go on to the other --

14          MR. STEINBERG:  Yes, sir.

15          THE COURT:  Joshua Spotted Eagle.

16          MR. STEINBERG:  No allegations of sexual misconduct.

17  Joshua Spotted Eagle talks about kids would hang out at Weber's

18  house, drink soda, had snacks, played video games, earned money

19  mowing his lawn.

20          THE COURT:  Sleepovers.

21          MR. STEINBERG:  Right.

22          THE COURT:  Now, none of it on its face is criminal,

23  but it certainly provides opportunity, if your defense is "how

24  would this happen?  This man is a doctor in the community?"

25  He's having middle school kids sleeping over at his house.

1          MR. STEINBERG:  Again, there's the leap of faith.

2    I'm assuming Joshua Spotted Eagle, if asked, would say, "He

3    never touched me; never did anything to me."  Then it becomes a

4    403 because what's the inference you're trying to create there?

5    The inference you're trying to creating there --

6          THE COURT:  Well, the next page talks about Mr. Weber

7    touching boys on their head, neck, and shoulders and hugs when

8    he was intoxicated.  I assume that's when Mr. Weber was

9    intoxicated.

10          MR. STEINBERG:  Yes.

11          THE COURT:  Okay.

12          MR. STEINBERG:  I'm assuming that too.

13          But having said that, under 403, under the balance

14    the Court has to conduct.  These are nonsexual.  If you will, I

15    don't think touching a boy on their head, neck, and shoulders

16    or even giving them occasional hugs means that someone is

17    sexual in terms of misconduct.

18          And what they are doing is they are trying to paint

19    and create this impression that -- it's an unfair inference

20    because the inference that they are trying to create by

21    introducing this is to say, "Hey, look.  He is doing this.

22    He's a pervert."  And, on balance, I don't think the Court can

23    reach that conclusion.  These are not specific acts of sexual

24    misconduct.  In terms of --

25          THE COURT:  Well, let's go on to Wes Spotted Eagle.

 1          MR. STEINBERG:  Right.  I just don't understand why
 2  it's relevant.  He doesn't talk about any misconduct.
 3          THE COURT:  Well, giving condoms to 14-, 15-year-old
 4  boys, I mean, I guess that's not unlawful.  But were the
 5  parents informed of that?  I don't know.
 6          MR. STEINBERG:  I don't know what the law is on that
 7  either.  I think that the Supreme Court hasn't delved into
 8  whether or not sexual education of a 14- and 15-year-old young
 9  boy is inappropriate.
10          I mean, you know, perhaps I'm too modern, and my
11  suggestion is that I don't think that giving a condom to a 14-
12  or 15-year-old boy is something that would suggest someone is a
13  pervert.
14          THE COURT:  Let's go to Robert Ahenakew.  He first
15  met Dr. Weber when he was 12 or 13 at a group session for kids
16  that got in trouble.  During the session, Mr. Weber showed them
17  movies about sex and the proper use of condoms.
18          MR. STEINBERG:  And you know what?  I bet you they do
19  that in every high school in America.  That's not private.
20          THE COURT:  He went to Mr. Weber's home with other
21  boys to eat pizza and drank wine.  Does that happen at every
22  high school in the country?
23          MR. STEINBERG:  Well, probably not, but not with
24  parental -- not with parents there.
25          But, again, so what?  If, in fact, then he says,

1  "After we would have wine, he would molest us," then I would
2  have to concede, yeah, it is relevant.  But he doesn't say
3  that.  He said, "I went to his home.  I had pizza and wine."
4  And that's all he says.

5       So other than saying he's a bad guy, because the
6  inference that you drew is what I'm concerned is what the jury
7  would draw, and that is "Hey, he gave wine and pizza to
8  15-year-old kids.  He's a bad person."  How is it relevant?

9       THE COURT:  All right.  Justin Meineke, recalls soda,
10 snacks, and cash at Mr. Weber's house.  Why is he getting cash?

11      MR. STEINBERG:  Maybe he's generous and gives -- you
12 know, it would be great if it said, "I got cash in exchange for
13 a sexual favor or told to keep quiet."  I mean, giving poor
14 kids cash is somehow an inference that someone is engaged in
15 sexual misconduct?  I mean, if in fact --

16      THE COURT:  Could be a sign of grooming.

17      MR. STEINBERG:  Yeah, but he doesn't say that he did
18 it.  You're absolutely right.

19      THE COURT:  Other boys are going to say he did it.

20      MR. STEINBERG:  Well, then let the other boys who got
21 the cash and got the sexual misconduct.  Yeah, I agree.

22      THE COURT:  All right.  So Meineke is also going to
23 testify about trips and hotel rooms.

24      MR. STEINBERG:  They stayed in separate rooms if I
25 remember correctly.  Maybe this is the wrong one.  Yeah, the

1 | boys stayed in one room, and Weber stayed in a separate room.

2 | THE COURT: Mark Galbreath, same group session, boys
3 | in trouble.

4 | MR. STEINBERG: He went to Weber's house on two
5 | occasions. And I think he says he provided them pizza and took
6 | them to subway and then he went to an overnight. They stayed
7 | in a motel, and Weber paid for the trip. He doesn't say that
8 | they stayed in the same room. I just don't understand on a 403
9 | how it's relevant.

10 | THE COURT: All right. Dr. Foster testified that
11 | Mr. Weber was prone to treating boys who were from broken
12 | homes, poor, slender, and on the fringes of life.

13 | MR. STEINBERG: Shouldn't that be something that's a
14 | positive?

15 | THE COURT: Potentially. But it also could be
16 | something very negative.

17 | MR. STEINBERG: Right. That's the danger. That's
18 | why it's irrelevant under 403.

19 | THE COURT: Well, it's not relevant? Is that what
20 | you are saying?

21 | MR. STEINBERG: Yeah. I'm saying it's --

22 | THE COURT: That he singled out boys who were from
23 | single-parent families to treat them as patients when he had a
24 | choice of other patients as well?

25 | MR. STEINBERG: Well, it's the inference that you are

1   drawing there.  And that is if you can point to specific kids
2   and say, "He treated this kid who happened to be from this
3   family and then he sexually molested them," that on its face --
4   what inference does the Court draw?  That he altruistic?  No.
5   You don't draw that because the assumption is "Oh, he's a bad
6   guy."  And, again, it's to show that he's a bad guy.  And the
7   government wants to be able to say, "He's a bad guy.  You need
8   to convict him of this because he did this kind of stuff."

9           THE COURT:  Is Mr. Weber licensed to be a counselor
10  for these kids?

11          MR. STEINBERG:  I think pediatricians are licensed to
12  practice medicine, and I think that a pediatrician can counsel
13  kids, yes.  I don't think that you need -- if an MSW or
14  somebody else can do it, I can't imagine that under the
15  guise of -- there's no question he was licensed as a
16  pediatrician.

17          THE COURT:  I have four children who have gone to
18  pediatricians, and none of them were invited over for pizza and
19  wine or taken on trips with them or shown how to use condoms.

20          It's prejudicial.  I agree.  But does the prejudice
21  outweigh the probative value?

22          MR. STEINBERG:  And I'm suggesting it does.  Unfairly
23  prejudicial because you want to draw inferences that you can't
24  reach.  If these kids -- again, I am being repetitious here.  I
25  apologize.  But if the kids had taken the next step and said,

1  "He talked to me about sex and him having sex with me.  He

2  talked about 'would you be willing to do these kinds of

3  things,'" then it passes the boundary.  But this stuff gets up

4  to the boundary, but it doesn't cross it.

5      THE COURT:  The same colleague goes and talks about

6  that she goes to Havre and saw Mr. Weber with five boys from

7  Browning over 13 years old.  Mr. Weber is dressed as a teenager

8  with baggy clothes.  He was well-known for having parties with

9  young boys at his house.

10      MR. STEINBERG:  So?  Again, he -- now we're getting

11  to the point where we criticize people because of the way they

12  dress?

13      THE COURT:  And parties for young boys.  That's a

14  little concerning to me.

15      MR. STEINBERG:  Well, if the parties for young boys

16  were a bunch of kids came over and they had -- if they said,

17  "Pizza and wine" -- let's just give them the wine, pizza and

18  wine, and nothing happened, why is that relevant?  If they had

19  something that said, "Hey, and then" --

20      THE COURT:  Well, because what if one of the victims

21  in this case testifies and says, "It was at one of these pizza

22  and wine parties at Mr. Weber's house where he molested me for

23  the first time," or whatever he did?

24      MR. STEINBERG:  Then it becomes more relevant.  I

25  agree.  But my understanding of the testimony is that's not the

CURT - MULLER - CROSS EXAMINATION BY MR. STEINBERG

1  way this is going to happen.

2          THE COURT:  Then we have Dr. Foster, a colleague of

3  Mr. Weber's, claiming Mr. Weber didn't like to treat female

4  patients.  Known to have boys over to his house.

5          MR. STEINBERG:  Again, conjecture.

6          THE COURT:  It was so concerning that he voiced his

7  concerns to the head of the IHS, Ms. LaFromboise --

8          MR. STEINBERG:  Right.  But, again --

9          THE COURT:  -- back in 1995.

10          MR. STEINBERG:  I understand that, Judge.  But isn't

11  it conjecture?  "Hey, he did not like to treat female

12  patients."  How do you know about that?  Did he tell that you?

13          THE COURT:  So in your view the only thing that

14  should happen in this trial is the victims would come in and

15  testify as to what happened, you would cross-examination them,

16  and that would be the end of the case?

17          MR. STEINBERG:  Unless it meets the test for 404(b).

18  And, clearly, these don't meet the test.  What's it being

19  offered to show?  What does -- Dr. Foster saying, "Hey, he

20  didn't like to treat female patients," what does that mean?

21          THE COURT:  Because then Ms. LaFramboise is going to

22  say that Mr. Weber had group counseling sessions and had them

23  at his house and would take them on outings together.

24          MR. STEINBERG:  Okay.  And, again, not criminal.  Not

25  a problem.  And the fact that he wants to treat boys as opposed

1    to girls -- and I'm not conceding that that's a fact -- I don't

2    understand on a 403 how that becomes relevant.  Because there's

3    this assumption that everyone in going to have to draw that,

4    "Oh, he only treated boy because he wanted to sexually molest

5    them."

6              THE COURT:  He offered after-hours clinics.

7              MR. STEINBERG:  And do we have evidence that anybody

8    attended those?  Do we have any evidence that that -- see, this

9    is conjecture.  How does he know all of this?  Who attended it?

10   What's his source?

11             THE COURT:  This is Ms. LaFramboise.

12             MR. STEINBERG:  I'm sorry?

13             THE COURT:  This is Ms. LaFramboise.

14             MR. STEINBERG:  Yes.

15             THE COURT:  All right.  Now we have Dr. Mary Cecillia

16   DeRosier.  She corroborates the fact that Dr. Foster brought

17   his concerns to IHS administration.

18             MR. STEINBERG:  Again, it's total conjecture.  Total

19   speculation.  Nothing concrete.  And I'm just suggesting that

20   we can't try this case based on conjecture.

21             THE COURT:  Then we have Timothy Davis, IHS

22   maintenance employee.

23             MR. STEINBERG:  Uh-huh.  He says, "Hey, he had

24   treats, games, candy bars, and soda at his house."  Now that's

25   coming in?  Again, conjecture, speculation, nothing concrete.

1          THE COURT:  Then we have Dr. Mark Butterbrodt.

2          MR. STEINBERG:  Yes.

3          THE COURT:  He met Mr. Weber at Pine Ridge.  He

4     testified that Mr. Weber focused his practice on skinny teenage

5     boys.  He did not like to treat teenage girls.  Did not like to

6     treat overweight teenagers.  Mr. Weber billed himself as an

7     adolescent specialist.  It seemed odd given the fact that

8     Mr. Weber focused his practice on the healthiest segment of the

9     population.

10         MR. STEINBERG:  Again, conjecture, speculation,

11    nothing concrete.

12         THE COURT:  Used a technique for alleviating

13    headaches of shoulder and head massage.

14         MR. STEINBERG:  No one is going to suggest that

15    that's below the stand of care.  Who says that?  Maybe that is

16    a good way to treat.

17         THE COURT:  How do you know it's not below the

18    standard of care?

19         MR. STEINBERG:  Because I don't have any endorsement

20    from the prosecution that says, "We have a doctor that's going

21    to say, 'This is below the standard of care; and, therefore,

22    it's admissible.'"

23         THE COURT:  Then let's talk about the -- let's go on

24    to the 413/414 disclosures.

25         MR. STEINBERG:  I have those.

1      THE COURT:  Then we have the testimony of R.F.H.
2  this is Document 33.  Do you have that, sir?
3      MR. STEINBERG:  Yes, sir.  I have it in front of me,
4  sir.
5      THE COURT:  Okay.  Do you have any objection to it?
6      MR. STEINBERG:  (Reviewing document.)
7      No, this is concrete stuff in terms of R.F.H.
8      THE COURT:  All right.
9      MR. STEINBERG:  Absolutely.
10     THE COURT:  And then --
11     MR. STEINBERG:  G.R.C., I think those are both the
12 charged counts, sir.
13     THE COURT:  All right.  And then we have the page
14 Number 8, proposed testimony of South Dakota victim P.T.B.
15 Pretty concrete stuff.
16     MR. STEINBERG:  I have to concede that they are
17 concrete.
18     THE COURT:  Two to four times a week of sexual
19 intercourse.  That seems pretty concrete to me.
20     MR. STEINBERG:  I don't dispute your analysis.
21     THE COURT:  So why is that out under the *Glanzer*
22 test?
23     MR. STEINBERG:  I think at some point the Court makes
24 a determination, in terms of fairness, how many can come in.  I
25 understand that we've got two.  This would be three.  We have

1  the two named counts, and then this count in terms of P.T.B.

2  would be a third instance.

3          THE COURT:  All right.  And then we have is E.H.H.

4  invited to Mr. Weber's house.  Chips and soda.  Unzipping his

5  pants.  Rubbing his thigh.  Masturbating E.H.H.  Is that coming

6  in?

7          MR. STEINBERG:  I hope not.

8          THE COURT:  Why not?

9          MR. STEINBERG:  Because I think at some point the

10 Court has to make what I've suggested in terms of accumulative

11 analysis.

12         THE COURT:  Well, we're at three.  You asked me to

13 keep out ten of them.  This would be Number 4.

14         MR. STEINBERG:  Yeah.

15         THE COURT:  You said it has to be concrete.  This is

16 pretty concrete.

17         MR. STEINBERG:  There's no question it's concede.

18         THE COURT:  He masturbated him until they ejaculated.

19 That seems pretty concrete to me.

20         MR. STEINBERG:  I...

21         THE COURT:  A jug of clear alcohol mixed with vodka

22 and a fruity beverage at his house.  Two OxyContin tablets.

23         MR. STEINBERG:  Yes, sir.

24         THE COURT:  Why wouldn't this come out?

25         MR. STEINBERG:  Under 413 and 414, as the law stands

1  now, it would be pretty tough for me to argue that it doesn't
2  come in.
3          THE COURT:  Okay.  Then we've got the South Dakota
4  victim F.G..  Grabbed F.G.'s testicles and penis and rubbed his
5  penis with his hands until it became erect.  He retrieved a
6  little grey camera and took pictures.  He said, "This is our
7  little secret, and you don't need to tell your mom or nobody."
8          Why does that not come in?
9          MR. STEINBERG:  It's a bit different, and it's
10 cumulative.
11         THE COURT:  Because it took place in the office?
12         MR. STEINBERG:  No, the pictures and that whole --
13 it's a new different --
14         THE COURT:  The ejaculation -- I mean, it all seems
15 like it's sexual abuse to me.
16         MR. STEINBERG:  I understand.
17         THE COURT:  Okay.  Any others?
18         MR. STEINBERG:  I think that Document 49, Your Honor.
19         THE COURT:  I'm sorry, yes, the second notice.
20         MR. STEINBERG:  That's the one that was filed Friday.
21         THE COURT:  Let's see.  D.J.M.
22         MR. STEINBERG:  Yeah.
23         THE COURT:  Okay.  He's going to testify about two
24 incidents involving -- three, excuse me.
25         MR. STARNES:  Four.

CURT MULLER - CROSS - EXAMINATION BY STEINBERG

1       THE COURT:  Four incidents.  I'm sorry.  Four

2  incidents.  Dr. Weber performed fellatio on him.  That's the

3  fourth one.  Third one, fingers in -- penis in his anus.

4  Pretty concrete facts -- allegations as well.

5       MR. STEINBERG:  No question.

6       THE COURT:  How are they out under 413/414?

7       MR. STEINBERG:  I think that the analysis is 403.

8  And then the 413 and 414 does say "may," at some point, Judge,

9  I would suggest that you have to be concerned about the

10  defendant's ability to get a fair trial on the indicted

11  allegations.  And I think it reached that point here.  I

12  mean --

13       THE COURT:  Well, if the abuse has gone on long

14  enough, you get to pick and choose how you defend it?  Only

15  have to defend it one at a time?

16       MR. STEINBERG:  No, I think, ultimately, the Court as

17  the gatekeeper has to say, "Am I concerned that Weber is going

18  to get a fair trial on the indictment counts, or am I concerned

19  that as a result of the spillover effect the jury is just going

20  to not even care about the indicted counts, but they're just

21  going to convict him on what they believe to be his character."

22       THE COURT:  Okay.  I keep coming back to *Glanzer* --

23       MR. STEINBERG:  I know.

24       THE COURT:  -- and how do I apply those factors here

25  to these proposed witnesses?

1           MR. STEINBERG:  Can I just say that I hate 413 and

2  414?  I think it --

3           THE COURT:  I understand.

4           MR. STEINBERG:  -- effects a person's ability to get

5  a fair trial.

6           THE COURT:  They really have changed the balance

7  here.  I mean, there's a clear intent by Congress to let this

8  evidence be admitted.  Now --

9           MR. STEINBERG:  No question.

10         THE COURT:  -- I believe that there is a tipping

11  point where it becomes overly prejudice, but I'm not sure where

12  to draw a line here because there's so many alleged victims and

13  so many people who had contact with Mr. Weber.

14         MR. STEINBERG:  Well, I have a proposal, and that is

15  let's try the Montana victims here, and then I'll go to South

16  Dakota, and I'll try the South Dakota victims there.  But that

17  probably isn't appealing because we're going to end up doing

18  two separate trials at two separate locations involving all of

19  these victims.

20         THE COURT:  Well, I mean, that would certainly be

21  advantageous for Mr. Weber.  But the government has chosen to

22  charge it this way:  the two here in Montana.  I assume you are

23  going to try to undermine the credibility of those alleged

24  victims and run the risk of opening the door to all of this

25  stuff, even if I were to say you can't bring it up in your

1  case-in-chief.

2        MR. STEINBERG:  Yeah, of course.  I mean, I can't
3  just sit there and not vigorously defend my client.  And the
4  answer is I intend to suggest that credibility is an issue, but
5  I don't think that mere cross-examination -- I think I can
6  contain myself in terms of making sure I don't open the door.

7        THE COURT:  Well, have you read the *LeMay* case?
8  Opening statements, challenging the credibility of the -- no
9  scientific -- these are 20 years ago.  So there's no physical
10 evidence of the abuse.  No scientific testimony of the abuse.
11 All of those factors were present in *LeMay*.  You are going to
12 highlight them here, I assume.

13       MR. STEINBERG:  I don't know what I'm going to do.

14       THE COURT:  I think *LeMay* says I have to at some
15 point let the government try to refute those allegations.

16       MR. STEINBERG:  I understand.  And I don't know that
17 I'll go down that track.  I think that some facts are obvious,
18 and you don't need to talk about them.

19       THE COURT:  All right.  Anything else?

20       MR. STEINBERG:  No, sir.

21       THE COURT:  Thank you.

22       MR. STEINBERG:  Thank you, sir.

23       THE COURT:  Mr. Starnes.

24       Mr. Starnes, your 404(b) disclosure is pretty
25 extensive.

1     MR. STARNES:  It is, Your Honor, and that was done
2   out of abundance of caution.

3     THE COURT:  So let me just -- I'm assuming that these
4   witnesses are available if needed.  They are not all intended,
5   necessarily, for your chase-in-chief.

6     MR. STARNES:  Well, actually, Your Honor, I think
7   they would be, and here's why.  So the case that I'm going to
8   be relying on most heavily, which I cite, as to why this
9   evidence that's listed, particularly in the 404(b) motion is
10  the *Pitts* case, and I've got that here.  I need to get to my
11  place, and I just need to catch back up, Your Honor.

12     Okay.  So that --

13     THE COURT:  Which document are you on?

14     MR. STARNES:  This is Document 36.  This is the
15  government's response to the 404(b) and 609 motion.  It would
16  be page 3, at the very top of that document, Your Honor.  And
17  we can just start and try to take this as chronologically as we
18  can.

19     But what the *Pitts* case tells us is that evidence
20  that corroborates significant aspects of a witness's testimony
21  is admissible under 404(b).  So the first question is whether
22  or not any of this evidence qualifies under 404(b).  Is it
23  really another crime, wrong act?  I say it's probably not,
24  although there is an argument that we have other acts here,
25  particularly giving alcohol to minors, that sort of thing.

1          None of the individuals listed in the government's
2   404(b) notice in Document 36, other than minor in possession
3   and giving alcohol to a minor, there's no new crimes here.  So
4   we're really talking about acts of the defendant.

5          So the reason I listed each of these individuals is
6   because, as the Court will notice, I gave sort of a brief
7   summary of what the anticipated testimony would be from the two
8   charged victims in this case:  R.F.H. and G.R.C.  R.F.H. talked
9   about being sexually abused in various ways at the IHS hospital
10  in Browning when he was on the Blackfeet Indian Reservation.
11  And he basically indicates, as I lay out here, that a lot of
12  that occurred through these patient visits that he would have
13  with Dr. Weber.  And those would occur at the hospital, some
14  would occur at the Nurturing Center.  Those are the acts that
15  he described.

16          Victim G.R.C., likewise, describes being sexually
17  abused or attempted to be sexual abused by Dr. Weber, but this
18  time at his home.  Now, importantly, G.R.C. described several
19  activities that Dr. Weber was engaged in around the time that
20  he received the sexual abuse, that included getting snacks and
21  food and wine and being taken on trips, being given gifts,
22  being given small sums of money, things of that nature.  These
23  are things that the charged victims are going to testify to.
24  At least we anticipate that's what they will testify to at
25  trial.

1    So, now, corroborating aspects of those two charged
2 victims' testimony becomes of extreme importance because I have
3 no doubt that the defense is going to cross-examine each of
4 those two victims.  And the second they do, really the second
5 they take the stand, their credibility is at issue.

6    But we know, because this is a historical sexual
7 assault case, that there is no physical evidence, that this
8 occurred more than 20 years ago, the credibility of the victims
9 is really what matters here.  And so corroborating significant
10 aspects of their testimony -- like having a doctor come to a
11 counseling session when I'm a middle-school-aged boy and he's
12 talking to me about sex, or I get invited to this doctor's
13 house and he give me condoms and makes lubricant available, or
14 he gives me pizza and he gives me wine --

15    THE COURT:  Mr. Starnes, my challenge here is to try
16 to provide a fair trial to both sides and put Mr. Weber on
17 trial for the crimes charged.

18    MR. STARNES:  Certainly.

19    THE COURT:  And to allow the government to present
20 its case.  It seems like I can't rule here today.  If you look
21 at the *LeMay* analysis, it depends.  It depends how you present
22 your case and how the defense chooses to try to undermine it,
23 as to which if any of these witnesses I would allow and to what
24 extent.

25    MR. STARNES:  Certainly.  I understand that it's very

1  difficult for the Court to make a decision in a vacuum.  I
2  understand that.  And the reason that we gave the --
3          THE COURT:  Well, I appreciate the notice.  The
4  notice --
5          MR. STARNES:  Sure.
6          THE COURT:  -- is commendable.  You have been as
7  inclusive as possible, but --
8          MR. STARNES:  Well, and to a certain extent, this is
9  based off of a lot of what has been told to investigators in
10 the past and discovery that has been provided to the defense.
11 I can't guarantee that a victim is not going to come in here
12 and there's going to be slightly different testimony than what
13 we anticipate.  That does happen in cases like this all of the
14 time.
15          But what I'm telling the Court is I fully expect that
16 what is going to happen is the second one of these two victims
17 testify, they are going to be cross-examined.  Their
18 credibility is going to be attacked.  So all of a sudden their
19 credibility is now of heightened importance, and it's the issue
20 at trial.
21          So if I have a victim saying that, "No, no, I went to
22 that guy's house, and he gave me pizza and beer and provided
23 video games and took us on trips," and now I have a bunch of
24 other people saying, "Yeah, he would do those things," it makes
25 it more likely that the victim is now telling the truth.  And

1   that's what LeMay really tells us.

2           And what 413 and 414 tell us is that -- and really
3   the *Pitts* case -- the corroboration of that testimony bears
4   directly in the credibility of the two victims, which is the
5   key element in this trial.  There's no other evidence beyond
6   testimony from the victims and corroboration.  That's what we
7   have because the case is so old and because these individuals
8   were so young when this abuse happened to them.

9           And so I understand the Court being put in sort of a
10  difficult position now.  But what I'm telling the Court is that
11  it doesn't really matter because the second credibility is
12  attacked, the government has a right to demonstrate how
13  credible those witnesses are.  And the way to do that is with
14  circumstantial evidence that things that they told the jury
15  actually occurred.  And they're not doing it in the form of
16  hearsay or some other admissible manner.  It's direct
17  observations by other individuals who were on the reservation
18  at that time who were invited to his house or had presentations
19  given to them and so on and so forth.

20          THE COURT:  Well, one issue, when you're talking
21  about corroboration, that's fine.  But we're also talking about
22  prior bad acts.  So taken in a vacuum some of these acts
23  wouldn't necessarily be bad, you know, having snacks at his
24  house or having kids watch movies at his house, things that
25  could be perfectly benign.

1       MR. STARNES:  Absolutely.  They could be.  And that's

2   for a jury to decide.  I fully expect the defense will make

3   those arguments.  But another way of looking at that is that he

4   provided himself the opportunity to prey upon at least one of

5   these --

6       THE COURT:  But I raise that point because I'm trying

7   to understand:  Are these prior bad acts, or is this just

8   corroborating evidence?

9       MR. STARNES:  And that's sort of a -- there's two

10  ways to look at it.  I didn't necessarily think these are prior

11  bad acts.  In a vacuum, is making my house available to have

12  snacks for the neighborhood kids to come hang out and nothing

13  else ever happens -- maybe it's a little odd, but is that a bad

14  act under Rule 404(b)?  Probably not.  It's not even a crime.

15  It might be seen as a little bit weird or unusual, but that

16  doesn't make it a crime.

17      But my point is that that is one potential

18  explanation.  Another potential explantation is it's this sort

19  of activity that gave him the opportunity to commit the crime

20  and the opportunity --

21      THE COURT:  But for terms of my analysis on

22  admissibility, some are not really prior bad acts, they are

23  just prior acts.

24      MR. STARNES:  Correct.  I don't know that Rule

25  404(b) --

1    THE COURT:  Does it have to be a prior bad act?  I
2  mean, it seems like the burden would be on the defense to show
3  that there's some prejudice here.

4    MR. STARNES:  And maybe I'm not following.  So I
5  don't know that --

6    THE COURT:  You are not -- if you had a witness who's
7  going to testify -- you know, some of them were more -- the
8  alcohol or something like that, that's a bad act.

9    MR. STARNES:  Sure.

10    THE COURT:  Okay.  So I would exclude that,
11  potentially, because it's prejudice, outweighs the probative
12  value.  But if it's just that he had kids over for parties,
13  watched movies, and was generous with the snacks and took kids
14  on trips, those are not necessarily bad acts.  I guess I'll
15  have to talk to defense about that.

16    MR. STARNES:  No, they are not necessarily bad acts.
17  They are just other acts.  So the rule doesn't necessarily
18  limit to other bad acts.  It's notice of other acts.  Right?
19  So that's why notice is given in the first place.

20    And the reason I'm arguing to the Court that these
21  acts are relevant and not unfairly prejudicial is because it's
22  these types of acts that corroborate testimony of the charged
23  victims in this case -- R.F.H. and G.R.C. -- assuming they
24  testify in accordance to what I have said I anticipate what
25  they will testify to.  So corroborates those aspects.

1           But each person also sort of serves a unique purpose,

2    whether it be an identification of the defendant.  I know there

3    was some discussion about this terminology that was used by one

4    of the charged victim's brother calling the defendant "Uncle

5    Bad Touch."  Right?  But the reason that's important is that's

6    how that individual identifies the defendant.  That's how they

7    knew him because of the behavior he would exhibit, and it's

8    that inherent behavior that contributes to the testimony of

9    G.R.C. and R.F.H., assuming they testify.

10           THE COURT:  All right.  Anything else, Mr. Starnes?

11           MR. STARNES:  With respect to the 404(b) witnesses,

12    no, Your Honor.

13           THE COURT:  How about the 413/414?

14           MR. STARNES:  Well, and I think the analysis is sort

15    of similar.  I think the defense, if I understand them, have

16    sort of conceded that those acts all fall within the realm of

17    413.

18           THE COURT:  You have four alleged victims from South

19    Dakota.  Correct?

20           MR. STARNES:  That's correct.

21           THE COURT:  So how do I make sure that Mr. Weber's

22    assessed by the jury for the alleged conduct here in Montana

23    and not "Oh, look at all of this other stuff that he did"?

24           MR. STARNES:  I think you instruct the jury, and the

25    jury is presumed to follow the instructions that the Court

1  gives it.  And I think it's quite fair for the Court to

2  instruct me, and I will constrain my argument as -- I mean, I

3  will proffer to the Court that I will constrain my argument.  I

4  don't think I can fairly argue that, "Hey, he did before or he

5  continued to do it after; therefore, he did it now."

6          I think that I can say, "These were not isolated

7  incidents.  You've heard from other people.  This was a

8  continuing pattern."  And that makes these individuals more

9  believable.  And that's why -- something to that effect.

10         But I think the Court can fairly craft instructions

11 to tell the jury that "You're going to hear from four different

12 people.  They are going to talk about acts that occurred after

13 the charged time frame, and they occurred in South Dakota.

14 Now, here's the permissible scope for you to consider this."

15         You can do that before testimony starts.  You could

16 do it before argument again or after argument at the time you

17 charge the jury --

18         THE COURT:  Would you plan to present your alleged

19 victims first?

20         MR. STARNES:  I would, yeah.  So the order would

21 be --

22         THE COURT:  So I would be able to evaluate what's

23 transpired up to that point in deciding on what corroborating

24 evidence you would get to present?

25         MR. STARNES:  I think it has to be, Your Honor,

1    because otherwise we're not corroborating anything.  So unless

2    they testify there's nothing to corroborate -- so we'd have to

3    put them on in order to then corroborate aspects.

4            I am just telling the Court that in my experience the

5    second a witness testifies and the defense cross-examines them,

6    their credibility is now going to be an issue.  And in a case

7    like this, credibility is pretty much what we have.

8            THE COURT:  All right.  Thank you, Mr. Starnes.

9            MR. STARNES:  Thank you, Your Honor.

10           THE COURT:  Brief rebuttal.

11           MR. STEINBERG:  Thank you, Judge.

12           You know, I took the time -- not that I wasn't

13   listening to Mr. Starnes -- but to review 404(b); in

14   particular, prohibited uses and permitted uses.  The prohibited

15   use is, obviously, they can't use it to prove a person's

16   character.

17           Permitted uses are as follows:  May be admissible for

18   another purpose such as proving motive, opportunity, intent,

19   preparation, plan, knowledge, identify, absence of mistake or

20   lack of accident.  This idea of corroboration being 404(b) is

21   not provided for in the rule.

22           And I was thinking about opening the door.  And if

23   someone says, "Yeah, I went to his house, and there was a party

24   there, and there were other kids there, and he was providing

25   snacks and wine, watched movies," and if I suggest that that's

1    not the case, that that's not true, then that's an example of
2    where I open the door.
3            But if I don't touch that, you can't use 404(b) as a
4    way -- I've never seen 404(b) in terms of it's analysis saying,
5    "I'm using it to bolster corroboration and credibility."  It's
6    aimed at showing that, in terms of the defendant's actions,
7    that the defendant, looking at him in terms of its purpose,
8    somehow is implicated.
9            THE COURT:  Why is this not opportunity?  It says,
10   "Evidence may be admissible for another purpose such as proving
11   motive, opportunity, intent, preparation, plan, knowledge,"
12   et cetera.
13           MR. STEINBERG:  Because he's not saying opportunity.
14   He said, "I want to corroborate the fact that he had parties
15   because --
16           THE COURT:  Are you going to concede he had parties?
17           MR. STEINBERG:  I may not touch it -- again I don't
18   want to -- I can't answer your question.  It depends how it
19   comes out.
20           THE COURT:  Right.  So I think the answer is it
21   depends.  If you are going to cross-examine and say, "Well,
22   these parties really weren't that frequent.  They weren't
23   that -- there was nothing unusual about them" --
24           MR. STEINBERG:  And that opens the door.  That's not
25   404(b).  That's my point, Judge.  You are absolutely right.  If

1  I open the door and suggest on cross-examination that the
2  victim is lying about parties, that opens the door to other
3  witnesses coming in and saying, "No, he had parties."  But
4  that's not 404(b).  That's the distinction.  This is not 404(b)
5  evidence.  This is "if Steinberg attacks credibility, we should
6  be able to bolster credibility by showing, in fact, there were
7  parties."  That's not 404(b).  That's the problem with the
8  analysis.  Thank you for the opportunity to rebut.

9            THE COURT:  All right.  Thank you.

10            So I think with regard to this issue, I am going to
11  have to defer a final ruling until the trial, once I've heard
12  the government's case and the defense attempts to undermine
13  that and through the first couple witnesses.

14            I'm looking at the *Glanzer* analysis and the *LeMay*
15  analysis with regard to the other sexual acts and with the
16  South Dakota victims in particular.

17            With regard to the Montana witnesses about the
18  parties and their experiences with Mr. Weber, again, I have to
19  see what efforts are made to undermine the credibility of the
20  alleged victims and the witnesses presented by the government
21  before the people identified in the 404(b) notice are called.
22  So I can't give you a definitive ruling.

23            I do understand my obligation to provide a fair trial
24  to all parties, in particular, to make sure that Mr. Weber is
25  tried on the charges here in Montana and for these acts and not

1  for having parties or for having snacks in his house.

2         So I think I have to -- I'm conscience of my role

3  under 404(b) to make sure that we don't go too far in trying to

4  smear Mr. Weber with an avalanche of testimony from people

5  saying, you know, these strange things happened, but they don't

6  relate directly to the alleges charges.  I'm not sure I can

7  give you much more guidance than that.

8         All right.  Let's move on to -- that takes care of

9  Motions 3 and 4.

10        Motion 5 was disclosure of intent to introduce

11 evidence pursuant to 807.

12        Is that at issue here, Mr. Starnes?

13        MR. STARNES:  No, Your Honor.

14        THE COURT:  Do you agree, Mr. Steinberg?

15        MR. STEINBERG:  Conceded by the prosecution.  Thank

16 you.

17        THE COURT:  Thank you.

18        Then we have Number 6, motion to disclose and

19 introduce Brady material.  I think, Mr. Starnes, your position

20 is that -- have you done that yet?

21        MR. STARNES:  To the extent it's -- basically,

22 whatever the evidence the United States has has been disclosed

23 to the defense, Your Honor, with the exception of grand jury

24 testimony by Special Agent Muller, which is Jencks.  And it's

25 standard practice in the District of Montana, at least in our

1  office, we will turn that over to the defense in order for them

2  to be able to prepare for cross-examination, roughly a week,

3  week and a half before pretrial.

4          THE COURT:  And I'm assuming you've disclosed the

5  alleged victim's criminal records?

6          MR. STARNES:  That's correct, Your Honor.  Everything

7  the government has and everything required by Rule 16:

8  Statements by the defendant, defendant's criminal record.

9  We've even given most Jencks statements of all of our proposed

10  witnesses, certainly all the witnesses that are listed in the

11  404(b) motion and 413 motions have all been previously

12  disclosed to the defense.

13          THE COURT:  All right.  Mr. Steinberg, you want to

14  talk about the Brady and Jencks material?

15          MR. STEINBERG:  I just want to make sure we have all

16  the criminal records of all of the witnesses.  That's

17  important.

18          MR. STARNES:  I believe we do.  I will go back and

19  double-check.  But what I -- the representation I can make is

20  that if we have it, it's been provided to the defense.  I will

21  double-check to make sure all proposed witnesses --

22          THE COURT:  All right.  So some of the witnesses, the

23  nonvictims, they have criminal records as well?

24          MR. STARNES:  I don't know off the top of my head,

25  Your Honor.

1          THE COURT:  All right.  Well, make sure I'm alerted
2    to that as well.
3          MR. STARNES:  Certainly, Your Honor.
4          THE COURT:  Mr. Starnes, the trial is August 6th?
5          MR. STARNES:  That's correct.
6          THE COURT:  All right.  So how soon can you get all
7    of this material to the defense?
8          MR. STARNES:  I can look to see today.  Some of it
9    may likely -- if we have it, it's already been disclosed.
10   Otherwise, we just have to do a quick search.
11         THE COURT:  All right.  What about the Jencks
12   material?
13         MR. STARNES:  Jencks material has already been
14   previously disclosed with the exception of Grand Jury
15   testimony.
16         THE COURT:  All right.  With the Brady material, I
17   will set a deadline of no later than two weeks before trial.
18         MR. STARNES:  That should be adequate, Your Honor.
19         THE COURT:  Okay.  So that's July 23rd, I believe.
20         MR. STARNES:  That's correct.
21         THE COURT:  All right.  Mr. Steinberg, are we clear
22   on that?
23         MR. STEINBERG:  Yes, sir.
24         THE COURT:  Okay.  I hope we have had full
25   disclosure.

1      That takes care of -- then there's Motion 7, intent

2  to use particular -- certain evidence.  What's the status?

3  That's items seized from the -- were there any items seized

4  from the search?

5      MR. STARNES:  There were, but we're not using them,

6  Your Honor.  That was the first motion that is moot.

7      THE COURT:  Oh, this relates to the search of the

8  Spearfish residence?

9      MR. STARNES:  I think, if I understand it correctly,

10 the defense just wants confirmation that all discovery has been

11 provided.

12     THE COURT:  Mr. Steinberg, are you clear on that

13 point?

14     MR. STEINBERG:  Yeah.

15     THE COURT:  Do you agree?

16     MR. STEINBERG:  I agree that there was a search, and

17 that's been agreed upon.

18     THE COURT:  All right.  So that was the Jencks

19 material.

20     Now we're up to Motion Number 9, which is the

21 severance of the two trials.

22     Mr. Steinberg?

23     MR. STEINBERG:  Stand on the record.

24     THE COURT:  All right.  Mr. Starnes, do you wish to

25 respond?

1              MR. STARNES:  Your Honor, I think the case law is
2      fairly laid out in the motions as to what the standard is.
3      Basically, there's two ways that this Court could look to
4      either sever or look at whether or not this case has been
5      properly joined for two victims in one trial.  So I think the
6      standard is fairly clear.

7              I'll tell you what.  I'll approach the podium, Your
8      Honor.

9              THE COURT:  Thank you.

10             MR. STARNES:  Thank you.

11             So the two places that the Court is going to have to
12     look at as laid out in our motion:  There's Rule 8(a) in this
13     case because it's not a multiple defendant case.  It's a
14     multiple victim case.  So there's multiple -- two victims, five
15     counts:  Victim 1 has three of the counts; Victim 2 has two of
16     the counts.

17             Rule 8 has a strong presumption in favor of joinder
18     when the charges are somewhat alike, which we have here.

19             THE COURT:  What's the time frame on the two charges?

20             MR. STARNES:  So the charges would have occurred
21     between 1992 and 1995.  That's the closest window we can get.

22             THE COURT:  Both alleged victims fall in that same
23     window?

24             MR. STARNES:  That's correct because Dr. Weber was
25     only assigned to the Blackfeet Indian Reservation for about

1    three years.  So it would have had to have occurred in that
2    window.  So while there's not a specific month or specific
3    week, necessarily, the way the counts are broken down is one of
4    the counts is the first victim, R.F.H., has to do with some
5    touching and then some oral copulation and then attempted anal
6    penetration.  With Victim 2, it was over-the-clothes touching,
7    if I remember correctly, and then the other count was an
8    attempted oral sex.  So that's the way it really breaks down.
9    And both of those would have occurred over the same time
10   period, that being between 1992 and 1995.

11              THE COURT:  Okay.

12              MR. STARNES:  More or less.

13              But we have Chapter 109(c) offenses, so they are all
14   sexual offenses.  So at least from the outset, based on the
15   face of the indictment, which is what Rule 8 tell us to look
16   at, we have somewhat alike offenses occurring over this
17   generally same period of time involving generally the same
18   types of acts.  So joinder would be proper under Rule 8.

19              The next question is whether or not under Rule 14 any
20   party will suffer prejudice.  I think the analysis of this
21   depends heavily on the Court's decision on Rule 413/414,
22   because there's no point in splitting a trial if you're going
23   to have the same testimony in each case.  You're just doubling
24   the work, essentially.  All you would be doing, really, is
25   taking one victim and turning that person into a witness for

1   Trial 1 and then vice versa for Trial 2.

2           So there's a strong favor -- a strong presumption

3   that favors, I should say, judicial economy in cases like this.

4   But, here, as the Court has already gone over, the substantive

5   list of the potential witnesses the government is looking at

6   calling for 404(b) purposes and 413 purposes, you are going to

7   get some significant crossover in that testimony.  So because

8   we're dealing with the same types of offenses, occurring over

9   the same period of time, because you're going to get so much

10  overlap and crossover in testimony, there's really no prejudice

11  that's going to occur to the defendant.  So these offenses

12  should remain joined.

13          THE COURT:  All right.  Thank you, Mr. Starnes.

14          MR. STARNES:  Thank you.

15          THE COURT:  I don't find compelling defense argument

16  of the fact that one victim is under 12 and one was over 12

17  warrants severance here.  These were pretty close in time, 1993

18  to 1995, in place, and in manner.  I am going to deny that

19  motion.

20          And, finally, the last motion we have is disclosure

21  intent to call expert witnesses and discovery.

22          Mr. Starnes, any expert witnesses?

23          MR. STARNES:  At this point, we have not identified

24  an expert witness.  I'll note that the Court's general

25  scheduling order requires disclosure of expert witnesses, as

1  well as the curriculum vitae and summary of testimony,

2  approximately two weeks before trial.  I would ask that the

3  Court continue with that date.

4      THE COURT:  Is there any intent --

5      MR. STARNES:  I do not anticipate calling an expert

6  witness, Your Honor.

7      THE COURT:  All right.  Mr. Steinberg?

8      MR. STEINBERG:  That's fine.

9      THE COURT:  Okay.  So, again, two weeks if you have

10 one.  Get it as soon as you can.

11     MR. STARNES:  Thank you, Your Honor.

12     THE COURT:  Then that takes us back to the last

13 issue that I make a ruling that I accept these statements;

14 correct?

15     MR. STARNES:  That's correct, Your Honor.

16     THE COURT:  All right.  With regard to the

17 statements:  The testimony today was that Agent Bennett knocked

18 on the window of Mr. Weber's truck, as Mr. Weber sat waiting,

19 stopped for construction, to take place on -- stopped in an

20 area of where construction was taking place and cars were

21 sitting there on the road.  Agent Bennett testified that he

22 asked Mr. -- he identified himself and asked Mr. Weber to speak

23 with him, and then he pulled him over into the parking lot of

24 the Lakota Cafe where he was joined by Agent Muller, who also

25 testified about -- questioning Mr. Weber, asked him about

1   whether he would agree to speak to them about some allegations.
2   They were somewhat vague about that.

3          The agents certainly didn't come out and say, "We
4   want to talk to you about alleged sexual abuse on the Pine
5   Ridge Reservation and the Blackfeet Reservation back in the
6   1990s.

7          The question is whether -- well, two questions:
8   First, as argued in the briefs, Mr. Weber -- this was briefed
9   as an issue about voluntariness of the interrogation at the
10  home.  He did not raise the -- he didn't raise the Supreme
11  Court case in your briefing -- first, the *Royer* case.  The
12  first question is whether there was, as argued here today,
13  whether there was a seizure.  And that's where we rely upon
14  *Royer*.  The second question is whether, once you got to the
15  house, any of those six factors bearing on voluntariness tip in
16  favor of suppressing the statements.

17         With regard to the alleged seizure, the facts in
18  *Royer* were a person was approached in an airport, was asked for
19  his identification, the identification didn't match the
20  identification on his luggage and his plane ticket.  He had a
21  drug courier profile.  He was taken to a room for 45 minutes.
22  They searched his luggage.  Searched his person.  And the Court
23  ultimately ruled that they exceeded the limits of the
24  investigative stop.

25         Here, I think we have a different circumstance.  We

1  have 5 minutes in the parking lot.  There's no search of

2  Mr. Weber's person.  No seizure of any of his belongings.  He

3  agrees to wait for Agent Muller to show up.  And then he agrees

4  to accompany the agents to his house.

5          Now, typically, in a seizure situation, the person

6  seized doesn't get to drive their own vehicle to wherever the

7  agents are going.  I think that's another indicia of the fact

8  that this was not a seizure; that Mr. Weber was free to ask the

9  agents to discuss this at another time if he chose.  He chose

10 not to do that.

11          I don't think the law requires the agents to identify

12 the exact purpose of the questioning with regard to specific

13 crimes and specific acts.  I don't see any case law to support

14 that.  I think the *Royer* case here is distinguishable with

15 regard to the circumstances that led the Supreme Court in *Royer*

16 to say that was an impermissible seizure.  I don't think we

17 have the same fact pattern here.

18          With regard to the voluntary contact, the six

19 factors:  Mr. Weber's age.  He's 67.  He's certainly mature.

20 There's no indication he suffers from any cognitive problem at

21 this point.  He's a medical doctor.  Certainly intelligent

22 enough to understand what was going on and understand his

23 rights.

24          Lack of adequate notice of rights -- lack of

25 advisement of rights.  There was not a Miranda warning.

1  Without a seize, I don't think they're required to give the
2  Miranda warrant.  They did, in the recorded portion of the
3  interview, advised Mr. Weber he had a right not to talk to
4  them, could ask to leave at any time, and he could refuse to
5  answer specific questions, which, in fact, he did as evidenced
6  by questions on page 71 and 78, as the transcript indicates.
7  So he understood those rights as evidenced by the fact that he
8  exercised those rights on two different occasions.

9          The length of the detention is two hours.  I think
10 it's in his home setting.  I don't find that unreasonable under
11 these circumstances.

12         There's no physical punishment involved.

13         The fifth factor is -- I can't read my own writing --
14 responded and something notice of -- the government didn't
15 provide any notice of the questions.  I'm not sure they are
16 required to do that.

17         Let me make sure I have that last factor correct.
18 Hold on a minute, please.

19         The repeated and prolonged nature of the questioning.
20 Again, I don't think the transcript indicates they were
21 badgering Mr. Weber.  He refused to answer a couple of
22 questions.  The agents moved on with their questions, as
23 indicated by the transcript.

24         So under the six factors, identified in *US v Haswood*,
25 Ninth Circuit case from 2003, I don't think the government

1  agents overstepped their bounds here with regard to coercing or
2  forcing or cajoling Mr. Weber into making these statements.  I
3  am going to deny the defendant's motion to suppress the
4  statements.

5          I think that resolves all ten motions today.

6          Mr. Starnes, anything else you need to address today?

7          MR. STARNES:  I don't think, Your Honor.

8          THE COURT:  Mr. Steinberg, anything else today, sir?

9          MR. STEINBERG:  No, sir.  Thanks.

10          THE COURT:  All right.  So we have a trial date still
11  for August 6th.

12          MR. STARNES:  That's correct.

13          THE COURT:  See you then.  We'll be in recess.  Thank
14  you.

15          MR. STARNES:  Thank you.

16      (The proceedings concluded at 12:37 p.m.)

17                          --o0o--

REPORTER'S CERTIFICATE

I, Yvette Heinze, a Registered Professional Reporter and Certified Shorthand Reporter, certify that the foregoing transcript is a true and correct record of the proceedings given at the time and place hereinbefore mentioned; that the proceedings were reported by me in machine shorthand and thereafter reduced to typewriting using computer-assisted transcription; that after being reduced to typewriting, a certified copy of this transcript will be filed electronically with the Court.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys to this action, nor financially interested in this action.

IN WITNESS WHEREOF, I have set my hand at Great Falls, Montana, this 18th day of March, 2019.


/s/ *Yvette Heinze*
_____
Yvette Heinze
United States Court Reporter