1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MONTANA

3          GREAT FALLS DIVISION

4

5   UNITED STATES OF AMERICA,          )

6                  Plaintiff,          )
                                       )   Criminal Docket
7        vs.                           )   No. CR 18-14-GF-BMM
                                       )
8   STANLEY PATRICK WEBER,             )
                                       )   Court of Appeals
9                  Defendant.          )   No. 19-30022
    _____     )

10

11                Partial Transcript of Trial with a Jury
12                            413 Issue

13
                      Missouri River Federal Courthouse
14                       125 Central Avenue West
                           Great Falls, MT 59404
15                     Wednesday, September 5, 2018
                         10:09 a.m. to 11:07 a.m.
16

17
                     BEFORE THE HONORABLE BRIAN MORRIS
18
                  UNITED STATES DISTRICT COURT JUDGE
19

20
                          Yvette Heinze, RPR, CSR
21                     United States Court Reporter
                     Missouri River Federal Courthouse
22                       125 Central Avenue West
                           Great Falls, MT 59404
23                   yvette_heinze@mtd.uscourts.gov
                            (406) 454-7805
24
                  Proceedings recorded by machine shorthand
25         Transcript produced by computer-assisted transcription

**APPEARANCES**

PRESENT ON BEHALF OF THE PLAINTIFF,
THE UNITED STATE OF AMERICA:

                Jeff Starnes
                Assistant U.S. Attorney
                OFFICE OF THE U.S. ATTORNEY
                119 1st Avenue North, Suite 300
                Great Falls, Montana 59401

                Lori A. Harper Suek
                Assistant U.S. Attorney
                U.S. ATTORNEY'S OFFICE
                2601 Second Avenue North, Suite 3200
                Billings, MT 59101

PRESENT ON BEHALF OF THE DEFENDANT:

                Harvey A. Steinberg
                SPRINGER AND STEINBERG
                1600 Broadway, Suite 1200
                Denver, CO 80202

                Nicole L. Siefert
                RHOADES, SIEFERT & ERICKSON, P.L.L.C.
                430 North Ryman, Second Floor
                Missoula, MT 59802

                Ryan T. Cox
                SPRINGER AND STEINBERG
                1600 Broadway, Suite 1200
                Denver, CO 80202

1                          PROCEEDINGS

2          (Open court.)

3          (Defendant present.)

4          (Jury present.)

5          (During Day 2 of the above-entitled trial, at 10:09 a.m.,

6          proceedings were as follows:)

7                   THE COURT:  Mr. Starnes, next witness.

8                   MR. STARNES:  Your Honor, may we have a sidebar?

9                   THE COURT:  You may.

10         (Discussion on the record at sidebar.)

11         (Defendant not present.)

12                  THE COURT:  We're at sidebar with counsel.

13                  Mr. Weber waived his right to be here?

14                  MR. STEINBERG:  Yes, sir.

15                  THE COURT:  Okay.  Mr. Starnes, your issue.

16                  MR. STARNES:  Thank you, Your Honor.

17                  So the two victims in this case have now testified.

18                  THE COURT:  Yes.

19                  MR. STARNES:  We would like to address at some point

20    the remaining 413 issues out there, and we're thinking about

21    planning purposes for the Court.

22                  THE COURT:  All right.

23                  MR. STARNES:  So I have Michael Four Horns who we can

24    call who is in custody.

25                  THE COURT:  Is he a --

1             MR. STARNES:  He's not a 413.  He's just a

2  corroboration witness, one of the Browning witnesses.

3             THE COURT:  Okay.

4             MR. STARNES:  We have another witness who is under

5  subpoena that we believe is en route to the courthouse, but

6  he's probably not going to be here for some time.  That's

7  Justin Meineke.

8             THE COURT:  What do you mean "some time"?  This

9  afternoon?

10            MR. STARNES:  Well, he left his house this morning.

11  He doesn't have a cell phone, so we believe he's en route.

12            THE COURT:  He's from Browning?

13            MR. STARNES:  He is.

14            THE COURT:  Okay.

15            MR. STARNES:  So that's why we'd like to see if we

16  can try to get a read from the Court on the remaining 413

17  issues that are out there.

18            THE COURT:  All right.  Which?  These are the South

19  Dakota --

20            MR. STARNES:  That's correct.

21            THE COURT:  Which of them do you wish to call?

22            MR. STARNES:  So there's three that we'd like to

23  call:  Daniel Martin, Fred Gayton --

24            THE COURT:  Hold up.  D.J.M.?

25            MR. STARNES:  D.J.M. is Daniel Martin.  F.G. is Fred

1  Gayton.

2          THE COURT:  Okay.

3          MR. STARNES:  And then E.H.H. is Eugene Hunts Horse.

4          THE COURT:  All right.  And you want to call them for

5  what purpose?

6          MR. STARNES:  Well, under *LeMay*, Your Honor -- so

7  there's a five-factor test we have to address.  As the Court

8  recalls, we spent significant time addressing credibility

9  issues for Mr. Four Horns yesterday.  The majority of his

10 testimony was that he was perpetrated by Dr. Weber at the

11 hospital facility.  Mr. Martin will explain that each of the

12 incidents of sexual abuse that he experienced in South Dakota

13 also occurred in a hospital setting.  It included acts of

14 digital penetration, sexual touching of his penis, and anal

15 penetration by Dr. Weber's penis.

16          THE COURT:  Okay.

17          MR. STARNES:  So I think his is the most closely

18 related to what Mr. Four Horns testified to, and credibility is

19 certainly an issue.

20          So under *LeMay*, I think the necessity of this

21 evidence with respect to Mr. Martin is heightened.  I think the

22 similarity of the events is very much on par with what

23 Mr. Four Horns testified to.  I don't think Mr. Martin has any

24 of the same potential mental health issues.  He's currently

25 incarcerated on a charge --

 1          THE COURT:  What was the time frame for D.J.M.?
 2  1995?
 3          MR. STARNES:  It would have been after 1995.  I want
 4  to say it's around '97, Your Honor.  So he's a little bit
 5  unsure because he remembers being about 8 or 9, but I think
 6  that the timing of that would be that he would have to be
 7  slightly older.
 8          THE COURT:  All right.  Anything else?
 9          MR. STARNES:  With respect to the other two --
10          THE COURT:  I'm sorry.  Let's talk about him first.
11          Mr. Steinberg, what's your position on Mr. Martin?
12          MR. STEINBERG:  Our position of Mr. Martin is that it
13  was a difference situation, different state, different time.
14          THE COURT:  Different state?
15          MR. STEINBERG:  Yeah.
16          THE COURT:  Okay.  So after he moves, that excludes
17  it?
18          MR. STEINBERG:  No, but in terms of --
19          THE COURT:  The time frame is 1995, according to the
20  government.  '96.
21          MR. STEINBERG:  Well --
22          THE COURT:  You had --
23          MR. STEINBERG:  -- I'm not convinced of that.  I
24  think --
25          THE COURT:  Hold on.  You had Mr. Running Crane.  You

1  were claiming he was 16.

2          MR. STEINBERG:  I didn't claim anything.

3          THE COURT:  Well, you were asking him about being 16.

4  That would make it 1997 for the Browning incident?

5          MR. STARNES:  Well, that would be -- we will

6  establish that is not a possibility.

7          THE COURT:  So it's pretty close in time and close in

8  type of activity.

9          MR. STEINBERG:  Sure.

10          THE COURT:  Close in age of the victims.

11          MR. STEINBERG:  Well, here's the problem.  Let's be

12  blunt.  If we're going to let these things in, then we'll never

13  get a fair trial, and I understand the rules.

14          THE COURT:  What do I do about *LeMay*.  How do I apply

15  *LeMay*?

16          MR. STEINBERG:  *LeMay* still says that you are the

17  gatekeeper.  It still says you --

18          THE COURT:  Okay.  So we have -- here's the fact.

19  The similarity of the prior acts --

20          MR. STEINBERG:  We're saying it's dissimilar

21  because --

22          THE COURT:  Okay.  It's similar.

23          MR. STEINBERG:  -- anal sex --

24          THE COURT:  It's similar.  Come on.  Anal sex versus

25  what?  Versus asking for -- attempting anal sex?

1          MR. STEINBERG:  No, there was no -- Four Horns
2    didn't --
3          THE COURT:  Okay.  The closeness in time of the prior
4    acts:  It's roughly the same time frame, 1990s.  Mid-1990s.
5          Do you agree?
6          MR. STEINBERG:  No, because I don't think he will say
7    that.  I think Martin doesn't know when it happened.
8          THE COURT:  All right.  The frequency of the prior
9    acts, that's in dispute.  The presence or lack of intervening
10   circumstances:  Mr. Weber moved from Browning to South Dakota.
11         MR. STEINBERG:  And also, if I remember right, Martin
12   comes there, and he says that -- wait, I want to make sure.
13   May I have a moment?
14         THE COURT:  You may.
15          (Off-the-record discussion between with Mr. Steinberg and
16         Mr. Cox.)
17         MR. STEINBERG:  I don't know if we should be doing
18   this at sidebar.  My concern is I don't have my notes.  I want
19   to say -- and I could be wrong -- I think Martin is the one
20   whose mother comes with him to the exam room.
21         THE COURT:  Hold on.  Hold on.
22         You have a witness available right now?
23         MR. STARNES:  We do, Your Honor.  Michael Four Horns
24   is in custody.  He will be very short.
25         THE COURT:  Okay.  Let's put on Michael Four Horns,

1   and then we'll take a break and --

2           MR. STARNES:  And settle this out.

3           MR. STEINBERG:  Thank you.

4           MR. STARNES:  Thank you, Your Honor.

5       (Open court.)

6       (Defendant present.)

7       (Jury present.)

8           THE COURT:  Mr. Starnes, next witness.

9           Oh, Ms. Suek, sorry.  Next witness, please.

10          MS. SUEK:  Thank you, Your Honor.  The United States

11  calls Michael Four Horns.

12      (Testimony of Michael Four Horns.)

13          THE COURT:  You may step down.  Thank you, sir.

14          Mr. Starnes, you have another witness, or do we need

15  to address a legal issue?

16      (Off-the-record discussion between Mr. Starnes and

17      Ms. Suek.)

18          MR. STARNES:  Your Honor, I think we'd like to

19  address the issue.

20          THE COURT:  All right.  We're going to take a break,

21  members of the jury.  I'll call you back when we're ready to

22  go.

23      (Jury leave courtroom.)

24          THE COURT:  Please be seated.

25          All right.  Mr. Starnes, you want to call D.J.M.

1          MR. STARNES:  That's correct, Your Honor.  So at this
2    point -- so there's three witnesses from South Dakota that we
3    would like the Court to consider allowing us to testify in this
4    case.  The primary one would be D.J.M., and I think that's
5    because, as discussed in the United States' second disclosure
6    of 413/414 evidence, I think his account is very -- the one
7    that is most similar to things that Mr. Four Horns described --
8    Ronald Four Horns -- Ronald Joe Four Horns described during his
9    testimony yesterday.

10          And as the Court recalls, there was a significant
11    credibility attack on Mr. Four Horns that occurred -- actually,
12    beginning back in opening statement, there was mention of the
13    fact that he may have a mental health issue, that he was on --
14    or not on medication at various times, that certainly he is an
15    incarcerated individual.

16          And so Mr. Four Horns also described being sexually
17    abused in a hospital-type setting, at the hospital in Browning.
18    He also described a hospital-type room in a Nurturing Center,
19    where he was similarly perpetrated by Dr. Weber when nobody
20    else was around.

21          So as the Court can see in our second notice, D.J.M.
22    will similarly testify that when he was a patient of
23    Dr. Weber's at the Pine Ridge Indian Reservation.  We believe
24    no earlier 1996, but somewhere between 1995 and 1998,
25    approximately, when he first started seeing Dr. Weber.  His

1  parents --

2          THE COURT:  When did Dr. Weber move to Pine Ridge?

3          MR. STARNES:  In 1995, and that's yet to be

4  established, Your Honor, but we will establish that.  But he

5  moved in about the middle -- maybe July/August of 1995.  And so

6  given the timing of when Mr. Martin was born and when Dr. Weber

7  moved, we have a rough idea of how young he could have -- like

8  the earliest this could have happened to him in his life.

9          THE COURT:  Okay.

10          MR. STARNES:  But he describes four instances where

11  he was perpetrated by Dr. Weber that involved acts of digital

12  penetration, anal penetration, anal rape, touching, sexual

13  touching that took place in the hospital environment.

14          Mr. Martin will testify that on at least one

15  occasion, possibly more, he was brought to the hospital by his

16  parents but none of the -- or an adult, but no adults were

17  present in the room with him during these sessions.

18          So I think that his description of what happened to

19  him is the one that is most similar to what Mr. Four Horns

20  described.  So that takes you back to the *LeMay* factors, the

21  similarity of the events in question.  That's going to be a

22  factor that weighs heavily in favor of allowing us to present

23  D.J.M.'s testimony.

24          THE COURT:  What about the other factors?

25          MR. STARNES:  Well, so closeness in time and lack of

1  intervening events are going to be two that can be taken at the

2  same time.  Really all that happened was Dr. Weber moved from

3  the Browning IHS in 1995 to the Pine Ridge IHS later on in 1995

4  and would have picked up seeing patients, had access to these

5  individuals, including D.J.M.

6          So the closest in time would have been probably no

7  more than about two to three years between the times that --

8  the testimony that we've heard from Mr. Running Crane and

9  Mr. Four Horns.  I guess Mr. Running Crane was a little bit

10 convoluted in his time line.  But we know that Mr. Weber was

11 assigned to the hospital from 1992 to 1995 in Browning.  So he

12 would have left.  So those events would have occurred between

13 '92 and '95, sometime in there, and then you pick up in 1996,

14 1997, possibly 1995.  Closeness in time, very close in time.

15          THE COURT:  All right.  Next factor is the frequency

16 of the prior acts.

17          MR. STARNES:  Correct.  So we heard about a number of

18 acts from Mr. Four Horns that occurred to him.  He could not

19 put a precise number on it.  We know that it was more than one.

20 He said it was several.  He didn't know the exact number.  With

21 respect to Mr. Running Crane, we talked about two instances of

22 sexual conduct.

23          THE COURT:  And then we have presence or lack of

24 intervening circumstances.

25          MR. STARNES:  Correct.  The only intervening

1  circumstance was that Mr. Weber moved from one hospital to the
2  other by way of transfer.
3          THE COURT:  The necessity of the evidence.
4          MR. STARNES:  And I think that's the key factor here.
5  When we're dealing with these two individuals, particularly
6  Mr. Four Horns who has significant credibility issues -- and
7  his credibility was attacked many times on cross-examination
8  and from the outset during the defense's opening statement --
9  you have somebody who's been incarcerated, somebody with
10 significant issues, he's been on and off medication that helps
11 regulate his behavior over time, I think that the fact that
12 this happened to other individuals who are going to describe
13 similar acts that occurred to them will bolster the credibility
14 of Mr. Four Horns.  And that's the exact reason why we have 413
15 and 414 evidence, Your Honor.  And I've laid that all out in my
16 motion but --
17         THE COURT:  So we finish up D.J.M. and then
18 Mr. Steinberg cross-examines him.
19         MR. STARNES:  Correct.
20         THE COURT:  And then if you believe he was effective
21 in undermining D.J.M.'s credibility, then you want to call F.G.
22         MR. STARNES:  And I think we should be entitled to
23 call them both at this point because F.G., he talks about four
24 instances.  Three of those instances occurred at the hospital.
25 One of the instances occurred in Dr. Weber's home at the Pine

1  Ridge Indian Reservation.

2      So just so the Court is aware, the testimony would be
3  roughly that after -- well, once the South Dakota victims
4  encountered Dr. Weber, it was similar.  He was living in
5  government quarters.  He was an IHS employee.  He was a
6  pediatrician at the Pine Ridge Indian Reservation.  He met many
7  of these boys because they were patients.  That's how he first
8  gained access to them.

9      So with respect to D.J.M., all of the abuse occurred
10  at the hospital.  With respect to F.G., three of the four
11  instances that F.G. would testify about occurred at the
12  hospital.  One instance occurred at Dr. Weber's home, which was
13  on the IHS compound in the Pine Ridge Indian Reservation -- or
14  the government housing on the IHS Pine Ridge Indian
15  Reservation.

16      THE COURT:  How does F.G. differ from E.H.H.?

17      MR. STARNES:  So E.H.H. is slightly different because
18  all of the abuse that occurred to E.H.H. occurred at
19  Dr. Weber's home.  So E.H.H. would be more similar to
20  Mr. Running Crane's testimony.

21      THE COURT:  Is there any -- how do the time frames
22  for F.G. and E.H.H. compare to D.J.M.?

23      MR. STARNES:  Similar time frame, Your Honor.  It
24  would have -- well, okay.  So there was -- I think E.H.H. had
25  some more ongoing abuse.  He had several encounters with

1  Dr. Weber over a period of time.  Whereas at least with respect

2  to the encounters at the hospital for F.G., it would have

3  occurred in similar proximity around the same time that --

4          THE COURT:  What are the ages of F.G. and E.H.H. at

5  the time this happened?

6          MR. STARNES:  Today or --

7          THE COURT:  No, at the time it happened.

8          MR. STARNES:  So we believe, Your Honor, they would

9  testify that the acts would have occurred as earlier as 9 or 10

10  for D.J.M., and up until -- may I have just a moment, Your

11  Honor?

12          THE COURT:  Yes.

13      (Off-the-record discussion between Special Agent Muller,

14      Ms. Suek, and Mr. Starnes)

15          MR. STARNES:  So we believe F.G. was around 11 when

16  the abuse started, and E.H.H. was perhaps as old as 15.

17          THE COURT:  All right.  Anything else?

18          MR. STARNES:  No, Your Honor.  I think that what's

19  laid out -- well, based on the testimony of the two victims,

20  the potential credibility issues they have, this evidence

21  should be allowed in.

22          THE COURT:  All right.  Thank you.

23          MR. STARNES:  Thank you.

24          THE COURT:  Mr. Steinberg.

25          MR. STEINBERG:  Thank you, sir.

1          In reverse order in term of the factors.

2          THE COURT:  Pardon?

3          MR. STEINBERG:  If we could do them in reverse order.

4          THE COURT:  Go ahead.

5          MR. STEINBERG:  The one I don't quite understand is

6     necessity.  And I don't know how to interpret that from a

7     litigant's standpoint, let alone a Court's standpoint.  Does

8     that mean the Court says, "Hey, I think that the prosecution

9     needs this evidence because there's a danger the defendant

10    might be acquitted?"  I just don't understand it.

11         And in terms of this suggestion that there was an

12    attack on credibility, there was no attack on credibility as

13    much as there was putting out the facts.  No one is suggesting

14    that Four Horns wasn't incarcerated.  No one is suggesting --

15         THE COURT:  Come on, Mr. Steinberg.  Let's get

16    serious.  You attacked Mr. Four Horns's credibility.  You

17    attacked Mr. Running Crane's credibility.  There's no doubt

18    about that.  Just with the facts, you attacked their

19    credibility.  Let's not waste time.

20         MR. STEINBERG:  Okay.  Well, it's not, if you will --

21         THE COURT:  Tell me a Ninth Circuit case from a

22    District Court or the Court of Appeals that has disallowed this

23    kind of testimony under 413/414 in applying the *LeMay* factors.

24         MR. STEINBERG:  Well, the cases all say and the rule

25    says that that --

1          THE COURT:  That's not my question.  My question is

2     tell me a case where --

3          MR. STEINBERG:  They never appealed.

4          THE COURT:  Pardon me?

5          MR. STEINBERG:  They never go up that way.  They only

6     come up the opposite way.

7          THE COURT:  Tell me a case -- I said a District Court

8     or Court of Appeals that has disallowed this type of evidence.

9          MR. STEINBERG:  Well, I am not aware of any.  But the

10    point is, is that it's a fairly new rule.  And in terms of the

11    rule itself --

12         THE COURT:  Fairly new when?  Not like last year.

13    This has been around a while.

14         MR. STEINBERG:  Yeah, but it's not like 20 years old.

15    So my point being that these cases are only going to go up on

16    the other side when there's a suggestion that it shouldn't have

17    come in.

18         THE COURT:  Well, *LeMay* is from 2001.

19         MR. STEINBERG:  No, I understand.

20         THE COURT:  So that's 18 years ago.  So, in fact, the

21    rule is almost 20 years old.

22         MR. STEINBERG:  Yes, sir.

23         THE COURT:  So what you said there wasn't accurate.

24         MR. STEINBERG:  Well, it's not more than 20 years

25    old.

1     THE COURT:  Okay.  Well, it's at least 18.

2     MR. STEINBERG:  Yes, sir.

3     THE COURT:  And that's pretty close to 20.

4     MR. STEINBERG:  Yes, it is.

5     THE COURT:  Okay.  So --

6     MR. STEINBERG:  I mean, if you want --

7     THE COURT:  -- I'm trying to balance Mr. Weber's

8  right to be tried on the charges in Montana --

9     MR. STEINBERG:  Right.

10    THE COURT:  -- with the government's right to present

11 corroborating evidence.

12    MR. STEINBERG:  And so you are already allowing --

13 there's one witness that's going to come in from Montana that's

14 a, quote, "similar," unquote.  So you already have three

15 separate victims.

16    THE COURT:  Which one is that?

17    MR. STEINBERG:  I forget his initials.  The last

18 initial is M.

19    THE COURT:  M.  All right.

20    MR. STEINBERG:  I think it's J.M.

21    THE COURT:  Okay.

22    MR. STEINBERG:  D.M.

23    THE COURT:  J.M.  Or D.M.

24    MR. STARNES:  It's J.M.

25    MR. STEINBERG:  I thought it was J.M.

1          THE COURT:  J.M.

2          MR. STEINBERG:  Okay.  So now that's three.

3          THE COURT:  Three what?

4          MR. STEINBERG:  Three separate events of allegations

5  concerning sexual misconduct.  And if the idea is, hey, we want

6  to give -- in terms of this balancing act, we want to give a

7  fair trial to my client, you have three people, three separate

8  occasions, three people who apparently don't have a close

9  relationship, know each other, are coming up with allegations.

10  Isn't that enough?  You're saying, "No, under necessity, we're

11  going to allow six."  Then you say, "Now we have three more."

12          And does anyone think -- anyone think, that can

13  logically look and be fair say, "Hey, we have six people come

14  in, and the jury is going to be told, 'Hey, you're on trial

15  only for the two'"?  And I'll go to trial in South Dakota on

16  the ones that are there.  We're going to be on trial there.

17          THE COURT:  You'll argue that the Montana stuff

18  shouldn't come in.

19          MR. STEINBERG:  Well, that's part of it.  But

20  isn't -- Montana, here, you have the three separate events.

21  And in terms of necessity you have the three separate -- four

22  separate events in South Dakota?

23          THE COURT:  413 and 414 are different than 404(b).  I

24  understand --

25          MR. STEINBERG:  No question.

1    THE COURT:  -- there's a balancing.  But this was a

2    specific attempt by the Congress to broaden the scope of

3    admissibility in child sex cases.

4    MR. STEINBERG:  I agree.  And then there's still 403,

5    and there's still this thing called a due process clause which

6    is fairness in terms of a trial in saying, "Look, I can look

7    down and say Weber got a fair trial."

8    If there's anyone here who suggests that if you have

9    six different incidents come in and the jury is not going to

10   say, "Hey, clearly, if those happened, these happened."  That's

11   the danger here.  And that's not a fair trial because I don't

12   get tried on the two events that are part of the indictment,

13   but rather I get -- and I shouldn't say "events" -- the two

14   individuals that are part of the indictment, but rather I get

15   tried on his character.  And they are going to say his

16   character -- and that's what it comes down to.  Let's be

17   honest.  They just want to -- and I don't blame them.  I

18   suppose if I was on their side, I would say, "Hey, let's put

19   his character in front of this jury and let them know who he is

20   and what he does and they'll convict."  And they're probably

21   right.  Then I'll never get a fair trial, and no one who ever

22   sits in that chair will get a fair trial.  If that's what it's

23   come to, so be it.

24   But I'm kind of passionate about this because I

25   absolutely have done enough of these cases to know that no jury

1  in the world faced with this kind of situation is ever going to

2  be able to separate it out and try him based on the indictment

3  that's before this district.  It will be, "Hey, he's a bad guy.

4  He did this.  There's no question he did this.  If we had any

5  question about Four Horns or Running Crane, we know he's a bad

6  guy."  That's what this comes down to, bottom line.

7          THE COURT:  Well, don't we have -- doesn't your

8  argument protect someone who moves around?

9          MR. STEINBERG:  No.  Because, as I said, you already

10 have three events.  If this was a single event, then the

11 Court's argument might have some validity -- and I'm sorry --

12 the Court's suggestion might have validity, but that's not this

13 case.  Because this case, there are already three separate

14 events coming in, three separate victims coming in, three

15 separate time frames coming in.  So I would have to say, "no."

16         THE COURT:  All right.  And, again, I asked you for a

17 case where a District Court or the Court of Appeals has

18 excluded this type of evidence.

19         MR. STEINBERG:  And I'm not aware of any in the Ninth

20 Circuit.

21         THE COURT:  Aware of any in any circuit?

22         MR. STEINBERG:  No, sir.

23         THE COURT:  All right.  Rule 414 was adopted

24 September 3rd, 1994, Mr. Steinberg.  Effective July 9th, 1995.

25 So it's 23 years old.

1    MR. STEINBERG:  Yes, sir.

2    THE COURT:  And in those 23 years, I'm asking you for

3  any court that has excluded this evidence.  You told me it

4  wasn't 20 years old.

5    (Off-the-record discussion between Mr. Steinberg and

6    Mr. Cox.)

7    THE COURT:  Mr. Steinberg, do you have anything else?

8    MR. STEINBERG:  May I have a moment, Judge?

9    (Off-the-record discussion between Mr. Steinberg and

10   Mr. Cox.)

11   MR. STEINBERG:  Judge, I suppose instructive --

12  what's the case?  -- is *United States v Rogers*.  That can be

13  found at 587 F.3d 816.  And it's a Seventh Circuit case, and it

14  does cite *LeMay* and talks about the factors and how Courts

15  still are the gatekeeper and have to be careful when it comes

16  to this kind of --

17   THE COURT:  What was the holding?

18   MR. STEINBERG:  Was not -- well, the holding was you

19  have to be careful, but then they reversed the exclusion.

20   THE COURT:  And the holding was that the evidence

21  should have been admitted?

22   MR. STEINBERG:  Yes.

23   THE COURT:  Okay.  Here's what we're going to do.

24  Mr. Starnes, I am going to allow you to put on two South Dakota

25  victims.

1          MR. STARNES:  Okay.

2          THE COURT:  I'll let you decide.  I want one of

3   them -- D.J.M., That's the hospital setting?

4          MR. STARNES:  That's correct, Your Honor.

5          THE COURT:  All right.  And you can choose between

6   E.H.H. and F.G. regarding -- that was the home situation?

7          MR. STARNES:  That's correct, Your Honor.

8          THE COURT:  All right.  I looked at the similarity of

9   the acts.  All involve various types of alleged sexual abuse

10  with boys between the ages of 8 and 15.  These events took

11  place between -- the Montana events, between 1993 and '95,

12  roughly.  And the South Dakota events are '96, '97, something

13  like that.  Is that correct?

14         MR. STARNES:  That's correct, Your Honor.  We believe

15  that's when they first began.

16         THE COURT:  All right.  The frequency of the prior

17  acts, I'm not sure that's relevant here.

18         The only intervening circumstance was Mr. Weber's

19  move from Montana to South Dakota.

20         The necessity, again, Mr. Steinberg raises a valid

21  point.  It is a necessity because the government can't prove

22  their case and there's a chance that the defendant would be

23  acquitted?  I think the case law has interpreted necessity as

24  whether the government needs these witnesses to either

25  establish the credibility of the alleged victims or to

1  rehabilitate efforts that have been made to undermine the
2  credibility.

3          I think we've had attacks on the credibility of
4  Mr. Four Horns and Mr. Running Crane.  So I'll allow two of
5  those witnesses to testify at this point.

6          MR. STARNES:  Thank you, Your Honor.

7          THE COURT:  Any questions, Mr. Steinberg?

8          MR. STEINBERG:  No, sir.

9          THE COURT:  Okay.

10          MR. STARNES:  Would the Court like us to go ahead and
11  notify you which of the two witnesses, or may we have a few
12  minutes to consider it?

13          THE COURT:  Why don't you have a few minutes to
14  consider it.  We'll be back here -- are they available?

15          MR. STARNES:  We have -- I need to double-check.
16  They are both in the courthouse, Your Honor.

17          THE COURT:  All right.  Let me know as soon as you're
18  ready.  I'd like to get this case moving.  We've had two
19  witnesses in a day and a half.

20          All right.  Let the clerks know as soon as you're
21  ready to continue.

22          MR. STARNES:  Thank you.

23          THE COURT:  We'll be in recess.

24      (Proceedings in recess from 10:52 a.m. until 11:01 a.m.)
25      (Open court.)

1    (Defendant present.)

2          THE COURT:  Please be seated.

3          During the break, I reviewed again the *Rogers* case

4    cited by Mr. Steinberg, and I want to point out a couple of

5    items there.  In the *Rogers* case, the District Court had

6    excluded evidence of a defendant's prior conviction involving

7    any sexual act as well as prior conduct involving internet

8    chats.  He was charged with -- in the case at hand, he was

9    charged with chatting with -- well, let's see -- sexual

10   assault.  And, as the Court noted, he had a propensity for

11   chatting with young girls on the internet.  And so the District

12   Court excluded the evidence of the prior conviction and prior

13   conduct.  And the Court reversed noting that the evidence was

14   relevant for a number of reasons.  First is that the

15   evidence -- prior conduct made it more likely that the

16   defendant, by chatting with the girls, attempted to entice the

17   minor to engage in sexual activity and to send obscene material

18   to her.  I guess, looking at that same analysis, the conduct in

19   South Dakota is relevant to the extent it indicates that

20   Mr. Weber engaged in that type of activity.

21         Second, the motion by *Rogers* is that the evidence

22   established motive by showing that the defendant had a taste

23   for engaging in a crime or a compulsion to engage in it.  I

24   think the South Dakota evidence clearly establishes a motive

25   here.

1    Third, the simple fact that the defendant had done it
2  before makes it more likely to do it again.  That's what they
3  call propensity evidence.  The Court said that Rule 413/414,
4  the propensity analysis is different than 403 and 404.  And it
5  goes on to say that when we're looking at 413 evidence and you
6  apply the 404(b) or the 403 balancing, it's a different
7  standard than simply 404 evidence.  The burden shifts here.

8    And it goes on to say, unlike *LeMay*, the Ninth
9  Circuit isn't going to give you a list.  We just want you to
10 consider a number of factors?  I don't think *Rogers* helps
11 Mr. Weber's argument.  I'm in the Ninth Circuit anyway.  I'm
12 bound by *LeMay*.  I can apply the *LeMay* factors.  I will allow
13 the government to present two of these witnesses:  One
14 involving alleged sexual conduct at Dr. Weber's office or
15 hospital, and one involving alleged sexual conduct at his home.
16 I think that mirrors the allegations by the government in this
17 case regarding -- Mr. Four Horns alleged that activity took
18 place in an office setting, and Mr. Running Crane alleges the
19 activity took place in Dr. Weber's home.  So I will allow one
20 corroborating witness for each of those locations.

21    Have you decided on which ones, Mr. Starnes?

22    MR. STARNES:  Yes, Your Honor.  I believe we would
23 call Fred Gayton.  F.G. would be the individual whose testimony
24 we would present, in addition to D.J.M.

25    THE COURT:  D.J.M. and F.G.  All right.  Are they

1 here?

2       MR. STARNES:  D.J.M. is here.  He's in custody, Your

3 Honor.  We would begin with him as soon as the jury is back.

4       THE COURT:  All right.  Are we ready to proceed,

5 Mr. Steinberg?

6       MR. STEINBERG:  May I ask the Court one question?

7       THE COURT:  You may.

8       MR. STEINBERG:  It's interesting here because I did

9 check the effective dates, and they were both effective

10 September 13th of 1994.  And I'm talking 413/414.

11 Interestingly enough, the indictment alleges conduct before the

12 effective dates.

13       THE COURT:  These are procedural rules.

14       MR. STEINBERG:  I understand.

15       THE COURT:  Okay.

16       MR. STEINBERG:  It's still interesting.

17       THE COURT:  It is interesting.

18       MR. STEINBERG:  So the question now becomes, given

19 the Court's analysis, would the Court reconsider and not allow

20 the testimony of J.M.?  And the reason for that is J.M.'s

21 allegations are completely dissimilar to anything.

22       THE COURT:  No.  I'll reconsider after I hear his

23 testimony.

24       MR. STEINBERG:  I'm sorry?

25       THE COURT:  I said I'll reconsider after I hear this

1  testimony.

2          MR. STEINBERG:  Yes, sir.

3          THE COURT:  I'll give you a chance to argue about

4  that.

5          MR. STEINBERG:  Thank you, sir.

6          THE COURT:  As I explained at the pretrial

7  conference, those rules are preliminary based upon the evidence

8  that gets admitted.  During the next break, we can take that

9  issue up.

10          MR. STEINBERG:  Yes, sir.

11          THE COURT:  So for scheduling, I have a sentencing

12  hearing at 12:30 today.  So we're going to go now, I hope, till

13  about 12:15.  Give me a chance to get a quick bite before the

14  sentencing hearing.  We'll pick up at 1:30 after that.

15          MR. STEINBERG:  Yes, sir.

16          THE COURT:  All right.  Madam Clerk, please bring in

17  the jury.

18      (Jury present.)

19          THE COURT:  Please be seated.  Welcome back members

20  of the jury.  I apologize for the delay.

21          Mr. Starnes, please call your next witness.

22      (Trial proceeding continued.)

23                          --o0o--

24

25

REPORTER'S CERTIFICATE

I, Yvette Heinze, a Registered Professional Reporter and Certified Shorthand Reporter, certify that the foregoing transcript is a true and correct record of the proceedings given at the time and place hereinbefore mentioned; that the proceedings were reported by me in machine shorthand and thereafter reduced to typewriting using computer-assisted transcription; that after being reduced to typewriting, a certified copy of this transcript will be filed electronically with the Court.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys to this action, nor financially interested in this action.

IN WITNESS WHEREOF, I have set my hand at Great Falls, Montana, this 18th day of March, 2019.


/s/ *Yvette Heinze*
_____
Yvette Heinze
United States Court Reporter