IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>  vs.<br><br>STANLEY PATRICK WEBER,<br><br>        Defendant.<br>_____ | )<br>)<br>)<br>)  Criminal Docket<br>)  No.  CR 18-14-GF-BMM<br>)<br>)<br>)<br>)  Court of Appeals<br>)  No. 19-30022 |

Partial Transcript of Trial with a Jury
Defense Closing Statements

Missouri River Federal Courthouse
125 Central Avenue West
Great Falls, MT 59404
Thursday, September 6, 2018
10:42 a.m. to 11:05 a.m.

BEFORE THE HONORABLE BRIAN MORRIS

UNITED STATES DISTRICT COURT JUDGE

Yvette Heinze, RPR, CSR
United States Court Reporter
Missouri River Federal Courthouse
125 Central Avenue West
Great Falls, MT 59404
yvette_heinze@mtd.uscourts.gov
(406) 454-7805

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

**APPEARANCES**

PRESENT ON BEHALF OF THE PLAINTIFF,
THE UNITED STATE OF AMERICA:

    Jeff Starnes
    Assistant U.S. Attorney
    OFFICE OF THE U.S. ATTORNEY
    119 1st Avenue North, Suite 300
    Great Falls, Montana 59401

    Lori A. Harper Suek
    Assistant U.S. Attorney
    U.S. ATTORNEY'S OFFICE
    2601 Second Avenue North, Suite 3200
    Billings, MT 59101

PRESENT ON BEHALF OF THE DEFENDANT:

    Harvey A. Steinberg
    SPRINGER AND STEINBERG
    1600 Broadway, Suite 1200
    Denver, CO 80202

    Nicole L. Siefert
    RHOADES, SIEFERT & ERICKSON, P.L.L.C.
    430 North Ryman, Second Floor
    Missoula, MT 59802

    Ryan T. Cox
    SPRINGER AND STEINBERG
    1600 Broadway, Suite 1200
    Denver, CO 80202

              --o0o--

CLOSING STATEMENT BY MR. STEINBERG

PROCEEDINGS

(Open court.)

(Defendant present.)

(Jury present.)

(During Day 3 of the above-entitled trial, at 10:42 a.m., proceedings were as follows:)

THE COURT: Thank you, Mr. Starnes.

Mr. Steinberg.

MR. STEINBERG: Thank you, Judge.

Good morning, Folks. So I want to remind you of a couple of things. One, this trial is about two individuals. It's about Mr. Four Horns, and it's about Mr. Running Crane. Those are the two individuals that we're on trial for in this courtroom these several days. And you have to make a decision in terms of the evidence, whether or not those individuals, in terms of what the government has brought forward, have those counts been proven beyond a reasonable doubt?

And I listened intently as Mr. Starnes went on, and he said about Mr. Four Horns, "He did not know who to tell or how to tell." And then I remembered Ms. Suek's opening statement where she said, "You are going to hear from Dr. Becky Foster." They decided not to call Dr. Becky Foster. But remember her opening where she talked about the fact that Becky Foster, who was a psychologist, saw Joseph Four Horns when he was young because he couldn't deal with the fact that his dad

1  had died.  Remember those statements?  And I'm assuming they
2  didn't call Dr. Foster because --
3           MR. STARNES:  Speculation and facts not in evidence.
4           THE COURT:  Let's stick to what they did.
5           MR. STEINBERG:  It's the evidence or lack of
6  evidence, Judge.
7           And my position, so you know, is Foster saw
8  Four Horns.  We heard that from Mr. Four Horns.  Remember him
9  saying, "Yeah, I saw her"?  And remember him saying, "The
10 reason that I saw her was because I couldn't deal with the fact
11 that my dad had died, and that's when I saw her"?
12          And we anticipated they would bring her on because we
13 were going to ask her, "Hey" --
14          MR. STARNES:  Objection.  Facts not in evidence.
15          THE COURT:  Let's stick to what was presented to the
16 jury.  Okay?
17          MR. STEINBERG:  I will.
18          THE COURT:  Well, let's get to it now.  You are not
19 now.
20          MR. STEINBERG:  So what I'm trying to tell you is
21 that, in fact, Four Horns testified that Foster saw him.  They
22 talked.  But yet he never revealed this situation to her.  Why?
23 Well, he wasn't asked or it wasn't on his mind or it didn't
24 happen.
25          He said -- my colleague said, "You didn't know who to

1  tell or how to tell."

2          I asked him when he was on the stand, "How many times
3  were you asked by psychologists in the prisons if you'd ever
4  been abused, molested?"  I said, "Was it at least ten different
5  occasions?"

6          He said, "Yes.  On ten different occasions, I was
7  asked that, and I denied that."

8          Then we brought out, "Listen, how is it that you were
9  in a situation where you finally told this?"

10         "Because," he said, you know, "I denied it initially.
11 I said no to" -- it was Mr. Bennett that interviewed him.  "I
12 said no to Mr. Bennett.  I said no to Mr. Bennett.  And then I
13 found out I was going to come to Montana."

14         And I said, "Hey, have you had any visits with your
15 family since you have been in Kentucky?  Since you've been in
16 Pennsylvania?"

17         "No."

18         "Did you get visits when you were in Montana?"

19         "Yes."

20         "And, by the way, were you trying to withdraw the
21 plea that you made where you said, 'I was guilty of that
22 robbery'?"

23         He said, "Oh, yeah.  And now the government is giving
24 me a new hearing.  Even though it was denied initially, I'm
25 getting a new hearing."

CLOSING STATEMENT BY MR. STEINBERG

1   This is a gentleman who, by their own admission is --
2   THE COURT: Let's have a sidebar, please.
3   (Discussion on the record at sidebar.)
4   (Defendant present.)
5   THE COURT: Mr. Steinberg, I'll give you some
6   latitude, but let's stick to the facts. I give the hearing.
7   The government doesn't have a choice whether there's a hearing.
8   Do you understand that?
9   MR. STEINBERG: The government is not objecting to
10  it, having a new hearing. So this is -- you know, this is
11  closing. You've done everything you can to interrupt me.
12  You've done everything to break up my approach and embarrass me
13  in front of the jury, and enough is enough. I'm trying to
14  defend somebody. And what I don't need is some little thing
15  like that that has nothing to do with it. Clearly, the
16  government did agree to it, and you know that.
17  (Open court.)
18  (Defendant present.)
19  MR. STEINBERG: So as I was saying, the government's
20  agreeing to give him a new hearing. He knows that. He's
21  somebody who has been institutionalized, who knows the system,
22  and knows how to work the system. And isn't it ironic that on
23  little things that were clear and important, he feigned a lack
24  of memory.
25  The question, "Hey, did you meet with these

attorneys?  Had you met with these attorneys before?"

"No.  I never have."

And then suddenly it was, "Well, yes, I guess I did meet with them," after they got up and asked him.  He didn't say it on cross.  He denied it.  But on redirect he said, "Oh, yeah, now I remember.  I did meet with them."  And that was just the day before.  "And they played me the entire tape."

And what's relevant about the tape, by the way, is he says --

MR. STARNES:  Objection.  Facts not in evidence.

THE COURT:  Stick to the facts, please.

MR. STEINBERG:  I am.

They indicated and the witness indicated that, in fact, they had played him the tape, a 52-minute tape.  That was the evidence.

When I asked him the questions, "Oh, I don't remember.  I never met with anyone."

Then you take it a step further, and the step further is this:  We said to him, "Hey, look.  In terms of the situation, in terms of your memory, did you have your medication the very day that you made these statements?"

Remember what his answer was?  "No, I wasn't on that medication."

And I asked him, "When you are not on that medication, how does that affect you?"

1  "Well, when I'm not on that medication, I am not
2  calm. I hear voices. I see things. These voices tell me to
3  do things."
4  Then, when counsel said to him, "Hey, can you
5  identify Dr. Weber? Can you tell us where he is? Who he is?"
6  Who does he point to? He points to me.
7  So then what do they do? "Oh, do you have your
8  glasses? Can you see? Can you see?"
9  "Yes, yes. I can see."
10  So when you take a look at reasonable doubt --
11  Would you mind putting up Number 28?
12  (Displayed.)
13  MR. STEINBERG: 28 talks about reasonable doubt. And
14  it talks about, "A reasonable doubt" -- and this is the second
15  paragraph -- "is a doubt based upon reason and common sense.
16  It may arise from careful and impartial consideration of all of
17  the evidence or from lack of evidence."
18  I want to emphasize "from lack of evidence." Okay.
19  You have a situation where you are being asked to believe
20  someone. And it's someone who by definition -- and by, if you
21  will, the government's own concession in their closing -- is
22  someone who is a criminal; who has been institutionalized for,
23  unfortunately, a long time; and knows how to manipulate the
24  system; and knows how, if you will, on direct, to tear up, but
25  when it came to cross, there was none of that emotion. It was

CLOSING STATEMENT BY MR. STEINBERG

hostility. It was denial.

And what's poignant about his testimony was the lack of detail in terms of the events. It's easy to come in and say, "Yes, I was forced to do certain things." But where is the detail? Describe the room. What was he wearing? What were you wearing? What did you do afterward? Oh, what's your relationship with your brother?

The brother came in here. And if the implicit suggestion is somehow that because he was abused and he became a criminal because of that -- I mean, I suppose that's the thread that was trying to be planted -- that's belied by the fact that unfortunately his brother, who says, "Hey, I was never subject to any kind of touching. We were close. We looked after each other." So would Joseph want to protect his brother? And put aside that he's not going to talk about it because he's embarrassed by it. Put aside that he's 11 years old and seeing a psychologist regularly for issues in terms of his inability to accept his father's death. Put aside the fact that he goes back in terms of his version. Wouldn't he want to protect his brother and make sure his brother didn't go back? Where is that? Where is that?

And this is a kid who, remember, when he was 11, he told you that he was a member of the Crips and that he was a gang member and has used drugs from 11 years on.

"And had that affected your mind?"

CLOSING STATEMENT BY MR. STEINBERG

"Oh, yes. It's affected it." Well, common sense tells you that.

And so all of a sudden, now, he's approached, not by this officer, but by Officer Bennett. And he says, "No, it didn't happen. No, there was not oral sex. No, that never happened to me. Will I get to go to Montana?"

"Yeah." Boom.

And then the suggestion goes on. The suggestion goes on, and he's here, and sure he doesn't want to testify to it. And sure he says, "I'm never going to," if you will, "talk about it again." But he got what he wanted. He got to go to Montana. He gets to see his family. And I confess. I can't recall how many years it had been since. But I do recall absolutely that he said, "I haven't been able to see my family in Kentucky. I haven't been able to see my family in Pennsylvania. They took my visits away from me." But he got them here. He knows how to work the system.

So when it comes to believing someone, in terms of that credibility instruction and in terms of reasonable doubt, you say, "Is this the kind of person that I would" -- let's do something mundane, an important issue in your life: buying a house, buying a car, sending your kids to school. And you say to yourself, "Hey, look. I want to make a decision, and I'm going to have to rely on this person." And Mr. Four Horns is the salesman. And he's selling you the car, the house, the

1  school. And then you find out that he says he suffers from
2  schizophrenia. He's not on his medication. He's been
3  convicted of numerous felonies, including violent felonies. He
4  hasn't, basically, said anything about this for years. He's
5  given a small thing in your mind, but, obviously, a big thing
6  in his mind, -- a big thing. And that is the ability to come
7  see his parents. The ability for the government to give him a
8  new hearing. Maybe withdraw the plea. Maybe get out of
9  prison. What does he have to do? They come to him. And he
10 knows the system. And, sure enough, he gives them what they
11 want. He gives them what they want.
12         And then you say to yourself, "Okay. Am I going to
13 buy this house? Am I going to buy this car? Am I going to
14 send my kid to this school based on what Four Horns has told
15 me?" He's the salesman. And you say to yourself, "Probably
16 not."
17         Because the little things, like, when I asked
18 Investigator Muller, "What about those records in terms of
19 these medical records? How many times did my client see
20 Mr. Four Horns?"
21         And the response was, "I don't know. I don't know."
22         "Do you have the medical record?"
23         "Yeah, somewhere."
24         Well, wouldn't that be something you'd want to see?
25 Isn't that that little corroboration that you would want to

CLOSING STATEMENT BY MR. STEINBERG

1  see?  Where is it?
2          In terms of Mr. Running Crane --
3          Can you put up Number 14, Instruction 14.
4      (Displayed.)
5          MR. STEINBERG:  This is the first count as it relates
6  to Mr. Running Crane, and that's Count 14 -- I'm sorry --
7  that's Count Number 4.  Take a look at the second paragraph
8  from the bottom.  This is what you have to find:  "For the
9  purposes of Count 4 of the indictment, the term 'sexual act'
10 means that the defendant exposed his penis to G.R.C."
11         Do you have any evidence that on that first encounter
12 that he expose his penis?  Remember, I went to the witness, and
13 I put my hand down, and I said, "Is this as close as it got?"
14 And he got there.  And he said, "Yeah."  There was zero
15 evidence -- zero evidence presented that he ever exposed his
16 penis.  And these are the instructions you have to follow.  It
17 means that the defendant exposed his penis and asked to allow
18 the defendant to place his penis in his mouth.  No evidence
19 that he exposed his penis.  The law requires you to find my
20 client not guilty of 14.
21         In terms of the next count, Number 17 --
22         Could you put up Instruction Number 17?
23     (Displayed.)
24         MR. STEINBERG:  -- this relates to Count 5.  Take a
25 look at Element Number 2:  "G.R.C." -- Mr. Running Crane --

"was incapable of appraising the nature of the conduct."  They are to prove that he was incapable of appraising the nature of the conduct.

Now, keep in mind this, and let's focus on this: Clearly, the inference that the cross-examination was trying to plant with the witnesses was that, "Hey, it's only the vulnerable ones that my client picks on."

Well, there's no question in terms of the evidence that of all of the individuals that were part of this group that went over there, Mr. Running Crane was the toughest, the one who got in fights, the one who was called Big James because he was the biggest.  And, if I recall, he testified that he was about 215 pounds at this time.  And I think he said he was about five nine.  So, if the theory that the government is trying to espouse here -- and this is what they want you to follow -- is he picked out the weakest, the most vulnerable.  Of all of the ones you wouldn't want to pick out, it would be the strongest, the toughest.

Then they tried to say, "Hey, look, he would always have somebody alone so they were isolated."  So what do we do?  We bring you a witness who says, "I was alone.  By the way, I went over there at 4:00 in the morning, and I knocked on the door.  And I was intoxicated.  And he let me in.  Told me to sleep on the couch.  Went to bed and said, 'I have to get up at 7:00 a.m. because I have to go to work.'"

Then the cross-examination was "Hey, did any other doctor, did any other dentist, did any other professional treat you this way?" And I told you before he was an odd duck, you know. He was an odd duck because he actually did things for these kids. He actually cared for these kids. He let them come to his house. He fed them. He gave them soda. He let them hang out. And sure the rumors abound.

And you heard from -- what did we hear from? Four? Three kids? All who were part of this group. And interestingly enough, Mr. Running Crane, who didn't come there that often, is the only one they brought in that said, "Yeah, he provided alcohol to the kids." All of the other kids said, "No." And that is confirmed by their own witness Mr. Meineke. Because he's the one who said, "I had to steal." Remember he said, "I stole" -- I think he said, "I stole a box of wine."

If, in fact, this were the situation that they tried to plant that this was a situation where he would get these kids drunk and there would be alcohol there and he was just plying with alcohol, why is it that kids that we brought in -- all of them, as well as their own witness confirmed -- "he wasn't giving any kids alcohol."

He made the mistake of befriending them. He made the mistake of treating them with care. He made the mistake of letting them come over. And I suppose the lesson here is he shouldn't have. He shouldn't have provided a place for them

where they could go to.  He shouldn't have been nice to them.
He should have treated them just like everybody else did.
Hands off.  Don't care.  Don't provide them anything.  And he
wouldn't be here.  That's what this case stands for.

        No good deed goes unpunished.  And so what do they
do?  They bring in other witnesses to say, "Hey, look.  He's a
bad guy.  He's involved in all of these other acts."

        And then I hark back and I remember Mr. Martin saying
something.  "Who did you tell?"

        "The only person I told was my friend Joe.  I knew
they were coming.  I knew they were coming."  He knew they were
coming to talk to him.

        And when I asked Mr. Running Crane, "Do you know
Mr. Four Horns?"  Remember that exchange?  That exchange was
very limited.  "Well, yeah, I know of him."  These kids all
knew each other.  They all grew up together.  They're all
members of the same tribe.

        When we tried to get Mr. Running Crane to talk about
his relationship with Mr. Four Horns -- remember that?  -- it
was, "Yeah, I knew of him," but that was it.  Didn't want to
admit any kind of relationship, any kind of understanding, any
kind of agreement, or anything like that.

        And isn't it odd that Mr. Martin said, "Yeah, I knew
they were coming.  The only person I ever told was my friend
Joe."

CLOSING STATEMENT BY MR. STEINBERG

1  So when you look at this case and you say to
2  yourself, "It's a 20-plus-year old case that truly has no
3  corroboration in terms of trying to defend, in terms of the
4  evidence."  Is it the old hospital?  Is it the new hospital?
5  What does any of this look like?  Where are the medical
6  records?  Where is the camera?  Pictures?  Remember, we heard
7  that supposedly there were pictures taken?  Where is this?

8  You have to have reasonable doubt, and you have to
9  say to yourself, "I don't like it.  Something might have
10 happened.  Certainly, there's a lot of dust."  But when you are
11 going to be fair and when you are going to follow the law and
12 when you are going to -- which you must -- take out emotion and
13 not allow the passions to be inflamed and say, "I want to look
14 at this case as a juror must, with a dispassionate -- let's
15 look at the facts.  Let's look at the evidence."  You say to
16 yourself, "Who are the people who are the sales people here?
17 What's this really about?"  Is it about the rumor?  Is it about
18 the innuendo?  Or is it about the truth?  And that's the key to
19 this case.  You really don't know.  You really, really don't
20 know.

21 And because you don't know, and as that
22 Instruction 28 says, "Proof that leaves you firmly convinced."
23 You have to have your doubts, and those are reasonable based on
24 the evidence.  And because of that, the law requires you -- you
25 don't have to like it -- but the law requires you to find my

CLOSING STATEMENT BY MR. STEINBERG

1  client not guilty.  Thank you.
2          THE COURT:  Thank you, Mr. Steinberg.
3      (Trial proceedings continues.)
4                      --o0o--
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

REPORTER'S CERTIFICATE

I, Yvette Heinze, a Registered Professional Reporter and Certified Shorthand Reporter, certify that the foregoing transcript is a true and correct record of the proceedings given at the time and place hereinbefore mentioned; that the proceedings were reported by me in machine shorthand and thereafter reduced to typewriting using computer-assisted transcription; that after being reduced to typewriting, a certified copy of this transcript will be filed electronically with the Court.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys to this action, nor financially interested in this action.

IN WITNESS WHEREOF, I have set my hand at Great Falls, Montana, this 18th day of March, 2019.


/s/ *Yvette Heinze*
_____
Yvette Heinze
United States Court Reporter